**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| FORUM ON OPEN ACCESS TO GOVERNMENT RECORDS INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No.: |
| DALLAS COUNTY HISTORICAL FOUNDATION, d/b/a THE SIXTH FLOOR MUSEUM AT DEALEY PLAZA, and NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | § § § § § § | Jury Trial Demanded |
| Defendants. | § § | |

**ORIGINAL COMPLAINT**

FORUM ON OPEN ACCESS TO GOVERNMENT RECORDS INC., ("Plaintiff" or "Forum") by and through the undersigned counsel, brings this COMPLAINT for declaratory relief under the Copyright Act against DALLAS COUNTY HISTORICAL FOUNDATION d/b/a THE SIXTH FLOOR MUSEUM AT DEALEY PLAZA (the "Sixth Floor Museum" or "Museum" or "Defendant") and for declaratory and injunctive relief under the Freedom of Information Act ("FOIA") against the NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, an agency ("NARA," "National Archives," or "Defendant"; together with the Museum, "Defendants").

1.      The copyright in the Zapruder film is invalid because it is not an original work.

2.      The American public has long been informed that the Zapruder film is the most complete visual record of what happened to JFK in Dealey Plaza. But the film that survives today is not Mr. Zapruder's original footage. It is an altered version.

3.      Defendants both seek to suppress this fact because it embarrasses the government and makes irrelevant the Museum's only attraction as the purported origin of the shooting.

4.      Copyright protects only original works of authorship. The existing altered version is not entitled to protection as an original work.

5.      On May 6, 2025, the Forum published a book written by its attorney, Mark L. Javitch, called *SCAM: The Zapruder Copyright -- How the Sixth Floor Museum Continues the Coverup* ("*SCAM*"). *See* Exhibits A-1; A-2; https://www.amazon.com/Scam-Zapruder-Copyright-Continues-Coverup/dp/B0F7RTPMHW/



6.      The book contains 73 frames from the Zapruder film that the Museum asserts are subject to copyright. The book is available for sale on Amazon.com in Kindle, Paperback, and Hardcover formats. The book has been well received with the Kindle version currently ranking well in the categories of Copyright Law and 1960s History of the U.S.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                          **Page 2 of 55**

7.      In numerical order, Plaintiff's book publishes Zapruder frames 1-4, 131-135, 144, 154-157, 166, 174-177, 193, 201, 202, 207-212, 216, 219, 220, 221, 228, 237, 244, 262, 265, 269, 273, 276, 277, 289, 294, 304, 311-317, 320, 321, 323, 327, 328, 335, 337, 386, and 14 frames of Zapruder's employees in Dealey Plaza prior to the frame called "frame 1." Defendants assert that the Museum's copyright protects each of these frames.

8.      The book explains the evidence that the Zapruder film in the National Archives is not original.

9.      Modern forensic analysis and declassified interviews of top officials have shown that it is an altered version.

10.      One of the alterations is that an artificial "black patch" was added over the back of JFK's head in the place where doctors saw a bullet exit wound.

11.      It was likely altered to support Defendants' theory that Oswald was the sole gunman shooting from the Museum's location, the sixth floor of the former Texas School Book Depository.

12.      In 2010, researchers exposed that the black patch was also present on the Zapruder frames in the Museum's collection.

13.      The researchers caused a new firestorm when they discovered *a second alteration* during a subsequent visit. The Museum *altered the frames* to hide the previous alteration.

14.      Plaintiff seeks to expose this manipulation of historical evidence in its book. Accordingly, Plaintiff requested permission to access and publish Zapruder frames from the Museum and the National Archives. Despite being public records under the JFK Act, those requests were denied.

15.      The National Archives and the Museum seek to suppress the fact that the Zapruder film was altered because it strongly suggests a broad conspiracy. This endangers the Museum's very existence.  A broad conspiracy largely exonerates Oswald, which undermines

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    **Page 3 of 55**

Defendants' theory and the Museum's entire relevance as a historical institution. Once the evidence of Zapruder film alteration becomes widely known by the public, the Museum will be exposed as a distributor of propaganda rather than a genuine truth-seeking organization. Defendants are willing to go to great lengths to prevent this from happening.

16.     Defendants wrongfully block Plaintiff's legitimate FOIA requests for copies of primary Zapruder materials. The National Archives has several versions of the Zapruder film and frames, and the Museum has frames from *Life Magazine* that it obtained from the Zapruder family.

17.     Congress has passed many laws to ensure that this information is public, yet Defendants defy existing law to maintain secrecy of the film. NARA has millions of items in its collection, yet it applies special rules that only govern the Zapruder film.

18.     For instance, Plaintiff needs to inspect the National Archives' and the Museum's version of frames 317, 321, and 323 to ascertain how the black patch appears in those versions and how the Museum accomplished its alteration. Plaintiff requested these frames in 2024, but its requests have gone unanswered.

19.     Since the original film decays over time, these copies are historically valuable to preserve what is on the Zapruder film. In addition, since there is evidence of alteration, Plaintiff seeks to compare existing copies of different versions to determine whether those primary materials agree with Plaintiff's theory.

20.     Defendants also denied Plaintiff access to and licenses to publish these primary Zapruder materials, necessitating this lawsuit.

21.     After Plaintiff obtains these additional materials, Plaintiff plans to revise its book with additional materials.

22.     The Museum has also issued threats to prevent documentaries from playing Zapruder material if the documentary argues that the film has been altered.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 4 of 55**

23.     Plaintiff seeks declaratory relief against the Museum that the copyright is invalid and/or that Plaintiff's book is entitled to a determination of fair use.

24.     Plaintiff also seeks injunctive relief against the National Archives for its failure to comply with its affirmative duty to post the Zapruder frames in the electronic reading room because they are frequently requested records.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action with regards to the Museum because the dispute arises under the United States Copyright Act of 1976, 17 U.S.C. § 101 et seq. (the "Copyright Act") and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act). Thus, this Court has original jurisdiction over the Museum for the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338.

26.     The Court has personal jurisdiction over the Museum because it maintains its principal place of business in this district. For the same reason, venue is also proper under 28 U.S.C. § 1391(b)(1).

27.     This Court also has subject matter jurisdiction, personal jurisdiction and is in the proper venue regarding the dispute with NARA pursuant to 5 U.S.C. § 552(a)(4)(B). Plaintiff is a resident of this district.

## PARTIES

28.     Plaintiff Forum on Open Access to Government Records, Inc. is a corporation organized and existing under the laws of the state of Texas. Its primary address is in Dallas, Texas.

29.     Defendant Dallas Historical Foundation d/b/a The Sixth Floor Museum at Dealey Plaza is a non-profit organization incorporated in Texas. Defendant is a JFK assassination museum.

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 5 of 55**

30.     Defendant National Archives and Records Administration ("NARA") is an agency of the federal government within the meaning of 5 U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702, which has possession, custody, and/or control of the records that Plaintiff seeks.

31.     The headquarters of NARA is located at 700 Pennsylvania Ave., NW Washington, DC. 20408.

### PLAINTIFF FORUM ON OPEN ACCESS TO GOVERNMENT RECORDS, INC.

32.     The Forum is dedicated to making public records more accessible to the public.

33.     Many of the National Archives' files are collecting dust in boxes and may only be seen by personally visiting its facility in College Park, Maryland. The Forum took the time to research historical files related to the Zapruder film, visit the National Archives in College Park, Maryland, request to see the appropriate boxes, photograph each page individually, index the files chronologically, and upload them to its website.

34.     On its website, ZapruderFilm.com, the Forum now maintains the largest-ever collection of historical documents related to the Zapruder film obtained from the National Archives. The Forum published over 100 (one hundred) primary documents ranging from the contract between Mr. Zapruder and Time, Inc. governing the licensing of the Zapruder film, to pleadings from the famous 1968 case *Time v. Geis* to the correspondence of the Assassination Records Review Board that declared the film to be a public record. These documents are available to the public for free at ZapruderFilm.com. The Forum is continuing to search for more Zapruder-related documents at the National Archives and will continue to publish them on an ongoing basis.

35.     The Forum also published a book arguing that today's Zapruder film is not the original film, but instead an altered version. Accordingly, any copyright should be invalidated. The book reprints seventy-two (72) frames from the existing Zapruder film that are allegedly copyrighted by the Museum.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                              **Page 6 of 55**

## FACTUAL BACKGROUND

36.     President Kennedy was assassinated by gunfire on November 22, 1963, shortly after his motorcade turned onto Elm Street and passed the Texas School Book Depository. One now-famous amateur photographer, Abraham Zapruder, appeared to capture on film what happened next.

37.     Beyond these basic facts, however, much about the assassination remains fiercely disputed. Public confidence in the integrity of the official investigation is low.

38.     In the aftermath of JFK's assassination, President Johnson assembled individuals he described as the most esteemed and trustworthy members of the public to generate a report that would attempt to settle pending questions.

39.     On September 24, 1964, the Warren Commission issued its report concluding that Lee Harvey Oswald was the only shooter responsible for the assassination. Twenty-six volumes of evidence purportedly in support of its conclusion were later released on November 23, 1964.

40.     The Warren Commission's conclusion became known as the "lone gunman theory."

41.     The Warren Commission depended heavily on the Zapruder film and considered it the most credible evidence available. Zapruder frames 171-334 were printed in the Commission Volume XVIII (skipping 208-211 and reversing the order of some frames).

42.     The official version of the story is that Abraham Zapruder, using his 8mm Bell & Howell Zoomatic movie camera, and perched on a concrete abutment along Elm Street in Dealey Plaza, created the most comprehensive visual record of JFK's assassination from an ideal vantage point. It seemed to detail the critical moments before, during, and after the shots were fired at Kennedy's limousine. However, the official version is only the starting point for learning the history of the Zapruder film.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 7 of 55**

**Zapruder Lied About How Much He Earned from the Sale**

43.    On November 23, 1963, the day after JFK's death, Mr. Zapruder sold the print rights to Time, Inc. for $50,000 in a no-bid sale without even considering offers from other media outlets. After the sale to Time's Richard Stolley, he said he walked out the back of Zapruder's office with the original and sent it to *Life's* publishing plant in Chicago.

