# Exhibit A-1

Copyright © 2025 by Forum on Open Access to Government Records, Inc.

All rights reserved.

No portion of this book may be reproduced in any form without written permission from the publisher or author, except as permitted by U.S. copyright law.

**Resources**

The Forum now hosts the largest collection of historical documents concerning the Zapruder film on its website, ZapruderFilm.com. These documents were collecting dust in boxes in the National Archives until we recently photographed them and put them online.

ZapruderShrugged.com is a blog about the latest developments in the Zapruder film. If you have any feedback or wish to share your own ideas about the film, please contact us.

# Contents

Introduction: After 60 Years, the Zapruder Film is Still a Mystery — V

Part I: The Film We Know Today Cannot Be the Original Zapruder Film — 1

1. The Existing Film was Made in a Highly Classified CIA/Kodak Studio — 5

2. Forensic Examination Indicates the Film Was Altered — 9

3. The Museum Performed a Second Alteration—to Conceal the First — 16

4. Early Witnesses Describe a Different Zapruder Film — 22

Part II: The Film Is Visibly Altered — 28

5. The Film was Altered at Frames 154-157 and 207-212 — 33

6. The Splice Between Frames 132 and 133 Was Not Made in a Camera — 44

7. The Stemmons Freeway Sign Was Added to the Film — 59

8. The Film Contains Blended Frames Created in Post-Production, Not In-Camera — 69

9.  JFK's Driver Performed Impossible Head Turns    73

10. JFK's "Blob" Head Wound Was Painted On With Special Effects    80

11. A Black Patch was Superimposed Over the Wound on JFK's Head    84

Part III: The Museum Continues the Coverup    92

12. The Museum Is Biased in Favor of the Lone Gunman Theory    94

13. Why Does the Museum Claim to Own the Zapruder film Copyright?    96

14. Each Time a Lie Was Exposed, the Copyright Changed Hands    101

15. The Zapruder Heirs Could Not Have Obtained the Copyright in 1975    109

16. The Purpose of Copyright is to Expand Knowledge    113

Part IV: The Museum Must Stop Suppressing Certain Viewpoints    116

17. Copyright Cannot Be Used to Suppress Facts    122

18. Copyright Cannot Be Used to Suppress Facts Because of the First Amendment    125

19. Copyright Cannot be Used to Suppress Facts Because the Idea and Expression Merge    130

20. Copyright Cannot be Used to Suppress Facts Because of Fair Use    133

21. The Zapruder Film's Copyright Must Be Invalidated    139

Conclusion: How to Finally Free the Zapruder Film    144

# Introduction: After 60 Years, the Zapruder Film is Still a Mystery

**The Full Story of the Zapruder Film Has Not Yet Been Written**

More than sixty years after Abraham Zapruder captured his film, we are still making new discoveries. And yet, the film remains a mystery. It may always be that way. Our questions may never be fully answered.

In her 2016 book *Twenty-Six Seconds*, his granddaughter Alexandra Zapruder sought to offer the definitive account of the Zapruder film. While the book is impressively detailed, her narrow focus on defending her grandfather's legacy—and her lawyerly presentation of the facts—ultimately provoked more questions than it resolved.

Recent developments cast serious doubt on the prevailing narrative of the Zapruder film, largely shaped by *Life* Magazine.

## The Stakes Are High for the Sixth Floor Museum

The stakes could not be higher—especially for the Sixth Floor Museum ("Museum"). The Museum is a converted warehouse floor of the former Texas School Book Depository where the Warren Commission concluded that Lee Harvey Oswald fired the fatal shots. If the Zapruder film is proven to have been altered—something Oswald could not possibly have done—the lone gunman theory collapses.

The Museum cannot dispute that it is biased. Regardless of the truth, in order to maintain its existence, it must do everything in its power to convince people that Oswald killed JFK by firing from that location. If its theory is wrong, the Museum ceases to be a site of historical education and instead becomes merely a distributor of propaganda. The Museum has everything to lose. Therefore, the Museum cannot be trusted as a neutral historian.

## This Book Encourages You to Use Your Own Judgment

Before exploring the content of this book, it is important to first understand the events that have begun to challenge the long-accepted version of history. This book assumes a basic familiarity with the Zapruder film, particularly as it has been presented in major media and popular culture.

You are invited to examine the facts presented in this book, compare them with official accounts, and reach your own conclusions. Unlike *Life* Magazine, this book doesn't ask for your trust—it invites you to

form your own opinions. Reasoning is disclosed in plain sight. No special expertise is required—only a willingness to reconsider what you've previously been told. Your independent thinking in seeking the truth about the JFK assassination is essential.

### *The CIA Created the Existing Zapruder Film*

Through interviews conducted by Douglas Horne and Peter Janney, it was discovered that:

1. The original Zapruder film was in the possession of senior CIA photo analysts, not *Life* Magazine, during the weekend of the assassination.

2. The photo analysts had *two different Zapruder films*.

3. Both of these films were thought to be the "out-of-camera original" Zapruder film. Of course, only one of them could have been the original.

4. The surviving film is not the original Zapruder film. It is an altered version.

5. Whether the original still exists, or has been lost or destroyed, remains unknown.

### *Image Anomalies Uncovered by Researchers*

Early researchers identified discrepancies in the Zapruder film, but it wasn't until the 1990s that a growing number began to seriously challenge its authenticity. Those who studied the film frame-by-frame documented numerous instances of phenomena that defy physical

possibility. The number of these anomalies is so extensive that it is impossible to discuss all of them in a single book. Among this community of alterationists, the debate shifted from whether the Zapruder film was altered to how and where those alterations were carried out.

### Film Experts Found Artificial Special Effects Added to JFK's Head

Post-production experts Sydney Wilkinson and Thom Whitehead performed the highest-resolution scan ever made of the best available copy of the Zapruder film at the National Archives. They found that 1960s-era Hollywood special effects techniques were used to alter the appearance of JFK's head during and after the headshot.

### The Museum Conducted Another Alteration to Hide the First

Ms. Wilkinson sought to verify whether the anomalies she had identified were also present in the Museum's Zapruder film slides. During her viewing, she confirmed the presence of cartoon-like anomalies. However, in subsequent visits, she discovered that the Museum had *physically altered the slides* to hide evidence of the original alteration.

### *The Museum Censored Filmmaker Shane O'Sullivan*

In 2013, filmmaker Shane O'Sullivan was developing two films about the JFK assassination when he received a threatening letter from the Museum's high-powered law firm demanding that he remove the Zapruder film from his documentaries. One of his films, *The Zapruder Film Mystery*, contains interviews indicating that the Zapruder film was altered. O'Sullivan was intimidated by the threats, and he acquiesced to removing the Zapruder scenes from his films. The Museum succeeded in censoring his use of the film—even though that use was lawful under fair use and other principles.