44.    On November 25, 1963, the day of the state funeral, Mr. Zapruder and Time revised their deal to include all rights to the film, not just print rights.

45.    It is commonly reported that the price Time would pay Mr. Zapruder was increased from $50,000 to $150,000, in installments of $25,000 per year (or $1,540,000 in 2024 inflation-adjusted dollars).

46.    However, the agreement also provided that his heirs should continue to receive up to $25,000 per year from a split in licensing revenue. The agreement restricts any transfers that would affect the underlying requirements.

47.    Mr. Zapruder lied about the income he expected to receive from selling the film. He told the Warren Commission that he earned "only" $25,000 from selling the film, and that he gave the entire $25,000 to charity (the wife of slain Dallas police officer J.D. Tippitt). But the truth was that he expected to earn $25,000 per year *for as long as the copyright could be extended*.[1]

48.    It is normally thought that Zapruder lied "only" about the $125,000 he expected to receive. After the first payment, which Zapruder acknowledged, Time was to pay Zapruder five additional installments of $25,000 per year over the next five years.

---

[1] Zapruder, Abraham. *Contract Between Abraham Zapruder and Time, Inc.*, signed by Richard Stolley on behalf of Time, Inc., 25 Nov. 1963. Letter to C.D. Jackson. *Historical Documents from the National Archives on the Zapruder Film*, ZapruderFilm.com, https://zapruderfilm.com/p/historical-zapruder-documents (last accessed June 4, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 8 of 55**

49.     Mr. Zapruder's lie was not "only" about $125,000, *it was in the magnitude of $1,375,000.* After the first six payments of $25,000, Time was required to *continue the $25,000 yearly payments* funded by the film's proceeds for as long as Time (or any subsequent owner) could maintain the copyright. This meant that Zapruder expected he and his heirs to receive $1.4 million, over *56 years*, the maximum term under copyright law at the time.

### Time, Inc. Suppressed the Film While Lying About What It Showed

50.     Time cynically used its sole possession of the film to lie about what it showed, likely to prop up Defendants' lone nut theory.

51.     Time, Inc., only released selected frames (some in black and white) and never allowed the public to see the motion picture.

52.     First, Time left out what most consider to be the most major event that was visible in the film. After being hit, the Zapruder film showed JFK going back, and to the left. This would indicate the fatal shot came from the front, not the back, and contradict Defendants' theory.

53.     Next, Time also falsely described events that are not visible in the film.

54.     Paul Mandel wrote an article in *Life* published on December 6, 1963. The article said the film shows JFK "turning his body far around to the right as he waves to someone in the crowd. His throat is exposed – toward the sniper's nest -- just before he clutches it."

55.     Author Dick Rusell wrote about Mandel's article: "That account was patently false, since the film clearly showed that the president had never made such a turn. But at the time, nobody outside Time-Life or the government had seen the film."

56.     Time distributed six frames to Newspapers across the country with similarly misleading captions. Regarding the direction of the president after the fatal shot, instead of noting the back and to the left movement, the newspaper captions said that the president's head "collapsed on her shoulder." Another version read that he "falls into his wife's lap."

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 9 of 55**

57. Further, in some versions of its October 2, 1964, Warren Commission Issue, *Life* published frame 313 with the caption explaining the head exploding "forward," attempting to show that the shot struck from behind.

58. Time's false narrative of the assassination was not challenged because it controlled access to the film. Time was trusted to tell the truth about the assassination.

59. Requests to get *Life* to release footage it had not shown to other media outlets were denied.

60. The Warren Commission also disguised the backward movement by reversing two frames.

61. An early JFK researcher wrote "The Commission did not acknowledge the slam of the body against the back of the seat; it did not solicit opinion from experts as to whether that body recoil conceivably could be reconciled with a shot from behind the car; and it did not inform the public – the vast majority of whom will never view the Zapruder film at the National Archives – that the camera had recorded events central to the establishment of the truth and utterly inconsistent with the lone-assassin thesis."

62. Mr. Zapruder aided in the deception by failing to correct any of Time's inaccuracies about his film. Perhaps because Mr. Zapruder was to be paid incrementally over a period of many years and declined to correct any of Time's falsehoods.

63. Time was successful in this censorship, suppression, and falsification for several years until it lost its attempt to prevent the truth from emerging through an unsuccessful Copyright lawsuit in 1968.

**Time Fails to Disclose Frames were Damaged and Lost When Registering the Copyright**

64. Time registered the copyright as an unpublished film by Abraham Zapruder in 1967. Mysteriously, it was registered as a 10 second film, when the version on the Museum's website is over one minute long.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                **Page 10 of 55**

65.     Further, Time's registration fails to disclose that the film is not the original, visibly so as to frames 154-157 and 207-212. At the time of the registration, Time was aware that a technician had damaged the film during the weekend of the assassination, yet it failed to disclose that to the Copyright Office.

### Time Sues to Prevent Publication of Zapruder Frames Showing the Backward Head Movement in *Six Seconds in Dallas*

66.     When Professor Josiah Thompson tried to publish a book arguing that the Zapruder film showed shots from *two* directions, Time, Inc. sued to prevent his books from being sold.

67.     However, it was determined on summary judgment that unauthorized copying and printing Zapruder frames amounted to fair use. *Time Inc. v. Bernard Geis Assocs*, 293 F.Supp. 130, 146 (S.D.N.Y. 1968).

68.     The court held that "there is a public interest in having the fullest information available on the murder of President Kennedy, saying that "the copying by defendants was fair and reasonable."

### Time Abandons the Copyright by Failing to Appeal, Not Enforcing the Copyright, and Giving it Away for $1

69.     Time did not appeal its lost attempt to enforce the copyright in district court.

70.     Neither Time nor its successors filed another copyright action over the Zapruder film. Time still controlled access to the primary Zapruder materials, but it acquiesced to widescale infringement.

71.     The first public showing of the film was during the 1969 trial of Clay Shaw prosecuted by New Orleans District Attorney Jim Garrison. Garrison subpoenaed the film from Time. Garrison also argued that the film showed shots from more than one direction.

72.     After the trial, the film was copied widely and disseminated to the public in various forms.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 11 of 55**

73.    Cheap copies were made and sold on VHS for less than $10.

74.    Researchers around the country used copies of the film to present shows and informational lectures on the assassination.

75.    The film was aired as part of a Los Angeles area television newscast on February 14, 1969.

76.    The Zapruder Film was on the late-night television show Underground News with Chuck Collins, originating on WSNS-TV, Ch 44, Chicago in 1970.

77.    On March 6, 1975, Geraldo Rivera aired a copy on Good Night America for the first time on before a national audience on network television.

78.    Time did not sue ABC or any other infringers.

### Time Attempts to Give Away the Film

79.    In 1974, Time tried to donate the film to the government.

80.    On October 15, 1974, Meyer H. Fishbein of the National Archives wrote:

Lawrence Laybourne, Vice President of Time, phoned to let me know that he is still proposing transfer of the Zaprudo [sic] film of the assassination to us. (He phoned last June to ask about our interest. It is the copy sold to *Life*.). Lawyers are questioning whether the film has any monetary value for the media. He will continue to propose an offer to us.[2]

81.    However, Time decided it *could not* donate the film to the government, because such a donation was not permitted by the original contract between it and Zapruder, which required that any owner of the film must pay the Zapruder heirs up to a $25,000 share of revenue from licensing the film.

---

[2] Fishbein, Meyer H. "Letter to File Regarding Time Inc.'s Proposed Transfer of the Zapruder Film." October 15, 1974. *Historical Documents from the National Archives on the Zapruder Film*, *ZapruderFilm.com*, ZapruderFilm.com, https://zapruderfilm.com/p/historical-zapruder-documents (last accessed June 5, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 12 of 55**

82.     By 1975, Time finally abandoned the film by failing to enforce any infringement and then giving it away for a nominal amount of $1 to the Zapruder family.

83.     However, the transfer was ineffective. An abandoned copyright cannot be transferred.

84.     Besides the transfer being ineffective because the copyright had been abandoned, the documents purporting to effectuate the transfer were also ineffective because they are unsigned or contain illegible signatories.[3]

### Henry Zapruder Controls Access and Collects "Royalties"

85.     The failed transfer was a final act of abandonment after years of unchecked infringement.

86.     Nonetheless, Henry Zapruder, Abraham's son, established a family partnership, LMH Co, which purported to license the film and collect royalties.

87.     But Henry Zapruder's ability to collect money was based on physical control, not by copyright, which had been abandoned. Instead, he collected purported royalties through physical control over the primary Zapruder materials.

88.     Henry never filed a copyright enforcement action in court because copying the film was already determined to be fair use.

89.     After failing to grant access to the film for three years, researcher Harold Weisberg and filmmaker Chip Selby sued Henry Zapruder in 1988 for refusing to reasonably

---

[3] Assignment of Copyright. April 9, 1975; Purchase Agreement. April 4, 1975. *Historical Documents from the National Archives on the Zapruder Film*, *ZapruderFilm.com*, ZapruderFilm.com, https://zapruderfilm.com/p/historical-zapruder-documents (last accessed June 5, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 13 of 55**

license the film[4]. *See Selby v. Zapruder*, C.A. No. 88-3043 (D.D.C.). Henry Zapruder settled the researchers' lawsuit within two months and allowed them to use the Zapruder film.[5]

### The Government Pays the Zapruder Heirs $16 Million

90.    On August 3, 1999, a 2-1 divided arbitration panel determined that the Zapruder family would be paid *sixteen million dollars* ($16m) in just compensation for the taking of the film ($31m in inflation adjusted 2025 dollars).

91.    After the arbitration decision, Henry Zapruder claimed that the heirs still owned the film's Copyright, and he attempted to "donate" it to the Museum.

92.    However, this transaction was invalid because LMH had never received the copyright in the first place due to ineffective transfers.

93.    Additionally, this transfer was not prohibited because LMH Co. was not permitted to donate the copyright under the terms of the original license between Mr. Zapruder and Time, Inc.

### *SCAM* EXPOSES THAT THE ZAPRUDER FILM IS NOT ORIGINAL

94.    Plaintiff's book examines the evidence demonstrating that the existing Zapruder is not the Abraham Zapruder "Out of Camera Original."