### *The Museum Blocked Access to Zapruder Frames in the National Archives*

The Museum used its questionable claim of copyright over the Zapruder film to block Freedom of Information Act ("FOIA") requests. The organization publishing this book requested copies of the Zapruder film and individual frames from the National Archives, but those requests were denied on the grounds that the Museum had not granted permission. There is lawsuit pending against both the National Archives and the Museum. The conduct of the National Archives and the Museum stands in stark contrast to the spirit and intent of the Freedom of Information Act and the President John F. Kennedy Assassination Records Collection Act of 1992 ("1992 JFK Act").

# Part I: The Film We Know Today Cannot Be the Original Zapruder Film

The Zapruder film has long been touted by *Life Magazine* to be the most important visual record of President John F. Kennedy's assassination. Ironically, considering what we know today, *Life* claimed that the film was the "only unimpeachable witness."



*Life's Issue Covering the Warren Commission Report*

However, the widely circulated version of the film is *not the film shot by Abraham Zapruder*. There are many independent reasons to conclude that the film in circulation today is an *altered* version of his footage.

First, the official story given by *Life's* Richard Stolley—that he sent the original to Chicago for publication immediately after purchasing it—turned out to be false or incomplete.

During the time we were told the original was in Chicago, on the Saturday and Sunday nights following the assassination, the CIA had possession of *two different* Zapruder films in Washington, D.C. Over both nights, photo analysts selected frames and enlarged them

on briefing boards for government officials. Both of these films were thought to be the "original" Zapruder film.



*One of the Briefing Boards Made by the CIA in the Second Operation*

The film that exists today originates from the *second* of these operations, when the CIA made four briefing boards, one of which is shown above. The CIA disclosed that it possessed these briefing boards in 1975, and they are now housed in the National Archives. The film used to create these boards was not the one developed by Zapruder in Dallas. It was made at a top-secret CIA/Kodak photo facility in Rochester, New York.

The status of the film used by the CIA to produce briefing boards during the *initial* operation—believed to be the true Zapruder camera original—is unknown. It appears that the briefing boards containing original frames were intentionally destroyed by the CIA.

Second, the most advanced technical analysis ever conducted on the Zapruder film concluded that the footage was altered. Special effects were inserted to make President Kennedy's head wound appear consistent with a shot fired from behind by Oswald. If, as the analysis suggests, a large exit wound at the back of the head was deliberately

concealed, it would mean that Oswald could not have fired the fatal shot. This conclusion would be devastating for the Sixth Floor Museum, as it would undermine the historical significance of its location in the former Texas School Book Depository.

Third, in an apparent effort to avoid historical irrelevance, the Museum engaged in a new act of evidence tampering—one that suggests it is actively perpetuating the coverup more than 60 years after the assassination. Once it became clear that materials in its own collection could undermine the official narrative, the Museum's evidence suddenly changed to fit its preferred version.

Fourth, the Museum is actively obstructing filmmakers and researchers—particularly those who question the authenticity of the Zapruder film—from using the film in their work. In 2013, the Museum prohibited filmmaker Shane O'Sullivan from including clips of the Zapruder film in his documentaries *Killing Oswald* and *The Zapruder Film Mystery*. More recently, in 2024, the Museum intervened to block FOIA requests seeking mere copies of Zapruder-related materials held by the National Archives. My clients have filed suit to challenge the Museum and the National Archives in court.

Fifth, the accounts of those who viewed the Zapruder film shortly after the assassination conflict with the version available today. Some witnesses described elements that are no longer present, while others failed to mention movements that are now the film's most striking scene.

Sixth, a close visual inspection of the film frames today reveals anomalies that could not have come from a camera.

Taken together, these independent grounds strongly suggest that the existing film is not the original.

Chapter One

# The Existing Film was Made in a Highly Classified CIA/Kodak Studio

### The Original Was Sent to Washington, D.C., Not to Chicago

B y official accounts, the provenance of the original film developed in Dallas crumbles after Zapruder sold the film to *Life Magazine's* Richard Stolley. On Saturday, November 23, 1963, Stolley said

that he sent the Dallas original to *Life's* printing press in Chicago.[1] The chain of custody ends at that time, however, because there is no further evidence as to who actually received the film in Chicago on behalf of *Life*.

We now know that the Dallas original could not have been in Chicago for long on Saturday (if it was ever there at all) because it was accounted for in Washington, D.C by that evening. A team of CIA photo analysts[2] led by Dino Brugioni was called into work late that night to create enlargements of certain frames to brief senior officials.

However, that film *is not the film preserved today—**the Dallas original film has since been lost or destroyed***.

## The Existing Film was Altered at Kodak's CIA Facility in Rochester, NY

The surviving film is not the original developed in Dallas, and analyzed in Washington, D.C., on Saturday night.

---

1. Wrone, David R. *The Zapruder Film: Reframing JFK's Assassination*. University Press of Kansas, 2003.

2. Brugioni, Dino. Interview by Douglas P. Horne. *The Zapruder Film Mystery*, directed by Shane O'Sullivan, e2 films, 15 Aug. 2014. YouTube, https://www.youtube.com/watch?v=J_QIuu 6hsAc

On Sunday night, November 24, 1963, the night after the first team worked with the true original film, a *separate team* of CIA photo analysts involving Homer McMahon and Bennett Hunter were called into work late at night to create a second set of briefing boards. The enlargements this team made were from a version of the film that was altered at a top-secret CIA/Kodak photo lab in Rochester, New York.

## The Whereabouts of the Original Are Unknown

Brugioni recalls differences between the existing version and the Dallas original that he worked on. Brugioni saw a much larger and more prolonged head explosion.[3] He also remembered debris flying high into the air and a distinct white cloud.[4]

Brugioni kept the briefing boards containing frames from the true original until 1975, when the Rockefeller Commission requested that the CIA explain how it was involved in the Zapruder film. In a rare blemish on an otherwise spectacular career, Brugioni followed his superior's instructions and failed to disclose the boards to the commission.

When John Hicks, a senior CIA executive, learned that Brugioni retained evidence of the original film, he said: "Goddammit, what the hell are you doing with that? Get the god damn thing out of here!" Brugioni said that Hicks "was madder than hell."[5] Brugioni sent the

---

3. *Id.*

4. *Id.*

5. (Brugioni, *Zapruder Film Mystery*)

briefing boards to the CIA Director's office and never heard about them again.

## The Most Secretive Film Operation in CIA History

This extraordinary level of secrecy suggests that the CIA regarded its operations involving the Zapruder film as among the most sensitive and tightly guarded in its history. The events of Saturday and Sunday night were deliberately compartmentalized. Separate teams enlarged and mounted selected Zapruder frames onto briefing boards—yet neither team was aware of the other's involvement, and each believed it was working with the original film.