95.    This can be confirmed in several independent ways.

### The Original Was Sent to the CIA, not to *Life Magazine*

96.    The chain of custody of the original cannot be traced back to Mr. Zapruder's camera. The official story given by Richard Stolley of *Life Magazine* that he sent the original film to Chicago for publication immediately after purchasing it on November 23, 1963, turned

---

[5] Runkel, Christopher M. "Memo re: *Selby v. Zapruder*, May 1, 1989." *Historical Documents from the National Archives on the Zapruder Film*, ZapruderFilm.com, https://zapruderfilm.com/p/historical-zapruder-documents (Accessed June 5, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 14 of 55**

out to be false or incomplete. The original was actually delivered to the CIA's secret photo lab by that evening.

97.    During the time we were told the one and only original film was in Chicago, on the evenings of November 23 and 24, 1963, the CIA had possession of *two different Zapruder films* in top-secret operations at the National Photographic Interpretation Center ("NPIC") in Washington, D.C. Both of these films were thought to be the "original" Zapruder film.

98.    Only one of these two films survives today. The version of the film that exists today originates from the *second* of these operations, during which CIA personnel created briefing boards that resemble the current version of the Zapruder film and are now housed in the National Archives. That film did not originate with Zapruder in Dallas. It was made at a top-secret CIA/Kodak photo facility in Rochester, New York with a codename of "Hawkeye Works."

99.    The current location of the film used by the CIA to produce briefing boards during the initial operation—believed to be the genuine Zapruder out of camera original—is unknown.

100.    According to senior CIA photo analyst Doug Brugioni, he kept a set of briefing boards from that first operation until 1975, when the Rockefeller Commission requested all CIA materials related to the Zapruder film.

101.    Rather than disclosing the boards, Brugioni followed a directive from his superior to "get those damn things out of there" and sent them to the CIA Director's office. He never saw them again.

### Post-Production Experts Determine that a Black Patch Was
### Artificially Added Over the Back of JFK's Head

102.    Starting in 2008, the most sophisticated technical analysis ever conducted on the Zapruder film—led by post-production film experts Sydney Wilkinson and Thom Whitehead,

using the highest-resolution version of the film available—concluded that the existing film has been altered.

103.    Their study identified a deliberately added artificial black patch in several frames, a manipulation that cannot be explained by film damage or processing errors.

104.    In November 2024, Dr. David Mantik, a radiation oncologist who has studied JFK's x-rays and autopsy photographs, gave a demonstration of the black patch identified by Wilkinson and Whitehead.[6]



105.    The high-resolution scan of Zapruder frame Z-317 is blown up and a white circle is drawn over the rigidly shaped black patch.

---

[6] Mantik, David. *A Closer Look at the Zapruder Film: The Case for Alteration*. The Future of Freedom Foundation, 6 Dec. 2024, https://www.fff.org/freedom-in-motion/video/a-closer-look-at-the-zapruder-film-the-case-for-alteration/ (last accessed May 23, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 16 of 55**

106. The patch is overlayed on the part of JFK's head where Dallas doctors reported a massive, avulsed exit wound. It appears to have been inserted to obscure critical evidence—most likely the large exit wound in the back right of JFK's head that points to a shot from the front and challenges the lone gunman theory.

107. The black patch primarily appears in the twenty frames from Z-313 to Z-337.

108. Notably, besides Wilkinson and Whitehead, dozens of seasoned film and visual effects professionals reviewed the findings and agreed with the conclusion that the footage had been altered. Three of these experts expressed their opinions on camera.

109. Paul Rutan, Jr., has decades of experience in film restoration and optical printing. He worked on the official restorations of the classic films *Spartacus* and *The Good, the Bad and the Ugly*.

110. Regarding the high resolution scan of Z-317, he said: "I think you're looking at a patch, at a photographic patch they put on the back of his head, it's crude, but if you run the film, you'll see that it moves differently than his head does as well, so it's some sort of an optical that they put on there to not show the back of his head." It was done "with an aerial optical printer …where they could create that patch as an overlay, and then lay it on there, just like old time optical special effects stuff…50 years ago, it was perfectly believable, today with this 6K scan, the faults are very apparent…it's hard for me to look at because it's not real."

111. Garrett Smith is an adjunct professor for USC School of Cinematic Arts. He was previously the vice-president of production technology and digital mastering at Paramount Pictures for 24 years. Prior to that, he was director of post-production supervisor for *Ripley's Believe it Or Not*, and in post-production for Columbia Pictures.

112. When shown a frame containing the black patch, he said: "It looks to me like somewhere in here someone blacked in in between generation and then made a film copy, so you've got some film structure over the superimposed element…but you've got an irregular

**PLAINTIFF'S ORIGINAL COMPLAINT**                                   **Page 17 of 55**

shaped trapezoid superimposed over the head where the density values are completely different…Something has been added to that frame…It just seems really obvious where they've matted in the back of the head and matted in the blood, it's not even believable, nearly 50 year ago, that might have passed muster. My impression, if I showed it to a kid, they would say it was a cartoon…This was good enough for broadcast TV 50 years ago…This was part of the government theatre, somebody had an agenda, whatever that agenda was, they obviously doctored this film."

113.    Ned Price was the Head of Restoration for Warner Brothers Entertainment. When he saw frame 317, he said, "that frame doesn't make sense. It's hard to manipulate [film] without making really obvious marks…This image raises a lot of questions for me and really makes me want to look further into it and *it really makes me want to see the original*."

114.    In 2011, Douglas Horne showed Wilkinson's high-resolution scans to Dino Brugioni—probably the most important expert to consult on this subject.

115.    Brugioni was the CIA's top photo expert during this period and analyzed the true Zapruder "out-of-camera original" film for the CIA during the weekend of the assassination.

116.    Brugioni literally wrote the book on detecting photographic forgeries: *Photo Fakery: The History and Techniques of Photographic Deception*, published in 1999.

117.    When shown Z-317 enlarged, Brugioni pointed to the black patch and said, "my god, that's a different change of color there, that's for damn sure." He traced the top edge of the black patch with his pointer and said, "that doesn't look right."

118.    Brugioni was asked, "have you ever seen a shadow on someone's head that had straight edges like that, "no, not with hair." Comparing to Jackie's naturally textured hair in the same frame, he said: "see here's an example right there…that's an anomaly."

119.     When shown Z-321, he traced the black patch and said, "that troubles me right here."

**PLAINTIFF'S ORIGINAL COMPLAINT**                                   **Page 18 of 55**

**A "Cartoon-Like" Wound was Added on the Right Side of JFK's Head**

120. Not only was the black patch added over where doctors saw the large head wound, there was also an injury artificially added on the right side of the head that doctors did not see.

121. Concealing an exit wound in the back and creating an exit wound in the front side supports Defendants' theory that a lone nut fired from Defendant's location.

122. When shown the high-resolution scan of Z-335, Dino Brugioni observed: "I know it contradicts what the autopsy report said, but it just seems that the damage, rather than on the back of his head, is on the side of his head."

123. This was accomplished using an aerial optical printer. Garrett Smith said: "It just seems really obvious that the frames where they've matted out the back of the head, and added in the pink splash, the pink water-balloon — whatever it is that's supposed to be the blood — it's just not even believable … maybe fifty years ago that might have passed muster, but for anybody — I mean — my impression is if I showed it to a 12-year old kid, they would say it was a cartoon…."

124. The head wound depicted in the Zapruder film has been described as a shifting "Blob" on the right side of JFK's head. No anatomical explanation has ever been given for what injury the Blob represents.

125. From the 1970s, David Lifton had argued that the bright reddish-white wound that seems to appear and "snake up" the side of JFK's head. He called the wound the Blob. The Blob suddenly appears on the right side of Kennedy's face, partially obscuring Jackie Kennedy. In Frame 315, the Blob rapidly expands into a grotesque double-lobed shape, nearly as large as Kennedy's head itself. Over the course of the next 48 frames, this Blob moves, shifts, and mutates, defying anatomical logic.

126.     There is no medical or eyewitness evidence supporting the existence of such a wound on the President's face or side of the head. The autopsy photographs confirm Kennedy's face was intact, and Parkland staff saw no such trauma in that location.

**Doctors Saw the Wound in the Back, Not Where Zapruder Depicts**

127.     Further, the location of the head wound in the Zapruder film (on the right side of JFK's head) is not in the location where doctors say that they saw it.

128.     Doctors saw the wound on the back right (occipital parietal region) of the head.



129.     But in the Zapruder film, the wound is on the right side of the head. The back right has a black patch over the place where witnesses saw the wound.

130.     Dr. McClelland was one of the doctors who treated JFK at Parkland Hospital in Dallas. When he was shown Z-317 in a 2013 interview, he said that Z-317 did not depict what he observed. Where Z-317 shows dark black on JFK's head, Dr. McClelland saw the head wound.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                   **Page 20 of 55**



131.    Dr. McClelland said: "the area of the black of the president's head in this dark spot here is where I saw the wound, there was a large wound here, where *I could look down into the skull cavity*. In that area right here appears to be intact on this picture, *but it was not intact, it was anything but intact*." (emphasis added).

132.    Dr. McClelland said: "In looking at the president's head…I couldn't see any kind of wound over the front or the side of the president's head. All I saw was that massive wound in the back of his head."

### *The Sixth Floor Museum Alters the Zapruder Film*
### *To Conceal the Black Patch Discovered by Researchers*

133.    The Sixth Floor Museum has now been implicated in a new act of alteration — one that suggests it is actively continuing the JFK cover-up more than 60 years after the assassination. Beyond suppressing access to the Zapruder film, the Museum appears to have taken active steps to manipulate the primary Zapruder evidence it holds in its own archives.

134.    In November 2009, following their forensic analysis, Sydney Wilkinson and Dr. David Mantik visited the Sixth Floor Museum to view the MPI transparencies—first-generation

4x5" color photographic positives made in 1997 directly from the Zapruder film. These transparencies offered the closest public equivalent to viewing the original 8mm film.