The fact that the CIA conducted two classified operations using different versions of the Zapruder film—and that only one set of briefing boards survives—strongly suggests that the Agency intended to create a version of the film tailored to shape the narrative of how President Kennedy was killed. The surviving film is therefore best understood not as the Dallas original, but as the product of covert manipulation.

Chapter Two

# Forensic Examination Indicates the Film Was Altered

I n the most sophisticated study of the Zapruder film ever conducted, post-production film experts Sydney Wilkinson and Thom Whitehead uncovered compelling evidence that a black patch was artificially added to the film, as circled in Z-317, pictured below.



*Film Experts Discover Black Patch Concealing JFK Head Wound*

Given the controversial nature of their discovery, Wilkinson and Whitehead were not able to obtain funding to complete their full-length documentary. A short preview of their work is available in a presentation given by Dr. David Mantik.[1]

## An Independent Study By Post Production Experts

Undertaken out of pure curiosity and with no agenda, the study was led by Sydney and Thom—veteran professionals with years of experience at top Hollywood film restoration and post-production com-

---

1. Mantik, David. *A Closer Look at the Zapruder Film: The Case for Alteration*. The Future of Freedom Foundation, 6 Dec. 2024, https://www.fff.org/freedom-in-motion/video/a-closer-look-at-the-zapruder-film-the-case-for-alteration/

panies. In 2008, they acquired a 35mm duplicate negative of what the National Archives identifies as the "forensic version" of the Zapruder film's "camera original." After selling their editing company to Deluxe Labs—one of the industry's most respected post-production facilities—Wilkinson and Whitehead gained access to their state-of-the-art equipment.

## The Best Equipment, Producing the Highest-Resolution Scans

Using a Northlight scanner, considered the gold standard in film scanning, they digitized the film in 6K resolution in logarithmic color space and DPX format. This preserved every pixel of tonal and color data, allowing for unprecedented digital zoom without any loss of detail.



*Wilkinson's 6K Scans Reveal Significantly More Detail*

As demonstrated in the comparison above. The scans reveal over ten times the resolution and data size of an HD television image. No

prior authenticity study of the Zapruder film has matched the level of technical precision or professional expertise demonstrated in their work.

## Veterans with Decades of Post-Production Experience Are Asked for their Opinion

Wilkinson and Whitehead consulted with dozens of colleagues who, like themselves, had extensive experience in the post-production film industry. These post-production professionals are uniquely qualified to detect signs of tampering that others might miss.



*Few of the Technicians Consulted Were Willing to Appear on Camera*

Although Wilkinson and Whitehead requested their colleagues share their opinions on camera as part of the study, only three agreed: Paul Rutan, Jr., Garrett Smith, and Ned Price (not pictured). With decades of hands-on experience examining, repairing, and altering film, these technicians represent the precise skillset necessary to evaluate whether the Zapruder film bears marks of post-production manipulation.

## The Experts Identify the Black Patch Anomaly



*Film Restoration Expert Paul Rutan, Jr. Points out the Alteration*

Rutan, Jr., Smith, and Price discovered a sharply defined, trapezoidal black patch over the back right of JFK's skull in frames 317, 321, and 323, as well as in many other frames after the headshot. This patch lacks the irregularity and tonal gradation characteristic of natural shadows or film grain. In contrast, in the same exact frames as the black patch can be seen, Governor Connally's head appears natural and exhibits no such patch. In their professional opinion, the feature bore all the hallmarks of artificial artwork added in post-production. Further, they indicated that "cartoon-like" blood must have been artificially painted on to add a wound on the right side of the head.



*CIA Photo Expert Dino Brugioni Examines the Black Patch*

In 2011, Douglas Horne showed Wilkinson's high-resolution scans to Dino Brugioni—probably the most important expert to consult on this subject. Not only was Brugioni the top CIA photo expert who analyzed the true "out-of-camera original" film for the CIA during the weekend of the assassination, he also quite literally wrote the book on detecting photographic forgeries: *Photo Fakery: The History and Techniques of Photographic Deception*, published in 1999. When shown the frames containing the black patch, Brugioni directed his pointer right at it and said "that's an anomaly" and "that troubles me right here."



*David Lifton's Second Generation Scan of Z-317*

The anomalies could not have been the results of errors in Wilkinson's study because they are present on earlier generation copies. Wilkinson compared her 6K scans of the third-generation copy to the first-generation 4x5″ MPI transparencies at the Sixth Floor Museum and confirmed the presence of the same geometric black patch—with even greater clarity. David Lifton, an early researcher, also recalled seeing the same dark area when viewing Time-Life's 4x5″ transparencies in 1966 and again when examining first-generation copies made by Moses Weitzman in 1967.[2]

---

2. Lifton, David S. *Best Evidence: Disguise and Deception in the Assassination of John F. Kennedy*. New York: MacMillan. 1980.

Chapter Three

# The Museum Performed a Second Alteration—to Conceal the First

**Confirming the Alteration in the Museum's Zapruder Frames**

Following their landmark forensic analysis, Sydney Wilkinson and Dr. David Mantik went to the Sixth Floor Museum in November 2009 to view the MPI transparencies—first-generation 4x5″ color photographic positives made in 1997 directly from the Zapruder

film. These transparencies, housed by the Museum, offered the closest public equivalent to viewing the original.

Wilkinson and Mantik confirmed in the Museum's frames what they saw in their 6K scans: the back of JFK's head, particularly in frame 317 and adjacent frames, featured an unmistakable, sharp edged black patch. The shape, color, and contrast of this patch left no doubt to both Wilkinson and Mantik that it was artificial. It was so stark and unnatural that Mantik later described nearly bursting into laughter upon seeing it—not out of amusement, but at the sheer brazenness of the alteration.

As Wilkinson later wrote about the crude alteration:

> Words cannot describe how stunned I was when I viewed the head shot, frame Z-313, and the frames immediately following. The resolution was beyond anything I expected. Especially, in frames Z-317, Z-321, Z-323, Z-335 and Z-337, the solid, black patch that is clearly seen on our 6k scans--covering the right rear area of JFK's head--was even more egregious on the MPI transparencies. It was all I could do to muzzle my emotions. There was no doubt the MPI transparencies corroborated the obvious anomalies seen on our scans.

Seeing them at the same time as Wilkinson, Dr. Mantik wrote:

> The resolution and color were so incredible that I felt as if I were seeing these frames for the very first time. But the greatest emotional impact came on seeing the

> black patch in Z-317. It was so blatant, so childishly done, that I almost laughed aloud. Whether I did or not is in some doubt, but I retain an image of clapping my hand over my mouth to prevent such a laugh.