135. Wilkinson and Mantik viewed the transparencies in 2009 and confirmed what they saw in their 6K scans: the back of JFK's head, particularly in frame Z-317 and adjacent frames, featured an unmistakable, sharply bounded black patch obscuring the occipital region. The shape, color, and contrast of this patch left no doubt to both Wilkinson and Mantik that it was artificial. It was so stark and unnatural that Mantik later described nearly bursting into laughter upon seeing it—not out of amusement, but at the sheer brazenness of the alteration.

136. As Wilkinson later wrote about the crude alteration:

> Words cannot describe how stunned I was when I viewed the head shot, frame Z-313, and the frames immediately following. The resolution was beyond anything I expected. Especially, in frames Z-317, Z-321, Z-323, Z-335 and Z-337, the solid, black patch that is clearly seen on our 6k scans-- covering the right rear area of JFK's head--was even more egregious on the MPI transparencies. It was all I could do to muzzle my emotions. There was no doubt the MPI transparencies corroborated the obvious anomalies seen on our scans.

137. Seeing them at the same time as Wilkinson, Dr. Mantik wrote:

> The resolution and color were so incredible that I felt as if I were seeing these frames for the very first time. But the greatest emotional impact came on seeing the black patch in Z-317. It was so blatant, so childishly done, that I almost laughed aloud. Whether I did or not is in some doubt, but I retain an image of clapping my hand over my mouth to prevent such a laugh.

138. But when Wilkinson returned with Thom Whitehead to the Museum just one year later, in 2010, everything had changed. Though she was shown what were described as the same MPI transparencies, the sharp, geometric black patch had vanished. In its place was a diffuse, greyish area that bore no resemblance to the crisp anomaly she had seen earlier. The distinctive edges were gone, replaced by a more "natural-looking" shadow that blended ambiguously into JFK's hair. On seeing these twice-altered frames, Wilkinson said:

> I was definitely not prepared for what I saw when I looked through the loupe. Not only were the transparencies much larger in size physically, than the ones I had viewed the previous year with David, but none of them were as clear and sharp.

Not even close. Most importantly, and suspiciously, the flagrant image of the black "patch" was gone. Instead, the back of JFK's head appeared to show a natural shadow--what Thom called "fuzzied up" – without the straight and well-demarcated edges I had seen in 2009. We were both stunned. Furthermore, the black patch was not nearly so obvious in this supposed first generation copy as it was in our third generation 6K copy. That made no sense whatever to me. Despite being assured by the museum they were the same transparencies that David and I saw the previous year, there is absolutely no doubt that they were not.

139.    Dr. Mantik also had a chance to view the frames again in 2012. Upon seeing the slides, he wrote:

The verdict came quickly-the patch in Z-317, and conspicuously present in other frames such as Z-321 and Z-323, had vanished. The back of JFK's head appeared little different from all those images I had seen before (excepting for Sydney's 6K images). The powerful emotional response of 2009 did not recur. Furthermore, the back of JFK's head did not show the patently obvious patch I had seen on Sydney's 6K scans.

140.    It appears that the Museum altered evidence, and it will not permit outsiders to determine for themselves.

141.    Plaintiff sent a request to the Museum to obtain copies of these frames, but the Museum did not respond.

142.    If the Sixth Floor Museum had nothing to hide, it would have no reason to suppress access to the Zapruder film or to target those who seek to use it. Instead, the Museum has repeatedly acted to control and conceal the film, especially from researchers and publishers who challenge the official narrative.

## OTHER IMAGE ANOMALIES INDICATE THE FILM WAS ALTERED

143.    Countless other anomalies in the film that have been noticed by researchers also indicate the film has been altered. There are too many to list, but many significant ones are covered on pages 29-92.

**The Splice Between Frames 132 and 133 Was Not Exposed in Zapruder's Camera**

144. There is a splice at 132/133 where the scene jumps from motorcycles to JFK's limo already partially barreling down Elm Street. There are several independent reasons why this splice could not have been exposed in Zapruder's camera. *See* Exhibit A-1 at pp. 44-58.

145. If Zapruder stopped and started his camera, as must have happened if the motorcycles disappeared in one frame and JFK's limo appears in the next frame, then Zapruder's camera would produce frames with light flash. However, light flash is entirely absent, even though light flash does occur at other points in the film.

146. There is a significant decrease in the range of black contrasts captured in the clothing of the spectators on the North side of Elm Street.

147. In looking at the transition between Z-131 and Z-133, Ned Price said "so you go one ahead, and the detail's not there in the blacks – it could mean subsequent generation, it could mean optical work usually will clock up the blacks. That would not happen in a camera."

148. Although there must have been enough time elapsed to account for JFK's limo to turn from main to Houston, from Houston to Elm, and turn onto Elm, the North Elm spectators do not move a muscle even while Zapruder takes a break in filming.

149. Next, Zapruder captures the exact same frame showing the same twenty North Elm spectators in the exact same camera view after starting and stopping the film. This was likely impossible even with a tripod, and Zapruder did not have a tripod.

150. Plaintiff seeks to obtain copies of these frames from the collections in the National Archives and the Museum, but Defendant denied Plaintiff's first request and did not respond to Plaintiff's second request.

**The Stemmons Freeway Sign Exhibits Impossible Physical Characteristics**

151.    The Stemmons Freeway sign appears at the wrong angle to the street, oriented nearly perpendicular to Zapruder's camera instead of perpendicular to traffic, making it unreadable to drivers.

152.    This sign displays physically contradictory features in multiple photos, including Frame 202 of the Zapruder film, Pete Barnes' photographs, the FBI reenactment, Commission Exhibit 895 (CE895), Richard Bothun photograph #4, and Art Rickerby photograph #3.

153.    The visual orientation of the sign suggests it was artificially inserted, misaligned with Elm Street and the approaching motorcade.

154.    The sign lacks the expected optical distortion ("pincushion effect") produced by Zapruder's Bell & Howell 414PD camera when set to telephoto, which should have bent straight lines inward at the frame edges.

155.    Physicist John Costella showed that the sign remained perfectly straight while the rest of the frame exhibited pincushion distortion—something physically impossible if the sign had been filmed naturally.

156.    The poles of the Stemmons sign visibly shift relative to the pergola's square stone patterns between frames, despite both being fixed structures.

157.    This relative motion between supposedly stationary objects indicates the sign was not consistently anchored in space, unlike the pergola.

158.    Jackie Kennedy's hat appears in front of the Stemmons sign in frames 219 to 221, which would be impossible if the sign were a real, solid object in the foreground.

159.    Frame 220 shows Jackie's hat emerging in front of a slanted corner of the sign, which reverts to a rounded corner by frame 221—an inconsistency indicating flawed compositing.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                      **Page 25 of 55**

160.    The visibility of Jackie's hat over a sign that was *in front of her* is physically impossible, further indicating the sign was not actually present in the scene.

161.    Errors in the Stemmons sign's depiction were published early and widely, making correction impossible without detection.

**Frames That Could Only be Made in Post-Production Appear in the "Original"**

162.    Blended frames resembling double exposure appear multiple times in the Zapruder film. *See* Exhibit A-2, pp. 69-72.

163.    Double exposure occurs when two images are superimposed, making a subject appear in two places at once.

164.    Zapruder's Bell & Howell camera mechanically advanced one new frame per shutter cycle, making true double exposures impossible mid-reel.

165.    Only initial frames could be affected by a loading error or light leak—not isolated double exposures later in the film.

166.    Frame Z-201 shows clear double exposure of the Secret Service car's headlights, not motion blur.

167.    In contrast, motion blur, seen in frame Z-244, results from subject movement during exposure and appears as directional streaks.

168.    Blended frames are often created when converting 18fps film to 30fps video, combining two frames into one for smoother playback.

169.    Such blending can obscure motion, making actions unreadable and erasing visual details.

170.    Blended frames should not exist in a true camera-original film, as they are created during video processing.

171.    Their presence in the Zapruder film suggests it underwent post-production video transfer, contradicting claims of it being an untouched original.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 26 of 55**

### JFK's Driver's Impossibly Fast Head Turns
### Indicate Frames Were Removed

172.    Between frames 289 and 320 (1.75 seconds), JFK's driver, William Greer, appears to turn his head three full times: Backward to forward, forward to backward, backward to forward again — all while driving the limousine and while JFK is shot in the head. *See* Exhibit A-2, pp. 73-79.

173.    From frame 289 to 294 (0.27 seconds), Greer's head turns completely from backward to forward, an implausibly rapid movement.

174.    From frame 294 to 304 (just over 0.5 seconds), his head is again fully turned backward, indicating a second rapid rotation.

175.    Greer remains looking backward until frame 317, after the head shot at frame 313, then turns forward again by frame 320, just 0.16 seconds later—his third full head turn.

176.    No motion blur is visible in any of these rapid head turns, even though the Zapruder camera should have recorded blur from such fast movements.

177.    Greer's final head turn (frames 317–320) occurs in just 0.16 seconds, a biomechanical impossibility for a 54-year-old man, especially one actively driving.

178.    These rapid, blur-free transitions violate the expected continuity of motion, suggesting intermediate frames were deliberately removed.

### The Copyright is Abandoned Due to Large Scale Infringement

179.    Today, the Museum has abandoned any copyright it could claim to have. Confusion abounds online, as there are dozens of versions of the Zapruder Film available to view for free on YouTube, Rumble, and other video sites. These videos have been viewed millions of times without authorization from the Museum.

180.    A licensed DVD containing frames of the assassination (skipping 155-156 and 208-211) is offered for sale on Amazon, but unauthorized Zapruder frames are all available to be downloaded online for free.[7]

181.    A 2004 video game allows users to simulate aiming and firing shots from the Oswald window and generates a copy of the resulting Zapruder film.

182.    The Museum and the National Archives, however, do not make their unique versions of the frames available online. Defendants possess these historical copies obtained from *Life Magazine* or the Zapruder family.

183.    The Museum adds to the confusion by putting a version of the film on its website that omits the Pergola scenes that come before the motorcycle scenes. That version also omits the images between the sprocket holes, which are available on the original. The Museum does not explain what version it is displaying on its website.