## The Museum Altered Frames to Obscure the Black Patch

But when Wilkinson returned with Thom Whitehead to the Museum just one year later, in 2010, everything had changed. Though she was shown what were described as the same first-generation MPI transparencies, the sharp, geometric black patch had vanished. In its place was a diffuse, greyish area that bore no resemblance to the crisp anomaly she had seen earlier. The distinctive edges were gone, replaced by a more "natural-looking" shadow that blended ambiguously into JFK's hair. She wrote:

> I was definitely not prepared for what I saw when I looked through the loupe. Not only were the transparencies much larger in size physically, than the ones I had viewed the previous year with David, but none of them were as clear and sharp. Not even close. Most importantly, and suspiciously, the flagrant image of the black "patch" was gone. Instead, the back of JFK's head appeared to show a natural shadow--what Thom called "fuzzied up"--without the straight and well-demarcated edges I had seen in 2009. We were both stunned. Furthermore, the black patch was not nearly

> so obvious in this supposed first generation copy as
> it was in our third generation 6K copy. That made
> no sense whatever to me. Despite being assured by
> the museum they were the same transparencies that
> David and I saw the previous year, there is absolutely
> no doubt that they were not.

Dr. Mantik also had a chance to view the frames again in 2012. Upon seeing the slides, he wrote:

> The verdict came quickly-the patch in Z-317, and
> conspicuously present in other frames such as Z-321
> and Z-323, had vanished. The back of JFK's head
> appeared little different from all those images I had
> seen before (excepting for Sydney's 6K images). The
> powerful emotional response of 2009 did not recur.
> Furthermore, the back of JFK's head did not show
> the patently obvious patch I had seen on Sydney's 6K
> scans.

## How Could the Third Generation Appear Sharper Than the First Generation?

Wilkinson and Mantik's observations compel the conclusion that the Museum must have altered the frames in their custody shortly after the 2009 visit, which was also about the same time that Douglas

Horne published his book also exposing the black patch.[1] Together, Wilkinson and Mantik wrote:

> What strikes both of us as most anomalous is the wonderful clarity of Sydney's 6K scans--which are only a third generation--versus the (currently) less impressive "first generation" MPI images now housed at the Museum (but present only after our 2009 visit). This discrepancy makes no sense to either of us. It would be most useful if Sydney's 6K scans could be taken into the Museum viewing room to be compared side by side with the MPI images, but that is not allowed. Nor were we permitted to record any images of the MPI transparencies, either via camera or scanner--so we have only our memories.

A first-generation copy should not appear less clear than a third-generation one. Under normal conditions, each successive generation of film introduces some degradation. That a third-generation scan could appear sharper than a supposed first-generation transparency is virtually impossible—unless the latter was degraded or altered. This discrepancy is why we must obtain a copy of the Museum's

---

1. Horne, Douglas P. *Inside the Assassination Records Review Board: The U.S. Government's Final Attempt to Reconcile the Conflicting Medical Evidence in the Assassination of JFK*. Vol. 4, 2009, p. 1361.

transparencies to determine whether they were modified for a second time.

## Coverup of the Coverup?

This vanishing act has major implications. The black patch, which concealed a large exit wound consistent with a shot from the front, indicates a conspiracy well beyond one that could be hatched by Lee Harvey Oswald. Its removal from the transparencies conveniently aligned with preserving the official narrative: that Kennedy had been struck from behind by a lone gunman firing from the Texas School Book Depository.

The Sixth Floor Museum's handling of this critical photographic evidence casts doubt on its role. To see how serious this allegation is, the Museum is accused of altering frames that were altered in 1963 *to conceal the original alteration, 60 years after the fact*. We must be able to audit the Museum's materials. Whether it failed to protect or actively obscured authentic records, the result is the same: the historical truth has been buried. On April 3, 2025 and April 24, 2025, we requested that the Museum provide a copy of these slides, in order to learn more about this issue, but the Museum refused to respond, leaving the public in the dark about the integrity of this critical historical evidence.

Chapter Four

# Early Witnesses Describe a Different Zapruder Film

Also supporting the notion that the existing film is altered, the earliest witnesses — those who viewed the Zapruder film within days of the event—describe a different version of events than what appears today.

### Abraham Zapruder Said He Filmed the Limousine Turn

Abraham Zapruder, the man who filmed the assassination himself, gave public statements shortly afterward that did not match what we see in his film today. He described President Kennedy reacting

to the first shot and falling sideways—yet in the existing film, we do not see the President's reaction at all. Instead, Kennedy is completely obscured behind the Stemmons Freeway sign at the moment of the first shot, and emerges upright with both hands rising to his throat.



*Abraham Zapruder Burst onto the Scene Following the Assassination*

Zapruder also described filming the motorcade's entire approach, including its turn onto Elm Street. In a December 4, 1963 interview with the FBI, Zapruder was quoted as saying "he first picked up the motorcade as it made the turn onto Elm Street from Houston Street." In his testimony before the Warren Commission on July 22, 1964, he said: "I started shooting when the motorcade started coming in, I believe I started and I wanted to get it coming in from Houston Street." But as discussed, the splice at 132/133 omits the entire turn. At no point in his public statements did Zapruder acknowledge that he stopped and restarted filming. That silence is striking, especially given the significance of the missing footage.

## Marilyn Sitzman Also Described Continuously Filming the Limo Turn

Abraham Zapruder is often described as the most famous murder witness in history. But his secretary, Marilyn Sitzman, stood right behind him on the concrete pedestal from which he filmed the assassination. Her role was to steady Zapruder, who suffered from vertigo. Her vantage point gave her a clear view of both the assassination and Zapruder's filming.

Despite this, Sitzman was never called to testify before the Warren Commission. Why wasn't she considered as critical a witness as Zapruder himself? Like Zapruder, in the few interviews she gave, she notably omitted any mention of stopping and restarting the camera, or missing the limousine's turn onto Elm Street.

## Dan Rather Said Kennedy's Head Moved *Violently Forward After the Fatal Shot*

CBS News anchor Dan Rather was the first journalist who viewed and reported on the Zapruder film on television and radio. He described what he saw: President Kennedy being struck and moving *violently forward*. He did not mention the backward motion that is now the most discussed element of the film.



*Dan Rather Describing the Zapruder Film on November 25, 1963*

Rather also repeatedly emphasized that the film showed the limousine passing the Texas School Book Depository, where Oswald's sniper's nest was reportedly located, while turning onto Elm Street—again, something lost in the 132/133 splice which is clearly absent from the extant film.

## Cartha DeLoach of the FBI Also Said JFK Moved Forward After the Fatal Shot

Cartha "Deke" DeLoach was the FBI's Deputy Associate Director under J. Edgar Hoover at the time of the assassination. In his memoir, he recalled viewing the Zapruder film shortly after the shooting. Like Dan Rather, he reported that Kennedy's head moved *forward* at the moment of the fatal shot.