184.    Although no copyright action on the Zapruder film has even been attempted since the unsuccessful 1968 attempt, the Sixth Floor Museum purports to own the copyright today and makes threats to people who disagree with the lone nut theory.

### The Museum Forced Shane O'Sullivan to Remove Zapruder Frames from his Films

185.    In 2013, Lock Lorde LLP, on behalf of Defendant, sent a cease-and-desist letter to filmmaker Shane O'Sullivan.

186.    The letter demanded that O'Sullivan remove any unlicensed use of the film from both the trailer and the final work to *The Zapruder Film Mystery* and *Killing Oswald* within five days or face a lawsuit seeking damages of up to $150,000 per alleged willful infringement.

---

[7] See https://www.assassinationresearch.com/zfilm/;
https://sites.google.com/site/lightboxzframes/lightbox-frame-sets;
https://archive.org/details/zapruderfilmframes/

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 28 of 55**

187.    Under legal threat, O'Sullivan removed the clip and was subsequently unable to include any Zapruder footage in *Killing Oswald* or *The Zapruder Film Mystery*. O'Sullivan added a clip at the beginning of The Zapruder Mystery to show that he was not able to use the film due to threats from the Museum.



188.    The clip said: "Unfortunately, legal threats from the Sixth Floor Museum in Dallas have prevented me from using the Zapruder Film in *Killing Oswald* or to illustrate [*The Zapruder Film Mystery*] – *censorship of the worst kind*, in my opinion." (emphasis added).[8]

189.    Plaintiff's counsel received this information from O'Sullivan on April 28, 2025.

### PLAINTIFF NEEDS THE FILMS AND FRAMES HELD BY THE NATIONAL ARCHIVES AND THE MUSEUM FOR FURTHER STUDY

190.    Plaintiff seeks to obtain and compare these first-generation copies held by the National Archives and the Museum to the third generation used by Wilkinson and Whitehead.

---

[8] *The Zapruder Film Mystery*. Directed and produced by Shane O'Sullivan, E2 Films, 15 Aug. 2014. YouTube, www.youtube.com/watch?v=J_QIuu6hsAc.

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 29 of 55**

191.    When Plaintiff obtains these frames from the National Archives and the Sixth Floor Museum, Plaintiff will publish them here in a future version of this book, so readers may determine if the black patch exists on those frames.

192.    Plaintiff requested to obtain 160 Zapruder frames from the National Archives pursuant to FOIA, but his request was denied because of the assertion of the Museum's copyright.

193.    Plaintiff also requested to obtain a copy of the Museum's primary Zapruder materials, but the Museum denied the first request and did not respond to the second request.

## NARA DENIES VALID FOIA REQUESTS FOR ZAPRUDER MATERIALS IN THE NATIONAL ARCHIVES BASED ON THE MUSEUM'S COPYRIGHT

194.    Defendants also invoke the copyright to prevent individuals from making copies of public records housed at the National Archives. While some researchers who have examined the Zapruder film in person at the Archives have identified numerous anomalies, many of these anomalies would become even more apparent to the general public if the National Archives complied with FOIA requests for the Zapruder materials.

195.    The Museum continues to assert that its copyright prevents the National Archives from fulfilling Plaintiff's FOIA requests for the Zapruder film and its frames. Inexplicably, NARA defers to the Museum's position, despite the fact that doing so contradicts NARA's own longstanding interpretation of its obligations under FOIA

196.    NARA is violating its own legal guidance on this issue. NARA's website has a FAQ informing the public that "NARA may make a single fair-use copy of the [Zapruder] film and sell it to any researcher." In full, the question and answer in the FAQ says:[9]

---

[9] "Where Is the Zapruder Film? Can I Get a Copy of It?" *Frequently Asked Questions about JFK Assassination Records*, National Archives and Records Administration, 2025, https://www.archives.gov/research/jfk/faqs#zapruder-film.

Where is the Zapruder film? Can I get a copy of it?

The original Zapruder film is part of the Collection and is in the custody of the Moving Image and Sound Branch at the National Archives at College Park, MD. NARA may make a single fair-use copy of the film and sell it to any researcher. However, the copyright for the film is owned by the Sixth Floor Museum in Dallas, TX. If a researcher chooses to publish the film in any way, he or she will need to obtain permission from the copyright holder.

197.    NARA contradicts its own position in previous litigation. NARA stated that "NARA does not believe the individual Warren Commission slides should raise a copyright infringement concern, use or copying of such slides present a much stronger 'fair use' case for a copyrighted work than complete, commercial grade copies of the underlying film, all other factors being equal."[10]

198.    The Office of Legal Counsel ("OLC") already considered the issue in a written advisory opinion determining that copies of the Zapruder film should be produced in response to FOIA requests despite the copyright.[11] The OLC opinion states that "The Copyright Act is not a restricted use statute for the purposes of FOIA exemption 3…Therefore, unless another exemption applies…Archives personnel must provide access to copyrighted 'agency records' in response to properly made FOIA requests. For the purposes of the FOIA, 'access' means making records available for both inspection and copying." *Id.*

199.    Defendants do not even attempt to consider the doctrine of fair use.

200.    Further, the electronic reading room provision FOIA requires agencies to affirmatively disclose frequently requested records. It does so specifically by requiring agencies

---

[10] *See Forum on Open Access to Public Records v. The Sixth Floor Museum*, No. 3:24-cv-02399, Dkt. 23, Defendant's APP. 154.

[11] Dellinger, Walter. "Memorandum for Elizabeth A. Pugh, General Counsel, National Archives and Records Administration." *Office of Legal Counsel*, Oct. 17, 1995. *Zapruder Film Documents from the National Archives*, ZapruderFilm.com, https://zapruderfilm.com/p/historical-zapruder-documents (last accessed June 6, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 31 of 55**

to "make available for public inspection in an electronic format" without the need for any predicate request [records] that have been requested 3 or more times." 5 U.S.C. § 552(a)(2)(D) (hereinafter referred to as "frequently requested records").

201. Based on the Museum's assertion that its copyright blocks Plaintiff's requests and a lack of permission from the Sixth Floor Museum, the National Archives refused to grant Plaintiff's lawful FOIA requests, provide copies of Zapruder Frames 171-334, or permit Plaintiff to pay for copies or hire vendors to make copies, which Plaintiff is willing to do at its own expense.

202. On June 28, 2024, attorney Mark L. Javitch, on behalf of the Forum, submitted a FOIA request to the National Archives for Zapruder Frames 171-207, 212-334. The Request complied with all applicable regulations regarding the submission of FOIA requests. *See* Exhibit B.

203. On July 1, 2024, the National Archives responded but refused to grant the request because of the Museum's copyright. The National Archives emailed acknowledging receipt and assigning tracking number 24-51268. The email said "The series ZF-ZF (National Archives Identifier 559449) is open to the public and available to view in our research room in College Park, MD. If you would like to schedule a Still Picture Research Room appointment, please visit https://www.eventbrite.com/o/national-archives-at-college-park-still-pictures-48193105693. Please note that you may only view the slides during your visit, and you may not reproduce them without written permission from the Sixth Floor Museum. Although the National Archives has legal custody of the Zapruder film, and it is considered a federal record, the copyright to the film/slides is owned by the Sixth Floor Museum in Dallas, Texas. Researchers wishing to copy the slides must first obtain written permission from the Sixth Floor Museum." *See* Exhibit C.

204. Also on July 1, 2024, counsel for Plaintiff filed an appeal. *See* Exhibit D. On July 2, 2024, the National Archives acknowledged the appeal. *See* Exhibit E. Despite the requirement

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 32 of 55**

to decide the appeal within twenty (20) days, as of the date of this filing, the National Archives never informed Plaintiff of the results of its appeal.

205.    On August 8, 2024, attorney Mark L. Javitch, on behalf of the Forum, submitted a FOIA request to the National Archives for Zapruder Transparencies 208-211. *See* Exhibit F. The Request complied with all applicable regulations regarding the submission of FOIA requests.

206.    On August 9, 2024, the National Archives responded but again refused to grant the request because of the Museum's copyright. *See* Exhibit G.

207.    The response also stated in similar fashion: "Although NARA has legal custody of the Zapruder film, and it is considered a federal record, the copyright to the film/slides is owned by the Sixth Floor Museum in Dallas, Texas. Researchers wishing to copy the slides must first obtain written permission from the Sixth Floor Museum."

208.    Also on August 9, 2024, counsel for Plaintiff filed an appeal. *See* Exhibit H. On August 12, 2024, Defendant acknowledged the appeal. *See* Exhibit I. Despite the requirement to decide appeals within twenty (20) days, as of the date of this filing, the National Archives never informed Plaintiff of the results of its appeal.

209.    Plaintiff was not the only requestor to have their Zapruder request denied. On December 11, 2023, FOIAConsciousness.COM LLC ("FC") submitted a FOIA request for copies of two enhanced versions of the Zapruder film held at the National Archives.

210.    FC's requests for copies was solely for the purposes of noncommercial research and commentary.

211.    The National Archives denied FC's request based on the Museum's copyright.

212.    On February 20, 2024, FC filed suit against the National Archives for failure to comply with FOIA and named Museum as Respondent. *See FOIAConsciousness.com LLC v. National Archives & Records Administration*, No.3:2024-cv-00997-JD (N.D. Cal.).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 33 of 55**

213.    On June 30, 2025, the court denied FC's motion for summary judgment and granted the National Archives' motion for summary judgment on the grounds that FC did not request permission from the Museum. *See* Dkt. 49. An appeal is pending.

**PLAINTIFF SUBMITS TWO REQUESTS TO LICENSE ZAPRUDER MATERIALS**

214.    On January 9, 2025, in its Reply brief to its motion to dismiss the previous case, the Museum purported to grant a license to a single frame on its website.[12]

215.    But that was a token offer strategically to avoid a challenge to the copyright. Plaintiff did not consider this offer to be even close to what is necessary to cover Plaintiff's work. Plaintiff rejected that offer because Plaintiff seeks a broad enough license for its commercial project and to obtain access to materials in the Museum and the National Archives.

216.    On April 3, 2025, Plaintiff sent a letter to the Museum requesting to use the Zapruder film copyright for its publication. *See* Exhibit J.