## Dino Brugioni Saw a Different Version

Dino Brugioni worked directly with the original, out-of-camera Zapruder film. When Brugioni reviewed the existing version of the film,

he stated unequivocally that, although nearly identical, it could not have been the same version he had originally analyzed.



*Brugioni Describing How the Original Differs from the Existing Film*

He pointed to specific differences, especially in the depiction of the headshot—recalling a distinct white "ball" of blood and brain matter — an image he did not see in the current version. "I just remember the white ball, I thought it was like a white ball right over his head. About where my pointer is," he said. Brugioni believed the original was more graphic, with a different pattern of spray, suggesting that key frames had been altered or removed—implying the existence of multiple versions of the Zapruder film.

## Richard Stolley and Erwin Schwartz Didn't Notice the Head Snap

Richard Stolley said that he viewed the film three times in Zapruder's office on the day after the assassination. Zapruder's business partner, Erwin Schwartz, estimated that he saw the film about 15 times that weekend. Neither mentioned seeing the back-and-to-the-left head snap.

### The Original Must Have Been Altered Unless All Early Witnesses Are Lying

From Zapruder himself to his secretary, from journalists to top officials in the FBI and photo analysts in the CIA, early descriptions of the Zapruder film do not align with the version that exists today. They describe a continuous film *including the turn onto Elm Street,* they describe Kennedy being thrown violently *forward* by the fatal shot, and they make no mention of the now-infamous "*back and to the left*" head snap. Unless Zapruder, Sitzman, Rather, DeLoach, Brugioni, Stolley, and Schwartz all conspired to tell a coordinated lie, then these witnesses support the notion that the original film was altered.

# Part II: The Film Is Visibly Altered

Researchers—whether casual observers or seasoned analysts—can readily see that the surviving Zapruder film is not the original, unaltered version that came directly out of the camera. In fact, several anomalies are plainly visible to the naked eye. This is no longer a controversial assertion; the evidence is simply too extensive to ignore. While a comprehensive review would exceed the scope of a single book, what follows are some of the most significant examples of tampering.

### Visible Black Wavy Lines and Lost Frames

Thick, unnatural black wavy lines appear in frames 154, 157, 207, and 212—points where the film suffered physical damage and was repaired—allegedly during *Life Magazine's* handling on the weekend of the assassination. These black wavy lines may be the result of glue used in the repair process, but no one has ever provided a full explanation for the damage itself. Despite two distinct sets of lost and damaged

frames (154–157 and 207–212), Time only addressed the damage at 207–212, leaving the damage to frames 154–157 entirely unexplained.

### The Impossible Splice at Frame 132/133

Multiple inconsistencies at Z-132/133 indicate the film was altered. First, the crowd captured on Elm Street remains eerily frozen for over 30 seconds of real time, including before and after the splice, suggesting that either frame repetition or visual compositing was used. Second, the image quality abruptly changes after the splice, with a dramatic drop in dynamic range and contrast—something no camera could produce. Third, there is no first-frame overexposure at frame 133, a mechanical signature expected when restarting Zapruder's spring-wound 8mm camera. Incredibly, although the frame 132/133 transition has no first frame overexposure, overexposure is visible elsewhere in the film.

### Double Exposure Frames Appear that Were Created in Post-Production

Double exposure frames, as seen in several frames of the extant Zapruder film, are images in which visual elements from two different moments in time appear blended into a single frame, often resulting in ghosted or smeared figures. These are not true "double exposures" in the photographic sense (where the film is exposed twice during shooting). Instead, these frames are created for the purposes of playing 8mm film on television so the old film does not appear "sped up."

This conversion involves blending two adjacent film frames to create a single video image with elements from both, smoothing motion for TV playback. Such frames are easily identifiable by the presence of

multiple ghost-like images of people or objects in different positions within the same frame. However, these effects can only be created in post-production. They cannot be produced by the Bell & Howell 414 PD camera used by Zapruder, which exposes only one image per frame through a mechanical shutter system and cannot blend multiple exposures. Their presence is direct evidence that the existing Zapruder film cannot be an original.

## The Absence of Normal Parallax Effects

As a handheld film shot by an amateur from a moving, panning position, the Zapruder film should display parallax—shifts in the relative position of foreground and background objects. However, the film exhibits a mechanical flatness, as though different layers of action were composited together. The foreground and background appear to move together, even though they are expected to move in different proportions due to parallax.

## Frames Removed to Hide Secret Service Slowing the Limousine

The Zapruder film shows the limousine traveling at a steady speed through Dealey Plaza. However, multiple eyewitnesses reported that the limousine actually slowed down or even came to a brief stop. Logically, William Greer, JFK's driver, should have instinctively accelerated at the first sound of gunfire. Any visual evidence of that hesitation—or of Greer's inaction—would have been deeply damaging and therefore had to be edited out. By removing critical frames, the altered film not only hides what Greer may have witnessed or failed to do but also reinforces the official narrative: that a lone gunman acted independently.

These frames had to be suppressed because the public would not have believed a lone nut killed JFK if the Secret Service agents appeared to be culpable. Of course, a lone nut could not influence JFK's drivers to slow down the limo in Dealey Plaza.

## Impossible Characteristics of the Stemmons Freeway Sign

The Stemmons Freeway sign is riddled with visual and physical impossibilities. Unlike real-world signage, which is positioned perpendicular to traffic for visibility, the sign in the film appears angled toward the camera in a way that renders it unreadable to oncoming drivers. John Costella, Ph.D., an Australian physicist, determined that the sign was added in a *separate layer* from the rest of the scene. He also demonstrates that the position of the sign's poles shifts inconsistently against the fixed background structures. Lastly, when the limo emerges from behind the sign, the corner of the sign *changes shape from rounded to slanted for one frame and then reverts to appearing rounded.*

## A Black Patch on the Back of JFK's Head Added — Then Removed

Hollywood film restoration experts found a large, visible black patch had been artificially added over the back of JFK's head. The patch appears to hide the location of the large exit wound. When the filmmakers visited the Sixth Floor Museum, they confirmed that the artificial patch was visibly present on earlier generation copies. However, in subsequent visits, the black patch was no longer visible, implicating the Museum in the coverup.

## The Morphing "Blob" Head Wound Not Seen by Doctors

A cartoon-like blob was artificially added to falsely portray a large, grotesque wound on the top-right side of Kennedy's head—an injury that no Parkland doctor or nurse ever documented. Instead, all firsthand medical accounts describe a massive exit wound at the rear of the head. Researchers identified multiple frames where the back of Kennedy's head appears artificially blacked out and where a shifting, unnatural Blob morphs from frame to frame, violating the laws of anatomy and physics.

Taken together, these anomalies form a consistent pattern of post-production processing, suggesting that the extant Zapruder film was deliberately altered and cannot be an original.