217.    The request also asked that the Museum inform the National Archives it was unopposed to Plaintiff's FOIA requests for the Zapruder frames. *Id.*

218.    On April 15, 2025, the Museum responded, denying the majority of Plaintiff's request and citing bad faith. *See* Exhibit K.

219.    The Museum informed Plaintiff to apply again for a license in the future by filling out the form on the Museum's website.

220.    On April 15, 2025, Plaintiff asked the Museum if it would withdraw its opposition to Plaintiff and FC's FOIA requests for Zapruder materials at the National Archives. *See* Exhibit L.

---

[12] *See Forum on Open Access to Public Records v. The Sixth Floor Museum*, No. 3:24-cv-02399, Dkt. 27, at p. 10.

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 34 of 55**

221.    On April 16, 2025, the Museum responded that it would not withdraw its opposition to the FOIA requests because such requests constitute copying without a license. *See* Exhibit M.

222.    On April 23, 2025, FC requested permission from the Museum for the films it requested in its FOIA requests. *See* Exhibit N.

223.    On April 24, 2025, the Museum emailed that any request must go through the licensing program on the website. *See* Exhibit O.

224.    On April 24, 2025, Plaintiff filled out the form on the Museum's website. Plaintiff requested to view, obtain and publish not only the frames in the National Archives, but this time, also the frames in the Museum's collection.

225.    Plaintiff informed the Museum of the title of the book and that it planned to publish it on or around May 9, 2025.

226.    The Museum's website says applicants should allow up to three weeks for processing of your request. *See* https://www.jfk.org/rights-reproductions-request-form/.

227.    However, as of the date of this filing, the Museum did not respond.

228.    The Museum's form must have functioned properly, because Plaintiff's counsel received a confirmation message that the form had been submitted. *See* Exhibit P.

### Plaintiff's Publication of Its Opinions on the Zapruder Film

229.    On May 6, 2025, Plaintiff published a book exposing the Museum called *SCAM – The Zapruder Copyright: How the Sixth Floor Museum Continues the Coverup*. *See* Exhibits A-1; A-2. The book is available for sale on Amazon.com in Kindle E-Book, Paperback, and Hardcover formats.[13]

---

[13] https://www.amazon.com/Scam-Zapruder-Copyright-Continues-Coverup-ebook/dp/B0F7NWX2DF.

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 35 of 55**

230.    The book contains 72 (seventy-two) allegedly infringing Zapruder frames.

231.    However, Plaintiff cannot currently obtain copies of the frames held by the Museum and the National Archives, which it needs to add to the existing comparison of anomalies in the Zapruder film, such as the black patch, the "blob" wound, the impossible splice at 132/133, and the impossible head turn by the driver. Once Plaintiff obtains these copies from the National Archives and the Museum, Plaintiff and its readers can view for themselves how much the anomalies persist on those versions. The quality of the original film degrades over time, and the public is not allowed to inspect the original film, so these early copies are important primary research materials.

232.    Plaintiff has caused some ads promoting the book to run on X. https://x.com/javitch_mark/status/1924892542350590404.



233.    The ads make use of the allegedly infringing material.

234.    Plaintiff plans additional advertising using the allegedly infringing material.

235.    The book contains the following Zapruder frame numbers on the following page numbers:

| Page | Frame Numbers |
|------|---------------|
| 2 | 262, 265, 269, 273, 276 |
| 3 | 311-315, 323, 335, 386 |
| 10 | 317 |
| 11 | 277 |
| 12 | 320 |
| 13 | 317 |
| 14 | 317 |
| 26 | 313 |

**PLAINTIFF'S ORIGINAL COMPLAINT**                                **Page 37 of 55**

| | |
|---|---:|
| 35 | 154 |
| 36 | 154-157 |
| 38 | 157, 207 |
| 41 | 174-177, 208-212 |
| 43 | 212 |
| 45 | 131, 133 |
| 53 | 131, 133 |
| 55 | 132-135 |
| 56 | 1-4 |
| 57 | Pergola1-14, 1 |
| 60 | 202 |
| 61 | 174 |
| 65 | 193, 228 |
| 66 | 219-220 |
| 67 | 221 |
| 68 | 144, 166, 216 |
| 70 | 201 |
| 71 | 244 |
| 75 | 289, 294 |
| 76 | 304, 317 |
| 77 | 320 |
| 81 | 314, 315 |
| 82 | 335 |
| 83 | 337 |
| 86 | 317 |
| 87 | 317, 321 |
| 88 | 312, 313, 316, 317, 321, 323, 327, 328, 335 |
| 90 | 317 |
| 137 | 237 |

**<u>FIRST CAUSE OF ACTION</u>**
**Declaratory Judgment of Copyright Invalidity, Unenforceability, and Non-Infringement**
**Lack of Originality**
**Against The Sixth Floor Museum**

236.   Plaintiff incorporates the foregoing paragraphs herein.

237.   There is an actual, substantial, and continuing justiciable controversy between the Forum and the Museum regarding the validity, enforceability, and noninfringement of the Copyright Registration and Plaintiff's ability to sell its book containing the allegedly copyrighted images.

238.   Plaintiff published 72 (seventy-two) allegedly infringing Zapruder frames in its book, *SCAM: The Zapruder Copyright – How the Sixth Floor Museum Continues the Coverup*.

239.   In *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345 (1991), the Supreme Court made clear that "*[t]he sine qua non* of copyright is originality. (emphasis in original). To qualify for copyright protection, a work must be original to the author. *Id*. This originality requirement is imposed by the Constitution, as well as the text of the Copyright Act itself. *Id*. at 346. at 345.

240.   Accordingly, the Museum's claim to the copyright is only valid if the film is an original work by Mr. Zapruder.

241.   However, the existing Zapruder film is not the original work captured by Abraham Zapruder.

242.   Instead, the existing film is an altered version.

243.   This can be determined on several independent grounds.

244.   The most sophisticated analysis of the Zapruder film ever done by the most senior experts in the film post-production industry concluded that a black patch and a fake head wound had been added as a separate layer on top of the original film. *See* Exhibits A-1 at pp. 9-15; A-2 at pp. 80-91.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                        **Page 39 of 55**

245. When researchers discovered the black patch on the Museum's frames, the Museum manipulated the evidence to hide the original alteration. *See* Exhibit A-1, at pp. 16-21.

246. Further, several specific frames can be observed to be unoriginal upon plain sight. *See* Exhibit A-1, at pp. 33-43.

247. Frames 132-133, 154-157, and 207-212, at a minimum, are not originals or bona fide copies.

248. Frames 154, 157, 207, and 212 are visibly "spliced" and "repaired." Frames 155-156 and 208-211 are missing or lost and only inferior partial copies remain that are missing the images between the sprocket holes.

249. Other locations in the film also reveal that the existing film is a result of post-production.

250. The splice at 132/133 displays a significant drop in RGB values, indicating the section after the splice must have been a subsequent generation to the section before the splice. *See* Exhibit A-1, at pp. 44-58.

251. Post-production film experts determined that this sequence at 132/133 could not have been exposed in a camera.

252. Lost frames 155-156 and 208-211 are omitted from the DVD of the Zapruder film sold commercially by MPI.

253. Countless other examples are visible indications that the film could not be a true and accurate representation of the events of the assassination. For instance, the Stemmons Freeway Sign changes shape from frame-to-frame (Exhibit A-1, at pp. 65-68) and JFK's driver performed impossible movements while under fire. *See* Exhibit A-2, at pp. 73-79.

254. On April 3, 2025, Plaintiff requested information Defendant possesses that would prove that frames 154-157 and 207-212 are original. *See* Exhibit J. However, Defendant declined to provide that information.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 40 of 55**

255.    Plaintiff is entitled to a judicial determination that Plaintiff's book publishing 72 (seventy-two) allegedly infringing frames has not infringed, does not infringe, and would not infringe, either directly or indirectly, any valid, enforceable and/or protectable expression in the Copyright Registration because the existing film is not an original work.

## SECOND CAUSE OF ACTION
**Declaratory Judgment of Copyright Invalidity, Unenforceability, and Non-Infringement**
**Copyright Waiver**
**Against The Sixth Floor Museum**

256.    Plaintiff incorporates the foregoing paragraphs herein.

257.    There is an actual, substantial, and continuing justiciable controversy between the Forum and the Museum regarding the validity, enforceability, and noninfringement of the Copyright Registration and Plaintiff's ability to sell its book containing the allegedly copyrighted images.

258.    Plaintiff published 72 (seventy-two) allegedly infringing Zapruder frames in its book, *SCAM: The Zapruder Copyright – How the Sixth Floor Museum Continues the Coverup*.

259.    Three years after damaging the film, in early 1967, Time, Inc. explained that its technician caused damage to the film in these frames on November 23, 1963.

260.    However, besides admitting the damage, Time did not provide any information about the destruction or how it crudely reassembled the damage at Frames 207 and 212 using adhesive.

261.    Recognizing it did not possess the originals and only copies not containing the full image existed, Time, Inc. intentionally released the copyright to the public domain and expressly waived its copyright to Frames 207-212.

262.    The stipulation of facts signed by attorneys for Time, Inc. and filed in the court in *Time v. Geis* on May 1, 1968, stated: "On January 30, 1967, Zapruder frames Nos. 207 through 212 were publicly released without restriction on their use."[14]

263.    Lost frames 155-156 and 208-211 are omitted from the DVD of the Zapruder film sold commercially by MPI.

264.    The Museum's copyright cannot exceed the interest held by its predecessors.

265.    The Museum could not obtain a copyright on Frames 207-212 when its purported predecessor had already relinquished it to the public domain.

266.    Plaintiff is entitled to a judicial determination that *SCAM* has not infringed, does not infringe, and would not infringe, either directly or indirectly, any valid, enforceable and/or protectable expression in the Copyright Registration, at least as to Frames 207-212, because Time waived the copyright on these frames.

## THIRD CAUSE OF ACTION
**Declaratory Judgment of Copyright Invalidity, Unenforceability, and Non-Infringement**
**Fraud on the Copyright Office**
**Against The Sixth Floor Museum**

267.    Plaintiff incorporates the foregoing paragraphs herein.

268.    There is an actual, substantial, and continuing justiciable controversy between the Forum and the Museum regarding the validity, enforceability, and noninfringement of the Copyright Registration and Plaintiff's ability to sell its book containing the allegedly copyrighted images.