Chapter Five

# The Film was Altered at Frames 154-157 and 207-212

Among researchers of the JFK assassination, few are more ridiculed than the so-called "alterationists"—a subgroup within the already marginalized community of "conspiracy theorists." In her book 26 Seconds, Alexandra Zapruder devotes several pages to discrediting this group, expressing particular frustration at their claims. Alterationists are seen as beyond the pale of reasonable inquiry—dismissed as conspiracy theorists for believing that the film was altered.

Mainstream discussions may entertain the idea that Oswald was aided by a second shooter on the grassy knoll, but to suggest that the film itself was physically manipulated—that someone altered the frames—is often treated as a bridge too far. Alterationism, we are told,

is the red line: cross it, and you're no longer a serious researcher, but a fanatic.

However, those belittling alterationists should take a closer look at the film for themselves. Anyone examining frames 154, 157, 207, and 212 can clearly see have been physically damaged, spliced, and reassembled. Even Time's own explanation confirms that *the film has been altered*. Wavy black lines run through the damaged and repaired frames 154, 157, 207, and 212. Frames 155-156 and 208-211 were entirely lost, and only partial copies exist today. In Frame 212, a tree trunk appears disjointed, its base hovering several feet away from its crown.

This issue is not new. In 1964, when the Warren Commission published 160 frames in sequential order, it inexplicably omitted frames 208–211, while printing the repaired frames 207 and 212. In depicting the FBI reenactment, a partial copy of Z-210 was also printed. The omissions were never explained or corrected by the Warren Commission — it was only brought to the public's attention by early researchers Mark Lane and Harold Weisberg. Embarrassed by the criticism *Life* editors only came forward with an explanation two years after the Warren Reports revealed the error. The explanation left much to be desired, as Time only admitted that an unnamed technician had accidentally damaged, discarded, and repaired certain frames.

## The Damage and Loss to Frames 154-157 Has Never Been Explained



*Frame 154*

Frame 154, shown above, is particularly striking: a thick, black, wavy line divides the top two-thirds of the image from the bottom third. As implausible as Time's explanation for the damage is, it is even more implausible that a nearly identical incident also occurred with frames 154–157. Apparently, we are expected to believe that the same type of arbitrary damage occurred in two separate sections of the film.

But even fewer details are available for this second set of damage. Unlike the damage to frames 207–212, which Time eventually acknowledged, no explanation was ever offered for what happened to frames 154–157.



*Lining Up Copies of
Frames 156-157 Next to
Other Frames Shows the
Lost Sections*

In a book commemorating the 50th anniversary, the Editors of *Life* lumped both sets of damaged and lost frames together, seemingly to obscure the discrepancy.[1]  However, Time's actual admission of losing and damaging frames in 1966 only addressed frames 207-212. In a December 22, 1966 Baltimore Sun article, Richard Pollard, *Life's* photographic director, said that "the original, intact, color film had

---

1. *The Day Kennedy Died: 50 Years Later—LIFE Remembers the Man and the Moment*. Edited by the Editors of LIFE, TI Inc. Books, 2014.

been torn in use by *Life* technicians and then spliced with a loss of four frames. The laboratory technicians were not editorially minded and made an arbitrary decision, that at the time, seemed to have little significance." Mr. Pollard said he learned of the damage to the film only three weeks prior to the article. "I suspect our lab was too embarrassed to tell us about it," Pollard said.

Herbert G. Orth, deputy supervisor of *Life's* photographic laboratories, said that he noticed spliced frames among those produced for the Warren Commission when he supervised the production of 35mm slides.

## Time's Explanation for the Damage is Insufficient and Only Raises More Questions

Not only was Time's poor cover story incomplete, it raised unavoidable questions: how are we expected to believe that the most important home movie in American history—arguably the most scrutinized strip of film ever shot—was subjected to this level of careless handling without consequence or accountability? The idea that Time, a major national media company, could lose and damage frames of this magnitude within 24 hours of acquiring them, and then decades later still offer no coherent explanation, strains credulity.



*Frame 157 - The Second Black Splice*

Frame 157 exhibits the same black wavy lines, which supposedly resulted from gluing together damaged frames.

## How Could Time Have Caused Damage When It Didn't Have the Film?



*Time, Inc. Said that an Unnamed Technician Damaged Frame 207*

According to interviews with former CIA officials, the original Zapruder film was already in government custody in Washington, D.C.

at the time Time, Inc. claimed it was damaged. This raises another serious question: was Time's story—that an unnamed technician caused the damage during duplication—merely a cover for a different sequence of events? Could their explanation have been a lie to conceal a deeper truth?

## The Existence of Copies Does Not Excuse Destruction of the Original

Defenders of Time, Inc. attempt to downplay the severity of its mishandling by noting that copies of the Zapruder film were made prior to the damage.

In an attempt to squelch the controversy, *Life* released the copies. In *Six Seconds in Dallas* (1967), Josiah Thompson printed the undamaged partial copies of 207-212. In connection with their publication for the first time, George Hunt, Managing Editor of *Life* offered this statement to be printed in the book:

> It is a fact that in handling the film of the Kennedy assassination taken by Abraham Zapruder of Dallas and purchased from him by *Life* we accidentally damaged not four but six frames of the original—frames 207 through 212. Before that happened, however, and before we came into possession of the original print, Zapruder had ordered three color copies made by a Dallas laboratory—two for federal agents and one for Life. These are and always have been intact. All four copy prints include the frames in question. Later the Warren Commission requested that Life supply them

with color blow-ups of frames from the original film. We were unable to give them frames 207 through 212, but these were available to them on their own intact copy print. As a matter of fact, frame 210, one of those damaged, is in copy form printed in the Warren Commission report. Thus, there have never been any missing frames. So to end what has become an irrelevant discussion, we are releasing for publication frames 207 through 212, made from the intact copy print in our possession.[2]

Mr. Hunt avoids taking responsibility for *Life Magazine's* role in damaging the original Zapruder film. While he acknowledges that the magazine "accidentally damaged" six frames, he immediately pivots to a reassurance that copies exist. This rhetorical move deflects accountability by shifting the focus away from the harm caused. Rather than confronting the ethical and historical implications of damaging an irreplaceable artifact, Hunt suggests that no real harm occurred because the information was only partially lost.

This line of reasoning downplays the significance of the original as a forensic object and reframes the issue as one of content availability rather than evidentiary integrity. The value of the original Zapruder film lies not just in the visual frames it contains, but in its authenticity, chain of custody, and physical continuity—especially in a case where minute details can have outsized importance in forensic reconstruc-

---

2. Thompson, Josiah. *Six Seconds in Dallas*. Bernard Geis Associates, 1967. Distributed by Random House, pp. 216-17.

tion. By failing to acknowledge this and by calling the controversy "irrelevant," Hunt evades institutional responsibility and reframes a serious breach of journalistic and custodial duty as a logistical non-issue.