269.    Plaintiff published 72 (seventy-two) allegedly infringing Zapruder frames in its book, *SCAM: The Zapruder Copyright – How the Sixth Floor Museum Continues the Coverup.*

---

[14] Stipulation of Facts. *Time Incorporated. v. Bernard Geis Associates*, *et al.*, May 1, 1968. *Historical Documents from the National Archives on the Zapruder Film*, ZapruderFilm.com, https://zapruderfilm.com/p/historical-zapruder-documents (last accessed June 5, 2025)

**PLAINTIFF'S ORIGINAL COMPLAINT**                                **Page 42 of 55**

270.    A party seeking to establish fraud on the Copyright Office "must establish that the application for copyright registration is factually inaccurate, that the inaccuracies were willful or deliberate … and that the Copyright Office relied on those misrepresentations."

271.    Time's registration stated that the film was a 10 second original work by Abraham Zapruder. However, that registration contained knowing and willful inaccuracies. It is unknown what the 10 seconds is referring to, as the version on the Museum's website is over one minute long.

272.    Time, Inc. misrepresented the condition of the film at the time of registration in 1967. Time said it was an original work, but it failed to inform the Copyright Office of the plainly visible truth that the originals to 154-157 and 207-212 had been lost and/or damaged in 1963.

273.    Lost frames 155-156 and 208-211 are omitted from the DVD of the Zapruder film sold commercially by MPI.

274.    Time admitted that frames 207-212 had been lost and damaged, but it never informed the Copyright Office. Time never informed the public or the Copyright Office of the loss and/or damage to frames 154-157.

275.    Those inaccuracies were willful or deliberate, as the loss and damage was apparent to anyone who merely viewed these frames. This is one of the most important sequences when JFK appears to be hit as he comes out from behind the Stemmons Freeway Sign.

276.    The Copyright Office relied on misrepresentations. If the Copyright Office that the originals to 154-157 and 207-212 had been lost and/or damaged, The Copyright Office would have rejected the copyright claim, at least as to those frames. To date, Defendant still fails to update the Copyright office.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                   **Page 43 of 55**

277.    On April 3, 2025, Plaintiff requested information Defendant possesses that would prove that frames 154-157 and 207-212 are original. *See* Exhibit J. However, Defendant declined to respond to provide that information.

278.    Plaintiff is entitled to a judicial determination that *SCAM* has not infringed, does not infringe, and would not infringe, either directly or indirectly, any valid, enforceable and/or protectable expression in the Copyright Registration because Zapruder frames 154-157 and 207-212 are not part of an original work.

### FOURTH CAUSE OF ACTION
**Declaratory Judgment of Copyright Invalidity, Unenforceability, and Non-Infringement Abandonment**
**Against The Sixth Floor Museum**

279.    Plaintiff incorporates the foregoing paragraphs herein.

280.    There is an actual, substantial, and continuing justiciable controversy between the Forum and the Museum regarding the validity, enforceability, and noninfringement of the Copyright Registration and Plaintiff's ability to sell its book containing the allegedly infringing images.

281.    Plaintiff published 72 (seventy-two) allegedly infringing Zapruder frames in its book, *SCAM: The Zapruder Copyright – How the Sixth Floor Museum Continues the Coverup.*

282.    It used to be the case that "[a]bandonment [could] only be shown by proving the copyright proprietor intended to surrender the rights in a work he so deliberately perfected." *Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 898 (5th Cir. 1972).

283.    However, now "[a] right such as copyright may be waived by inaction." *Veeck v. S. Bldg. Code Cong. Int'l Inc.*, 241 F.3d 398, 409 (5th Cir. 2001).

284.    Since Time, Inc. lost its single attempt to enforce its copyright in court in 1968, fifty-seven (57) years ago, Time, Inc. stopped enforcing the copyright and acquiesced to large scale infringement.

**PLAINTIFF'S ORIGINAL COMPLAINT**                              **Page 44 of 55**

285.    Time and/or its successors never again initiated *one single lawsuit* to enforce any purported copyrights. Nor could they, because the holding that the whistleblower's unauthorized copying of the Zapruder film (as a unique source of historical information) amounts to fair use, has never been challenged.

286.    After Time disclosed the Zapruder film to Jim Garrison pursuant to a subpoena in the 1969 Clay Shaw trial, unauthorized copies of the Zapruder film began to be widely sold on VHS, as well as presented at colleges and universities across the country. It was also played on local and national television in 1975.

287.    All of these showings were without Time's authorization. Time did not enforce the copyright in the face of any of these violations.

288.    Time attempted to donate the film to the National Archives, but instead, gave the film away for $1.

289.    Failing to enforce the copyright and giving away the film was abandonment.

290.    A transfer to a new for essentially no money does not revive an abandoned copyright. In addition to Time, its purported successor, the Museum, if it was ever properly transferred the copyright, also abandoned it by acquiescing to large scale infringement actions.

291.    Dozens of versions of the Zapruder film appear all over the internet, for a period of many years, which have attracted tens of millions of views on YouTube and Rumble. All the frames are available to be freely downloaded on the internet.

292.    Like its predecessors, Defendant also acquiesced to large scale infringement and never enforced the copyright as to these millions of potentially infringing views.

293.    Defendant only purports to enforce the copyright by threatening infringement actions against those who don't share its historical views, and by denying requests to view Zapruder materials. Its control is primarily accomplished by controlling physical access, such as

preventing Plaintiff from obtaining copies from the National Archives and from its collection, rather than by filing copyright actions.

294.    The Zapruder film has been abandoned and entered the public domain.

295.    Plaintiff is entitled to a judicial determination that *SCAM* has not infringed, does not infringe, and would not infringe, either directly or indirectly, any valid, enforceable and/or protectable expression in the Copyright Registration because the copyright has been abandoned.

**<u>FIFTH CAUSE OF ACTION</u>**
**Declaratory Judgment of Copyright Invalidity, Unenforceability, and Non-Infringement**
**The Museum Never Obtained the Copyright**
**Against The Sixth Floor Museum**

296.    Plaintiff incorporates the foregoing paragraphs herein.

297.    There is an actual, substantial, and continuing justiciable controversy between the Forum and the Museum regarding the validity, enforceability, and noninfringement of the Copyright Registration and Plaintiff's ability to sell its book containing the allegedly copyrighted images.

298.    Plaintiff published 72 (seventy-two) allegedly infringing Zapruder frames in its book, *SCAM: The Zapruder Copyright – How the Sixth Floor Museum Continues the Coverup*.

299.    The Museum has no standing to enforce the copyright on the Zapruder film or Zapruder frames. The Museum's claim to the copyright is only as valid as the preceding transfers from Mr. Zapruder to Time, Inc., to Zapruder's heirs, to LMH Company, and to the Museum.

300.    However, Time, Inc. did not effectively transfer the copyright to Mr. Zapruder's heirs in 1975. The documents are either unsigned or contain illegible signatures.[15]

---

[15] *Draft Agreement between Time, Inc., and Zapruder's Heirs*, Apr. 4, 1975, *Life Assignment of Copyright*, April 9, 1975, *Zapruder Film Documents from the National Archives*, ZapruderFilm.com, https://zapruderfilm.com/p/historical-zapruder-documents. (last accessed June 5, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                 **Page 46 of 55**

301.    The purported 1999 transfer was also invalid. The terms of the original license regulated subsequent transfers and required a yearly royalty payment to Zapruder's heirs. The license prohibits any transfer at all by Zapruder's heirs, which would preclude the transfer to the Museum. Additionally, the license precludes any transfers purporting to dispose of the royalty payment obligation, which the transfer to the Museum purports to do. Accordingly, the copyright could never have been transferred to the Museum under the original licensing agreement.[16]

302.    On April 3, 2025, Plaintiff requested from the Museum any evidence of how copyright was transferred from Time to the Zapruder family, but the Museum responded that it declined to provide any.  The documents available in the National Archives are unsigned, illegibly signed, or otherwise defective.

303.    Plaintiff is entitled to a judicial determination that *SCAM* has not infringed, does not infringe, and would not infringe, either directly or indirectly, any valid, enforceable and/or protectable expression in the Copyright Registration because the Museum never validly obtained the copyright.

### SIXTH CAUSE OF ACTION
**Declaratory Judgment of Copyright Invalidity, Unenforceability, and Non-Infringement
Merger of Idea and Expression
Against The Sixth Floor Museum**

304.    Plaintiff incorporates the foregoing paragraphs herein.

305.    There is an actual, substantial, and continuing justiciable controversy between the Forum and the Museum regarding the validity, enforceability, and noninfringement of the

---

[16] Zapruder, Abraham. *Contract Between Abraham Zapruder and Time, Inc.*, signed by Richard Stolley on behalf of Time, Inc., Nov. 25, 1963. Letter to C.D. Jackson, *Historical Documents from the National Archives on the Zapruder Film*, ZapruderFilm.com, https://zapruderfilm.com/p/historical-zapruder-documents (last accessed June 4, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                              **Page 47 of 55**

Copyright Registration and Plaintiff's ability to sell its book containing the allegedly copyrighted images.

306.    Plaintiff published 72 (seventy-two) allegedly infringing Zapruder frames in its book, *SCAM: The Zapruder Copyright – How the Sixth Floor Museum Continues the Coverup.*

307.    Copyright experts have observed that the Zapruder film is the quintessential example of a work that cannot be protected by copyright because there is no separation between the idea of the film and the expression of the film.

308.    "The factual information contained in a film may be inextricably related to the film's expression of that information, rendering use of the latter necessary to secure broad distribution of the former. *See* 1 Nimmer on Copyright § 1.10(B), at 1-83; Note, Copyright Infringement and the First Amendment, 79 Colum.L.Rev. 320, 328-35 (1979).