*The Remaining Copies of 208-211 Do*
*Not Contain the Full Image*

As seen above on the left side of frames 208-211, above, not only are the images inferior in quality, these copies are incomplete—the space located between the sprocket holes was not captured on copies of 8mm film. When compared to a typical-sized Zapruder frame, it is apparent that the loss is significant. As a result, critical visual information is gone forever.

## Demanding Accountability for the Damage and Loss to 154-157 and 207-212

The explanation Time, Inc. offered to the public for the damage to the Zapruder film is unacceptable. Discarding frames 155-156 and

208–211, even if they were damaged, and arbitrarily splicing together two different frames as a solution—without explanation—crosses the line into the inconceivable and implausible.

For decades, the narrative that a *Life Magazine* technician accidentally damaged the film has gone largely unchallenged. That kind of answer may have been accepted by previous generations, but today, it is indefensible. Time, Inc.—and the Sixth Floor Museum, its successor in controlling the film owe the American people an explanation—not just for how the film was damaged, but why the truth has been concealed for so long. Further, Time must explain how it could have caused damage to the film while the film was actually in the CIA's possession. Anything less than a comprehensive accounting, supported by verifiable records, is a continued betrayal of the public trust.

## Alexandra Dismisses Alteration Despite Evidence in Plain Sight

Proponents of the lone gunman theory—such as Alexandra Zapruder—continue to mock those who question the authenticity of the Zapruder film, deriding them as delusional "alterationists."

SCAM - THE ZAPRUDER COPYRIGHT    43



*Frame 212 Splits a Tree in Half*

But the evidence is right there in plain sight. Will you trust Alexandra—or your own eyes? Frame 212 is perhaps the most blatantly altered image in the Zapruder film. Officially labeled as "repaired," it displays an impossible visual: a tree whose top and bottom halves *are misaligned by several feet*.

The irony is striking: Alexandra's dismissal comes in the face of visible, undeniable physical evidence. Frame 212 is clearly altered. So are frames 154, 157, and 207. These are not conspiracy theories—they are facts staring back from the film itself.

Chapter Six

# The Splice Between Frames 132 and 133 Was Not Made in a Camera

**Zapruder Never Mentioned He Stopped and Started Filming**

As discussed in Chapter 4, in multiple interviews, including a 1967 CBS News special, Abraham Zapruder stated that he began filming as the presidential limousine made its turn onto Elm Street from Houston Street, suggesting an unbroken sequence from

the moment the car appeared through the assassination. However, the existing Zapruder film contradicts this, abruptly jumping from frames of motorcycle escorts (1–132) to the limousine already partway down Elm Street at frame 133—omitting the turn entirely.



*Before the Splice*

Neither Zapruder nor Marilyn Sitzman, who stood beside him, ever mentioned a pause in filming, and both consistently implied continuity.



*After the Splice*

It's hard to believe that Zapruder would skip the moment he came to capture. Given the film's short duration, it's implausible he'd waste frames on motorcycles but miss the pivotal turn.

## How Much Time Elapsed During the Missing Footage?

In order to estimate how much time was lost during the splice, we can reconstruct the motorcade's path. After Zapruder's camera captured motorcycles at Houston Street, the lead car would have followed, and then the presidential limousine would have needed to:

- Turn from Main Street onto Houston Street,

- Travel north up Houston Street for approximately half a block,

- Execute a wide, slow, nearly 120-degree turn onto Elm Street,

- Straighten out and proceed some distance down Elm Street

All of this maneuvering would have taken at least 30 seconds under the conditions of the motorcade's deliberate, slow movement. Yet surviving film skips past all this. Even more, between frames 132 and 133, the environment subtly changes. More spectators are visible on the southwest side of Elm Street after the splice, but the spectators on the North side of Elm remained in place.

## How Did the Spectators Remain Perfectly Still for over 30 seconds?

Accounting for the time before, during and after the splice, over twenty spectators remain almost perfectly frozen, rather than reacting normally to the motorcade. The chance this many people could remain utterly motionless during one of the most dramatic moments in American history strains credibility. It is possible to see perhaps a single face turn and a single hand wave, but besides these isolated movements, in response to the sudden appearance of the President's limousine, the spectators inexplicably stand still.



*Croft Photo Shows the North Elm Crowd is Animated -- Not Motionless*

This is even harder to believe when considering that from other angles, the spectators appear fully animated in reaction to the celebrities passing in the limo. The people on the North Side of Elm Street captured from the other direction by Robert Croft (above), said to correspond to Z-161, are highly responsive and animated (not motionless) to seeing the President and First Lady.

There are two leading theories to explain these contradictions, both pointing to serious alteration of the original film:

## 1. Frame Removal and "Frozen" Repetition

The first possibility is that frames were removed from the original sequence—as substantial evidence elsewhere in the film also suggests. If frames showing natural crowd motion were cut out, the resulting footage would have caused the spectators' movements to appear jerky or fragmented, revealing the tampering to careful observers. To mask this visual disruption, the altered film may have "frozen" the north-side crowd, repeating a single photographic image of the group across multiple frames.

In effect, instead of capturing continuous real-time action, the altered sequence would show a single, static snapshot of the crowd, stretched unnaturally across time to hide the gaps left by removed frames. The result is the unnatural, impossible stillness that viewers now see.

## 2. Composite Fabrication Using Floating Matte Techniques

Some researchers propose that President Kennedy and the limousine were not physically present when this portion of the footage was originally captured. Instead, they suggest, the motorcade was introduced later into pre-filmed background footage using a floating matte technique—a visual effects process available in the early 1960s through aerial imaging technology.

In this method, elements filmed separately (such as the car and passengers) could be composited into existing background scenes by masking and layering images together.



*Oxberry Aerial Imaging Optical Printer System*

The art of photo faking is as old as photography itself. In 1857, Oscar Gustav Reijlander created a composite photo from thirty negatives called *The Two Ways of Life*. The claim that film alteration was technologically impossible in 1963 is a myth easily dispelled by the existence of the Oxberry optical printer, an aerial imaging machine

that was widely used in professional film production and special effects at the time. This precision device, capable of re-photographing individual film frames and compositing multiple image layers, was standard equipment in Hollywood and government facilities alike.



CAMERA →

ANIMATION OR TITLE
ON CLEAR CEL

CONDENSER
LENSES

45° MIRROR

MOTION PICTURE PROJECTOR
SYNCHRONIZED WITH CAMERA

*Diagrammatic Representation*

Far from being science fiction, frame-by-frame editing—including the insertion, removal, or masking of visual elements—was routine practice for studios producing everything from movie effects to classified intelligence materials. The idea that the Zapruder film was some-

how immune to these capabilities ignores the technical realities of the era.