309.    In this almost unique instance [of the Zapruder film,] it is at least arguable that the informational value of that film cannot be separated from the photographer's expression, see 1 Nimmer on Copyright § 1.10(B), at 1-83, thereby indicating that both should be in the public domain. *See Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc.*, 621 F.2d 57, 61 n.6 (2d Cir. 1980),

310.    Nimmer treatise's examples of pictures of the My Lai massacre and the Kennedy assassination were referenced regarding times when the demands for a democratic dialogue dictate less stringency in copyright application.

311.    "[W]here the 'idea' of a work contributes almost nothing to the democratic dialogue, and it is only its expression which is meaningful, copyright protection should be limited in the interest of public access to information necessary to effective public dialogue. *See* 1 Nimmer §1.10[C][2] at 1-82–1-84.

312.    "Similarly, in the welter of conflicting versions of what happened that tragic day in Dallas, the Zapruder film gave the public authoritative answers that it desperately sought;

**PLAINTIFF'S ORIGINAL COMPLAINT**                              **Page 48 of 55**

answers that no other source could supply with equal credibility. Again, it was only the expression, not the idea alone, that could adequately serve the needs of an enlightened democratic dialogue." In such instances, the expression and idea are not dichotomous at all but essentially a "unity", inseparable from one another." *Los Angeles News Service v. Tullo*, 973 F.2d 791, 795-96 (9th Cir. 1992) (citing Nimmer § 1.10[C][2] at 1 - 83-1 – 84).

313.    Plaintiff is entitled to a judicial determination that *SCAM* has not infringed, does not infringe, and would not infringe, either directly or indirectly, any valid, enforceable and/or protectable expression in the Copyright Registration because the expression and idea of the Zapruder film have merged.

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment of Copyright Invalidity, Unenforceability, and Non-Infringement**
**Copyright to Suppress Facts**
**Against The Sixth Floor Museum**

314.    Plaintiff incorporates the foregoing paragraphs herein.

315.    There is an actual, substantial, and continuing justiciable controversy between the Forum and the Museum regarding the validity, enforceability, and noninfringement of the Copyright Registration and Plaintiff's ability to sell its book containing the allegedly copyrighted images.

316.    Plaintiff published 72 (seventy-two) allegedly infringing Zapruder frames in its book, *SCAM: The Zapruder Copyright – How the Sixth Floor Museum Continues the Coverup.*

317.    Copyright is intended to increase and not to impede the harvest of knowledge … The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors. *Twentieth Century Harper and Row, Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)."

318.    "By establishing a marketable right to the use of one's expression, copyright supplied the economic incentive to create and disseminate ideas."

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 49 of 55**

319.    While the freedom of thought and expression includes the right not to speak, it also stated: "We do not suggest the right not to speak would sanction abuse of the copyright owner's monopoly as an instrument to suppress facts."

320.    Prohibiting people from viewing the Zapruder film inhibits crucial public debate and is impermissibly quenched contrary to the design of the copyright statute if such protection is extended.

321.    Plaintiff is entitled to a judicial determination that *SCAM* has not infringed, does not infringe, and would not infringe, either directly or indirectly, any valid, enforceable and/or protectable expression in the Copyright Registration because Copyright cannot be used to suppress facts.

**EIGHTH CAUSE OF ACTION**
**Declaratory Judgment of Fair Use**
**Against The Sixth Floor Museum**

322.    Plaintiff incorporates the foregoing paragraphs herein.

323.    There is an actual, substantial, and continuing justiciable controversy between the Forum and the Museum regarding the validity, enforceability, and noninfringement of the Copyright Registration and Plaintiff's ability to sell its book containing the allegedly copyrighted images.

324.    Plaintiff published 72 (seventy-two) allegedly infringing Zapruder frames in its book, *SCAM: The Zapruder Copyright – How the Sixth Floor Museum Continues the Coverup*. Plaintiff's work is intended to be a serious criticism of the film for purposes of examining whether it is truly the Zapruder out-of-camera original, as claimed by Defendants. The book shows Zapruder anomalies in the above frame numbers directly to the reader so the reader can decide for themselves if the film appears to be altered. However, the analysis is incomplete because Defendants retain exclusive control of primary first-generation copies of Zapruder

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **Page 50 of 55**

frames Plaintiff does not have access to because of Defendants' conduct, which would aid in its assessment of authenticity and provenance.

325.    In 1976, Congress enacted § 107 of the Copyright Act, giving statutory recognition to the long existing common law doctrine of fair use.

326.    [T]he fair use of a copyrighted work, . . ., for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

327.    Copyright law "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527 2023).

328.    "[C]onflicts between interests protected by the first amendment and the copyright laws thus far have been resolved by application of the fair use doctrine," *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95 (2d Cir. 1977).

329.    Copying and publishing frames of the film for commentary purposes was determined to be fair use. *Time Inc. v. Bernard Geis Assocs*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968).

330.    Plaintiff requested permission to obtain and publish Zapruder from the Museum, but the Museum denied Plaintiff's first request and has not responded to Plaintiff's second request.

331.    Plaintiff incurred damages. Plaintiff seeks to obtain these versions from the National Archives and include them in the next edition of its book so that readers can compare and decide for themselves if they believe the frames were altered. Plaintiff is unable to make this comparison without the requested records.

332.    Plaintiff is entitled to a judicial determination that *SCAM* has not infringed, does not infringe, and would not infringe, either directly or indirectly, any valid, enforceable and/or

protectable expression in the Copyright Registration because *SCAM* is entitled to a determination of fair use.

**NINTH CAUSE OF ACTION**
**Violation of FOIA for Failure to Affirmatively Disclose Records**
**Injunctive and Declaratory Relief Against**
**National Archives and Records Administration**

333.    Plaintiff incorporates the foregoing paragraphs herein.

334.    The National Archives is subject to FOIA.

335.    In June and August 2024, Plaintiff submitted two FOIA requests. Through the Requests, Plaintiff properly asked for the Warren Commission Slides, reflecting Zapruder Frames 171-334, which are public records within the possession, custody and/or control of Defendant. *See* Exhibits B-I.

336.    Defendant responded by asserting by rejecting the request and refusing to respond to the appeal because of the Sixth Floor Museum's copyright.

337.    Defendant's conduct violates its duties and obligations under FOIA.

338.    FOIA requires agencies to affirmatively disclose frequently requested records. It does so specifically by requiring agencies to "make available for public inspection in an electronic format" without the need for any predicate request [records] that have been requested 3 or more times." 5 U.S.C. § 552(a)(2)(D) (hereinafter referred to as "frequently requested records").

339.    The records requested by Plaintiff were routinely requested and released under FOIA. Zapruder frames are highly likely to be requested since they were integral to all investigations of JFK's assassination, and they were printed in the Warren Report. Inexplicably, they are available in the reading room, but not the electronic reading room.

340.    Prior to Plaintiff's request, dozens of researchers previously requested and viewed the Zapruder frames at the National Archives over the last 61 years. Those that have published

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 52 of 55**

books about doing so include early JFK researchers Harold Weisberg, Stuart Galanor, David Lifton, Fred Newcomb, and Perry Adams.

341.    Despite FOIA's nondiscretionary mandate to affirmatively disclose these records to the public, the requested records are not available to the public on NARA's website.

342.    The agency deprived Plaintiff access to several categories records which it is obligated to electronically publish under FOIA.

343.    Plaintiff needs to view these Zapruder frames in the National Archives to see how much they exhibit the same anomalies as documented in Plaintiff's book. Plaintiff seeks to publish them in the next version of the book to allow readers to view the material to determine for themselves if the film was altered. The best scans the film experts exampled was of a third-generation copy, so it is especially important for Plaintiff and its readers to see how the anomalies look on the first-generation copies held by the National Archives.

344.    The Court has authority under FOIA's judicial review provision, 5 USCS § 552, to enjoin agencies from withholding records and to order the production of improperly withheld records, including requiring agencies to post records online.

345.    Therefore, Plaintiff requests that the Court enjoin the agency from failing to make the commonly requested records available for public inspection in an electronic format on its website as required under FOIA.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court, pursuant to 28 U.S.C. §§ 2201 and 2202:

   A. declare that the existing Zapruder film and/or frames are not original works of authorship under 17 U.S.C § 102;

   B. declare that the Museum has no valid or enforceable copyright in the Zapruder film;

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 53 of 55**

C.   declare that Time, Inc. committed fraud on the Copyright Office;

D.   declare that Time Inc.'s purported transfer of the copyright to the Zapruder Family was invalid;

E.   declare that the Zapruder Family's purported transfer of the copyright to the Museum was invalid;

F.   declare that Time, Inc. and/or the Museum abandoned the copyright;

G.   declare that the idea and expression of the Zapruder film merge;

H.   declare that Time, Inc. waived the copyright to frames 207-212;

I.   declare that Defendant and/or its predecessors used copyright to suppress facts;

J.   declare that Plaintiff's Book does not infringe and/or that Plaintiff's Book is fair use;

K.   enjoin the National Archives from withholding those records by failing to make them available for public inspection in an electronic format on their website;

L.   order Defendant Museum to submit a cancellation request to the Copyright Office;

M.   award Plaintiff attorney's fees and costs reasonably incurred in this action pursuant to 17 U.S.C. § 505;

N.   grant such other relief as the Court may deem just and proper.


Dated: August 1, 2025                    Respectfully submitted,

                                         **JAVITCH LAW OFFICE**

                                         */s/ Mark L. Javitch*
                                         Mark L. Javitch
                                         CA Bar No. 323729 (pending *pro hac vice*)
                                         mark@javitchlawoffice.com


**PLAINTIFF'S ORIGINAL COMPLAINT**                              **Page 54 of 55**

----
3 East 3rd Ave. Ste. 200
San Mateo, CA 94401
(650) 781-8000 | Main
(650) 648-0705 | Fax

--and--

**CHAMPION LLP**

Austin Champion
Texas Bar No. 24065030
austin.champion@championllp.com
Ryan J. Reynolds
Texas Bar No. 24110268
ryan.reynolds@championllp.com
----
2200 Ross Avenue
Suite 4500W
Dallas, Texas 75201
214-225-8880 | Main
214-225-8881 | Fax

**COUNSEL FOR FORUM ON OPEN ACCESS
TO GOVERNMENT RECORDS INC.**