The motionless spectators must have been created in a separate layer and then combined with the rest of the scene using an optical printing system. Such a process would explain why the spectators appear disconnected from the limousine's passage, why their positions remain identical before and after the critical splice at frames 132/133, and why the film lacks the expected parallax effect one would naturally see in handheld footage shot from a moving, panning perspective.

## How Did Zapruder Return His Handheld Camera to Capture the Exact 20 Spectators in the Exact Same Position After the Splice Without a Tripod?

Yet another impossibility lurks within the splice: When Zapruder resumes filming, the camera angle, framing, and field of view *are nearly identical to the moments before the break*—despite the fact that he was shooting handheld from an unstable perch without a tripod. Reproducing such exact alignment is physically implausible under these conditions, especially during the chaos of a live presidential motorcade.

More remarkably, the spectators captured in the scene—roughly twenty individuals standing along the north side of Elm Street—appear in precisely the same positions after the break as before. Their posture, spacing, and orientation show no detectable change, despite the 30 second filming gap. Such behavioral stasis is impossible in any real-world crowd, particularly during an event where people should be reacting to the president and his wife, some of the biggest celebrities in the world at the time. People would have waved, shifted, gestured, or

turned their heads. The fact that none did runs counter to what would be expected human behavior during live events.

These dual impossibilities—exact camera realignment and total crowd immobility—cannot be reconciled through chance or skill. The only explanation that resolves both is that the scene itself is a composite. The crowd and background were likely duplicated or frozen across the splice to maintain spatial continuity, while other parts of the footage proceeded separately.

## A Sudden Drop in Dynamic Range and Contrast

One of the key observations made by restoration expert Ned Price was that, at the point of the splice, there is a sudden change in the dynamic range and contrast of the film image. Dynamic range refers to the spectrum of tones a film can capture—from the deepest, richest blacks to the brightest whites. A film with a high dynamic range will reveal subtle differences within dark areas, such as folds in clothing or slight differences in shading on pavement or grass. Contrast refers to how strongly the darkest and brightest parts of an image are separated from each other—higher contrast makes details pop, while lower contrast flattens and dulls the image.

Before the splice, the image is rich with subtle detail. For example, on the north side of Elm Street, the motionless spectators' clothing shows a variety of black tones—different shades and textures are clearly visible, even among garments that would broadly be called "black."

### Drop in RGB Range at 132/133



*See the RGB Range Collapse in the Four Spectators' Clothes*

After the splice, these tonal differences collapse. Black clothing appears flatter, less detailed, and less nuanced. The richness of dark textures has vanished, replaced by a more uniform, compressed look.

## Range of Black Tones Dropping "Could Not Happen In A Real Camera"

This shift is not minor. It is drastic enough that Price bluntly observed: "That could not happen in a real camera."

In other words, no camera—even with minor exposure or focus changes—could account for such an abrupt and significant drop in the film's tonal reproduction. Cameras do not cause a sudden loss of dynamic range and contrast when simply pausing or restarting filming. The only realistic explanation is that a different piece of film, created under different conditions, was physically joined to the original footage.

This change in black tones is significant because the range of blacks can reveal more than colors. Unlike colors, which can be distorted by lighting, or overall brightness, which can vary with aperture settings,

the dynamic range of blacks is a deep, structural quality of how film reacts to light and captures an image. If the blacks change noticeably between two frames, it strongly suggests that the two pieces of film were not created under the same conditions—or even at the same time.

## Missing First-Frame Overexposure

Beyond the missing time and the sudden change in black tones, the splice at 132/133 reveals yet another impossibility: the absence of first-frame overexposure. Zapruder's camera, like most amateur movie cameras of the time, operated on a spring-driven mechanism. When the operator wound the spring, it powered the film advance and shutter action. Stopping and restarting filming would require the camera's motor to get back up to proper speed, a process that was never instantaneous.

At the very beginning of filming, or after a stop, the camera would typically fire off a few frames before reaching its proper operating speed. This caused the first frame—or sometimes the first few frames—after restarting to receive more light than normal, resulting in a brief, obvious overexposure. Highlights would appear blown out, shadows would be washed out, and colors could appear paler or ghostly for a few frames after each time the camera was stopped and started.

This phenomenon was a well-known characteristic of spring-wind 8mm cameras. Kodak's expert assigned to study the Zapruder film, wrote that "the condition was undesirable and a development/design problem to be avoided, but a not uncommon occurrence. Mr. Zapruder's camera appears to have been prone to the problem."

## What the Zapruder Film Shows — and Doesn't Show

Given this basic mechanical fact, if Zapruder had stopped filming after frame 132, and then restarted to capture frame 133, frame 133 should show first-frame overexposure. Yet it does not.



*Missing First Frame Overexposure
at the 132/133 Splice*

Frame 133 shows no signs of overexposure at all. If anything, frame 133 is darker, not lighter, than frame 132. The lighting, exposure, and general image quality are entirely normal—at least as normal as the degraded post-splice conditions allow. There is no blown-out highlight, no pale haze, no photographic evidence that the camera had just been restarted. In short, frame 133 behaves exactly like a continuous recording—not like a natural restart of a spring-driven 8mm camera.

## Why This Matters: Another Fingerprint of Alteration

The absence of overexposure at frame 133 is not a trivial technicality. It is a fundamental violation of how Zapruder's camera was known to work. The absence of overexposure is exactly what we would expect if someone physically cut two different strips of film together, bypassing the normal spring-wind starting and stopping process entirely. It is not what we would see if Zapruder had simply stopped filming, waited for the limousine to approach, and started filming again.



*First Frame Overexposure is*
*Seen Comparing Frame 1 to 2-4*

Kodak's expert acknowledged that, as you can see here, there *is* first frame overexposure on the Zapruder film at the transition between

the pergola scenes leading into the motorcycles at frame 1. It is deeply ironic—and revealing—for the forgers of the Zapruder film — that while they forgot to include first-frame overexposure at the 132/133 splice, they did manage to faithfully reproduce this optical artifact elsewhere in the film.



*Pergola Scenes to Frame 1 Properly Shows First Frame Overexposure*

This inconsistency undermines the idea that the absence of overexposure at the 132/133 transition is due to camera idiosyncrasies or chance; on the contrary, it highlights an oversight by whoever assembled the altered film. That the creators could mimic this subtle

optical signature in one place but overlook it in a critical splice meant to conceal missing footage suggests they were skilled enough to forge convincingly—but not perfectly. Or, perhaps they were rushed.

## The Growing Mountain of Impossibilities

Taken together with the missing 30 seconds of action, the motionless crowd, the perfect re-alignment of the handheld camera, and the sudden collapse in dynamic range, the absence of first-frame overexposure seals the case: Frames 132-133 could not have been consecutively exposed in Zapruder's camera. They were assembled in the editing room.