# Exhibit A-2

Chapter Seven

# The Stemmons Freeway Sign Was Added to the Film

One of the most visually blatant anomalies in the film is the Stemmons Freeway sign. The sign plays a suspicious role in the film, as it blocks JFK from view while he was hit by the first shot. However, careful analysis reveals that the *sign was artificially inserted* in a layer separate from the rest of the scene. There are many reasons to conclude that the sign could not have been captured in Zapruder's camera.

**Unnaturally Large and Directly Facing the Camera**

First, the Stemmons Freeway sign appears to be set at the wrong angle. Traffic signage is normally positioned perpendicular to the flow of traffic, allowing drivers a clear view of the sign's text and instructions

as they approach. Yet in the Zapruder film, the Stemmons sign appears *squarely perpendicular to Zapruder's camera, not to the street.* This would render the sign unreadable for drivers and defeat the purpose of the signage.



*(A) Frame 202 Conflicts with (B) Pete Barnes, (C) FBI Reenactment, (D) CE895, (E) Richard Bothun #4, and (F) Art Rickerby #3*

In the above compilation, the sign in Zapruder Frame 202 (A) looks unusually large and almost perfectly square-on to the camera. However, several other photos (B-F) in the compilation show that the sign angled correctly— perpendicular to the street, and not as shown in the Zapruder film, perpendicular to the Zapruder pedestal.

Reinforcing that the sign appears incorrect in the Zapruder film, when filmmakers have recreated the scene using an actual sign in Dealey Plaza, they have chosen to adjust the sign's angle to make it look realistic.

## The LBJ Filmmakers Had to "Correct" the Sign

For example, compare the reenactment from the 2017 film *LBJ* to a frame it attempts to replicate at Z-174.



*Compare the Size, Angle and Shape of the Sign to Reenactments*

In the Zapruder film (Z-174), for comparison, the sign appears oddly angled, as discussed. But the sign appears different in *LBJ* when the filmmakers recreated the Zapruder scene.



*The Zapruder Position in LBJ (2017) "Corrects" the Sign*

The set designers had to "correct" the sign's size and angle to reflect how it would appear in real life—smaller, angled toward the street, and not directly at the camera. This "correction" by the filmmakers suggests they recognized that the sign's appearance in the Zapruder film was unrealistic and needed to be altered to match reality. Had they simply recreated the sign as it appears in the Zapruder film, it would have looked just as implausible—underscoring the anomaly.

## The Wrong Angle Relative to the Zapruder Pedestal

Unlike in the Zapruder film, which shows the sign squarely perpendicular in relation to Zapruder's pedestal, the sign was slanted relative to Zapruder's pedestal.



*The Sign was Slanted Relative to the Zapruder Pedestal*

However, when Oliver Stone reenacted the Zapruder scene for his 1991 film *JFK*, he also had to "correct" the sign.



*Oliver Stone Straightened the Sign to Match Zapruder*

In the above scene, Stone changed the sign as it was actually angled in real life to match how it was angled in the Zapruder film — perfectly straight relative to the Zapruder pedestal.

## Because Zapruder's Camera Had "Pincushion Distortion," the Sign's Straight Appearance is Impossible

Physicist John Costella discovered an unmistakable flaw in the sign. When considering the optical characteristics of Zapruder's camera. Zapruder's camera was a spring-driven 8mm model with a known lens distortion pattern called a pincushion effect. Pincushion distortion pulls the edges of the frame inward slightly, creating a subtle but measurable bending of straight lines. This distortion, as would be expected, can be seen throughout the entire Zapruder film—*except for the Stemmons Freeway sign*.

While the rest of the Dealey Plaza scene shows the expected effect, the Stemmons sign remains perfectly straight, free of distortion. Costella emphasized that this is physically impossible: The camera

applies the effect uniformly to each frame. It cannot selectively apply the affect to part of the frame while leaving the rest untouched.

Thus, the only possibility is that the Stemmons Freeway sign was *separately added to the film*, inserted in a way that escaped the optical signature of Zapruder's camera. Costella believes the film is a convincing forgery in general, but he calls missing pincushion distortion on *only* the sign the "Blunder of the Century."

## Inconsistent Sign Angles Relative to the Pergola Squares

Costella also observed inconsistencies in how the Stemmons sign moves relative to fixed structures in Dealey Plaza. In principle, stationary objects like the pergola squares along Elm Street and the Stemmons sign should maintain consistent relative positions across consecutive frames if the camera is panning smoothly and parallax is taken into account. Unfortunately for the conspirators—Dealey Plaza had fixed geometric features, such as the evenly spaced square stone patterns on the pergola. These squares provide stable relative reference points that in real life remain constant. The Stemmons Freeway sign appears for many frames in front of the squares.



*Comparing Z-193 to Z-228, the Sign Pole Angle Changes (Yellow Line)*

As the shifting angle of the yellow lines show in these two frames above, the sign poles do not maintain a fixed position relative to the pergola squares. When the frames are compared side by side, the poles on the back of the Stemmons sign visibly shift relative to the squares. This means that the Stemmons Freeway Sign is internally inconsistent, as it does not even remain fixed in the same place for the entire film, as a real fixed object would.

### The Sign Changes Shape and Jackie's Hat Appears *in Front of* the Sign

As the limousine emerges from behind the sign, the shape of the top right corner of the sign changes from *round to flat* and Jackie Kennedy's pink hat appears *in front of the sign*.



*Frame 219 - Stemmons Freeway with Rounded Top Right Corner*

Starting at Z-219, above, when Jackie is about to emerge from behind the sign, everything is normal, as you can see that the top right corner of the sign is properly rounded.



*Frame 220 - Jackie's Hat Emerges in Front of the Slanted Corner Sign*

However, just one frame later, in Z-220 above, the smoothly rounded top right corner of the sign has *turned into a slanted right*

*top corner*. Not only that, Jackie's hat has come into the foreground, *in front of the corner of the sign that is in front of her*.



*Frame 221 - Stemmons Freeway Sign with a Rounded Top Right Corner*

Just one frame later, in Z-221 above the sign is back to having a *perfectly rounded top right corner*.

This is clearly a physical impossibility: Jackie and the limousine were supposedly behind the sign at that point in the scene. A real, physical sign would have naturally blocked any part of her hat from appearing over it. The shape of the sign obviously could not change from rounded to slanted and back to rounded.

## The Sign Blunder Was Locked In Early and Became Irreversible

Compounding the problem for those who altered the film, the mistake with the Stemmons Freeway sign was locked in early. *Life Magazine* published three key frames of the sign in its November 29, 1963 issue, the first issue after the assassination.



*Stemmons Freeway Sign in Life Magazine November 29, 1963*

The frames clearly showed both the left and right sides of the Stemmons Freeway sign in black-and-white photographs distributed to millions of readers. In doing so, they irreversibly revealed that the sign lacked any pincushion distortion. By publishing these frames so quickly and so widely, Life inadvertently cemented the dimensions, angles, and placement of the altered sign into the public record—making it impossible to later correct the errors without detection. As a result, the insertion of the Stemmons Freeway sign left a permanent and unmistakable trace of alteration.

## Chapter Eight

# The Film Contains Blended Frames Created in Post-Production, Not In-Camera

Frames resembling double exposure ("blended") appear multiple times in the Zapruder film. Double exposure occurs when two distinct images are superimposed in a single frame. As a result, the subject appears in two places at once.

Double exposure is typically a beginner's mistake in still photography, where a user accidentally exposes the same frame twice. But with Zapruder's spring-wound camera, once the film was loaded, the mechanism advanced the film exactly one new frame per shutter cycle,

making it impossible to re-expose a frame in the middle of the reel. At most, a loading error or light leak might affect the leader or the first few frames, but it could not produce an isolated double exposure later in the film.



*Z-201: Double Exposure of Headlights — Not Motion Blur*

One of the clearest examples of double exposure is in the above frame, Z-201. The headlights of the Secret Service car appear to have been photographed twice within the same frame.

## Double Exposure is Not the Same as Motion Blur

It is important to distinguish between motion blur—which is expected in the Zapruder film—and double exposure. The above image of the headlights illustrates a double exposure, not motion blur. Motion blur would produce a single, elongated streak in the direction of travel during the exposure interval. In contrast, the double exposure seen here shows two distinct images of the headlight, slightly offset to the left and right, while the limousine is moving forward. This lateral displacement makes it clear that the effect cannot be attributed to motion blur.



*The Limo Occupants and Bystanders Appear Blurred in Z-244*

In contrast, motion blur occurs when a subject moves quickly during the brief period that the film frame is being exposed. This results in a smearing or stretching effect—an object appears streaked in one direction, like a car speeding past a slow shutter. The frame above, Z-244, seems to exhibit varying degrees of blur on the limo occupants and the bystanders. It reflects continuous motion during a single exposure and is a natural artifact of film photography, especially in handheld footage like Zapruder's. Some blur is expected on the limo occupants, the bystanders, or both as Zapruder pans the camera and the limo moves to the right, from Zapruder's point of view.

## Frame Blending is Often Used to Convert 8mm Film for Television or Movies

When film shot at 18 frames per second had to be transferred to video for television broadcast, technicians had to solve a basic problem: how to ensure the film played at a natural speed on a television system

that ran at 30 frames per second. One common solution was to blend two adjacent film frames together into one video frame, creating a smoother appearance.

## Frames Can Be Blended to Alter What Happens in the Film

The purpose of inserting blended frames is to obscure visual precision and conceal key details. By merging adjacent frames, editors can create "filler" frames in which motion becomes unreadable and crucial actions are lost in the blur. In some cases, the insertion of a single blended frame is enough to effectively erase motion altogether. These so-called "double exposure" frames do more than confuse the eye—they subtly rewrite history, frame by frame. The result is often a smeared image that implies movement but offers no discernible detail.

## Blended Frames Should Not Appear on an Original

If the extant Zapruder film were truly the camera-original, it could not contain post-production video artifacts. The presence of blended frames shows the film necessarily passed through a video transfer process, as such frames are never created in-camera.

Chapter Nine

# JFK's Driver Performed Impossible Head Turns

One of the clearest indications that the Zapruder film was altered lies in the head movements of Secret Service driver William Greer. Zapruder's camera recorded at approximately 18.3 frames per second. Between frames 289 and 320—just 1.75 seconds—Greer, then 54 years old, appears to turn his head from back to front, then back again, and finally forward once more. Even more striking, these rapid and seemingly impossible head movements occur precisely during the fatal headshot sequence.

It would be physically impossible for anyone to rotate their head that quickly while seated in a moving vehicle—let alone *while actively driving during an assassination*. 1990s JFK researchers who observed

this rapid motion conducted an experiment with twenty-year-old athletes, none of whom came close to matching the speed with which 54-year-old William Greer appears to turn his head in under two seconds.[1] Unlike Greer, these athletes weren't trying to drive at the same time. Moreover, if someone truly moved their head that fast, it would normally produce a blurred image due to motion. Yet in the following frames, Greer's head appears sharply defined, with no visible blur.

Many believe that frames must have been removed to conceal critical actions, causing the unnatural, jerky motions that violate the laws of physics. This frame removal is especially concerning because it occurs right before and after the head shot that was fatal to JFK. The implication is that the unaltered film would show that Greer slowed down the limo, turned around to look until JFK was shot in the head, and then turned ahead and sped off. Frames were removed to conceal Greer's apparent role in the assassination—specifically, his slowing of the limousine. But remnants of his complicity remain, as the existing film shows Greer looking directly at JFK (instead of at the road) until after the fatal headshot.

**Impossible Movement With No Blur: Frames 289–294**



*Starting at Z-289 - Greer Looking Behind*

Between frames 289, above, and 294, below, in just 0.27 seconds, and while driving, Greer's head goes from being fully turned backward to look at President Kennedy to being totally turned forward.



*Z-294 - Greer Facing Forward*

By frame 294, above, Greer's head has turned almost completely around to face the front.



*Greer - Turned Back Again*

At Z-304, above, in just over half a second, Greer's head is again turned fully backwards.



*Greer - Looking Back until after the Head Shot*

Greer holds this position looking back until frame 317 (above) after *JFK* is shot in the head at frame 313.



*Greer - Completes His Final Turn and Now Looks Ahead*

Then, within three frames, or just 0.16 seconds, at Z-320, above, Greer's head is turned all the way forward again.

## No Blur is Shown Despite Impossibly Fast Movements

Moreover, because the Zapruder camera operated at approximately 18.3 frames per second, any rapid movement would normally create a motion blur across the frame. Fast head turns, even among trained athletes, would blur across multiple frames, and the camera would capture a smeared motion effect. Yet between frames 292 and 293, Greer's head shows no appropriate blur—only a sharp, unnatural repositioning. This alone suggests frames were removed, destroying the natural progression of motion that should have appeared.

### The Impossible Turns Indicate Removed Frames

No human, under any recorded physiological test, has ever demonstrated rotational head speeds approaching what Greer appears to do in the Zapruder film. Researchers conducted tests which showed that even the fastest young athletes could not reach 50% of Greer's rotational speeds. Yet we are asked to believe that a 54-year-old Secret Service agent performed this physically impossible movement with no visible strain or corresponding blur.

Even the most basic understanding of the human body confirms that such a movement is not feasible. Greer's final head turn, like the previous ones, should have created significant motion blur across at least two or three frames. Yet again, the film shows an unnaturally sharp, blur-free transition, strongly suggesting that frames were deliberately excised to compress Greer's reactions unnaturally and to conceal key moments inside the limousine during the shooting.

### Evidence of Secret Service Misconduct Threatened the Lone Nut Theory

It is possible that the Greer's impossible head turns are the result of frame removal to suppress Secret Service complicity during the assassination. At the critical moment when the first shots rang out—whether at frame 189 (the earliest probable shot) or even using the Warren Commission's timeline of frame 225—Greer had several seconds to react, and he did not accelerate the limousine. Instead, *he turned around and looked back at the President.*

Most striking of all, Greer *remained turned backward* during the fatal head shot at frame 313 and did not begin to face forward again

until frame 317—a staggering 5.15 to 7.1 seconds after the first shot, depending on which starting frame is accepted. For a trained Secret Service agent, whose duty was to respond instantly and get the President out of harm's way, this delay is inexplicable.

The situation appears even more damning when considering eyewitness accounts that the limousine slowed dramatically during this time, perhaps even coming nearly to a stop—thereby increasing the President's exposure to gunfire. When combined with the physically impossible head movements and the apparent removal of key frames from the film, the evidence strongly suggests a deliberate attempt to conceal Greer's misconduct at the most critical moment of the assassination.

This participation and complicity in the assassination, if fully revealed, would have posed a grave threat to the lone nut theory—because no theory centered on Lee Harvey Oswald alone could account for the actions, or inactions, of the Secret Service driver.

## Chapter Ten

# JFK's "Blob" Head Wound Was Painted On With Special Effects

**The Appearance of the Blob**

In the 1970s, researcher David Lifton identified a strange anomaly that appears immediately after the fatal headshot at frame Z-314. He referred to this anomaly as "the Blob"—a bright, reddish-white shape that seems to snake up the side of Kennedy's head.



*The Blob Appears Immediately After the Headshot in Z-314*

No one has provided an anatomical explanation for what kind of wound the Blob represents. Crucially, no doctor or nurse observed significant trauma to the top or front-right side of the President's head—areas that appear to have sustained *catastrophic damage* in the Zapruder film.



*The Blob — One Frame Later — in Z315*

## "It Looked Painted On"

Some theorized that the alteration may have been achieved using an aerial imaging optical printer, a device used by Hollywood special effects artists in the 1960s. It enabled technicians to paint or modify individual frames on glass overlays and rephotograph the altered image onto new film stock. "It looked odd," the researchers wrote. "It seemed preposterous that something of that size—if it was real—wouldn't have been clearly visible at Parkland Hospital."[1]



*Enlarged Z-335 in Robert Groden's 1985 Book High Treason*

## The Blob Mutates from Frame to Frame

Beyond contradicting medical and eyewitness evidence, the Zapruder film's depiction of the head wound fails to maintain internal consistency.



*The Blob in Enlarged Z-337*

A genuine wound—anchored to the head—would retain a consistent size, shape, and position relative to the head's motion. The Blob does not. Instead, it appears to change shape, size, and location from one frame to the next. These visual anomalies, argued David Lifton, are hallmarks of post-production manipulation—likely achieved using techniques known to skilled Hollywood matte artists. These distortions suggest the Blob was not a real wound, but an animated overlay added after the fact.

## Chapter Eleven

# A Black Patch was Superimposed Over the Wound on JFK's Head

The back of President Kennedy's head was deliberately obscured by a black patch artificially added to the film over the location of his large occipital-parietal wound.



*Dr. McClelland Describes the Head Wound Location*

Dr. Robert McClelland was among the physicians who spent near-ly 20 minutes in an ideal position to observe the head wound.



*Dr. Robert McClelland Sketch*
*of JFK's Wound*

He drew the above sketch of JFK's head wound, describing it as a large avulsed wound located in the back right of the head. Dr. Mc-Clelland never wavered from his depiction of the above through the time of his death in 2013.

Prior to the alterations documented herein, the back of JFK's head in the Zapruder film shows a normal, natural shadow—a soft-edged

darkening consistent with how sunlight would cast shadows on hair and skull contours. Connally's hair in the same exact frames always appears natural and textured.

Beginning as early as frame 308, but appearing prominently after the headshot in frame 317 and thereafter, the natural shadow is abruptly replaced by a solid black shape that shifts and morphs unnaturally from frame to frame. This patch exhibits unnaturally sharp, geometric edges, unlike any natural shadow or photographic artifact.



*The Back of JFK's Head Shows a Dark Black Patch on Frame 317*

Starting with frame 317 above, the 6K scans of frames 317, 321, and 323 reveal an intensely deep black shade contrasting sharply with the rest of the back of JFK's head. This black tone aligns with the standard "reference black" used in film calibration. The dark patch appears irregular in shape and shifts position across the remaining portion of the back of his head.



*Frame 317 Enlarged*

An enlarged version of frame 317, above, clearly displays the dark patch almost in the shape of a trapezoid.



*Frame 321 Enlarged*

In this enlarged detail of frame 321, above, the dark patch seems to have enlarged to cover an even greater portion of the back of JFK's head.



*Frame 323 Enlarged*

In this zoomed-in version of frame 323, the dark patch seems to have shifted slightly again.

The black patch covers exactly the area where Parkland doctors reported a massive, avulsed exit wound—the right rear of JFK's head. Rather than allowing this visible wound to appear on film, the area was crudely obscured, hiding critical visual evidence of a frontal shot.



*9 Frames that Show the Black Patch Anomaly Prominently*

The above stills provide better examples of the D-max black blob with sharp edges that morphs into various trapezoidal shapes in the Zapruder frames immediately following Z-313.

## Restoration Experts Conclude the Back of JFK's Head Was Blacked Out

Modern 6K logarithmic color scans of the Zapruder film have allowed forensic analysts and professional film restoration experts to examine the footage in unprecedented detail. These high-bit-depth scans, which reveal far more shadow detail than standard video, expose what many experts concluded was a deliberate blacking out of the back of President Kennedy's head. In a major independent review, nearly all participating Hollywood film industry veterans—particularly those experienced in identifying visual effects from the 1950s and '60s—determined that the shifting black patch seen in frames 317, 321, and 323 was not a natural shadow or photographic artifact, but an artificial overlay. Despite the overwhelming consensus, only three of the experts agreed to speak on camera. Here is what they said:

1. Paul Rutan, Jr.

   - Experience: Decades of experience in film restoration and optical printing.

   - Findings: Identified a crude photographic patch on the back of JFK's head in frame 317. Observed that the black patch moves differently from JFK's head in the consecutive frames which follow Z-313, indicating it is an optical effect.

2. Garrett Smith

   - Experience: Over thirty-seven years in the movie business, including mastering work at Paramount.

   - Findings: Noted the inconsistent density of the black

patch compared to natural shadows. Described the alterations as blatantly obvious and not believable, even to a casual observer (*"if I showed it to a 12-year old kid, they would say it was a cartoon"*).

3. Ned Price

- ○ Position: Head of Restoration at Warner Bros.

- ○ Conclusion: Described frame 317 as a crude alteration (*"Oh that's horrible, that's just terrible. I can't believe it's such a bad fake"*), highlighting the poor quality of the alteration.

Comparing the black patch on the back of JFK's head to the shading of Governor John Connally's hair, which appears in the same frames, the film restoration experts found that while Connally's hair exhibits natural gradations of gray, reflecting the expected subtleties of light and shadow on human hair under bright sunlight, the black patch covering the back of Kennedy's head showed no such natural variation.



*JFK's Hair is Reference Black Compared to Connally's Natural Color*

Instead, the patch measured as "reference black"—an artificial, absolute black with no tonal variation whatsoever. In imaging science, reference black is a technical term indicating the darkest possible value a medium can reproduce, without any intermediate shading or soft edges. The existence of a perfect, flat black in the midst of naturally varying photographic grays is impossible in an unaltered exposure. The forensic contrast between Connally's hair and Kennedy's blacked-out head further confirms that the dark blob is not a legitimate shadow or photographic artifact—it is an artificial overlay designed to crudely erase visual evidence of the massive exit wound described by Dallas medical witnesses.

When we obtain these frames from the National Archives and the Sixth Floor Museum, we will publish them here in a future version of this book, so you can compare the black patch as it appears in those frames.

# Part III: The Museum Continues the Coverup

The Sixth Floor Museum, a private institution with a vested interest in preserving the official narrative of President Kennedy's assassination, has used its ownership of the Zapruder film copyright less to promote public understanding than to control access.

The Museum, while claiming neutrality, operates with a hidden agenda—one that aligns closely with the conclusions of the Warren Commission. The Museum's legal control over the Zapruder film was supposedly acquired through a controversial copyright transfer following a $16 million government payout to the Zapruder family. Although the purpose of the JFK Records Act was to free JFK records, it has only given the Museum disproportionate power over access to key historical evidence.

This is not how copyright was meant to work. The purpose of copyright is to encourage the creation and dissemination of knowledge, not to suppress facts or gatekeep history. When copyright is used

to restrict access to public records, limit scholarly inquiry, or silence dissenting viewpoints, it becomes a tool of private censorship—contrary to both the Constitution and the law.

The Museum's use of copyright to suppress access to the Zapruder film and related materials raises serious constitutional and legal concerns. The First Amendment guarantees the public's right to view, analyze, and speak about matters of public concern—especially those arising from government investigations, such as the Warren Commission Report, which itself reproduced and relied on the Zapruder film.

Doctrines within copyright law further underscore this point. The idea/expression dichotomy and the merger doctrine make clear that facts and historical events are not subject to copyright protection, and when a visual record is the only means of conveying a factual event—as in the case of the Zapruder film—copyright protections may not apply under the merger doctrine.

Moreover, the principle of fair use directly protects the right to reproduce and analyze the Zapruder film for purposes of commentary, scholarship, and criticism. The fair use of the Zapruder film for critical and scholarly purposes has already been upheld in court. *Time, Inc. v. Bernard Geis Associates*, 293 F. Supp. 130 (S.D.N.Y. 1968).

In sum, the copyright to the Zapruder film is being misused in ways that undermine the public interest, distort the intent of copyright law, and chill the freedoms protected by the First Amendment. Given the film's historical importance, its centrality to public discourse, and the unusual circumstances of its legal status, there is a compelling argument for invalidating the copyright. The truth about the JFK assassination belongs to the people—and so does the film that captured it.

Chapter Twelve

# The Museum Is Biased in Favor of the Lone Gunman Theory

The Sixth Floor Museum in Dallas is not a neutral institution. It appears to operate with one or more underlying agendas that compromise its objectivity. Because it has a vested interest in shaping how key facts about the JFK assassination are understood, the Museum cannot be considered an impartial source of information.

One obvious agenda stems from the Museum's physical location: its relevance is directly tied to the Warren Commission's conclusion that Lee Harvey Oswald acted alone, firing from the sixth floor of the Texas School Book Depository. If that narrative were discredited, the Museum's core premise—and its reason for existing in that specific location—would be undermined. As a result, the Museum has a

direct stake in promoting evidence that supports Oswald's sole guilt and downplaying or ignoring information that points to a broader conspiracy. More broadly, the Museum tends to highlight materials that uphold the Warren Commission's findings while suppressing or minimizing evidence critical of it.

The Museum's institutional relationships also reflect its agenda. In seeking to be considered an "official" source of information, it naturally aligns itself with government agencies and large institutions—entities that have also historically been invested in defending the Warren Commission's conclusions. Openly embracing "conspiracy theorists" or controversial alternative narratives could jeopardize funding opportunities or valuable partnerships with these organizations.

The Museum's bias extends directly to the Zapruder film and its management of the copyright. The infamous "back and to the left" head movement may not by itself threaten the Museum's position—since the Museum's location would still be relevant if Oswald was merely aided by a second shooter on the grassy knoll.

However, any credible suggestion that the Zapruder film was altered suggests a much broader conspiracy involving government actors, which poses a significantly greater threat to the Museum's relevance. The idea that a conspiracy existed at such a scale that it could manipulate the Zapruder film directly, something Oswald clearly could not have controlled, makes the Sixth Floor Museum's location irrelevant to the assassination.

The Museum's legal and financial interests depend on Oswald's guilt and the film's authenticity. Accordingly, the Museum cannot be seen as an impartial institution.

Chapter Thirteen

# Why Does the Museum Claim to Own the Zapruder film Copyright?

The Sixth Floor Museum's claim to ownership of the Zapruder film's copyright is outright bizarre. The Museum is supposedly the current owner of the copyright through a convoluted series of transfers: Mr. Zapruder sold the film to Time in 1963; Time returned the film to the Zapruders in 1975; the U.S. government seized the film under the 1992 JFK Act and paid the Zapruders $16 million in 1999 — but, supposedly, without acquiring the copyright. Then, by the extend of the year, the Zapruder heirs then "donated" the copyright to the Museum.

This series of transfers is striking for at least two reasons: First, Zapruder and his heirs were compensated with enormous sums of

money, well beyond what was contemplated by Zapruder's contract with Time, Inc.. Second, although the ownership of the copyright shifted numerous times, the philosophy was always to control and limit access, if not by copyright, then by physical control.

## The Enormous Compensation Paid to the Zapruders is Inherently Suspicious

The transfers of enormous sums to the Zapruder family are not only convoluted—they're virtually unprecedented and highly suspicious. After Abraham Zapruder sold the film to Time magazine for $150,000 in 1963 (at least $1.5 million in today's dollars), his heirs later bought it back *for just $1* in 1975. They went on to license it for several hundred thousand dollars before ultimately receiving a staggering $16 million payout from the U.S. government in 1999. The bonanza did not stop there, as the Zapruders then received a tax deduction by "donating" the copyright to a non-profit, the Sixth Floor Museum.

Zapruder's financial success is justified as an a symbol of the American dream—an immigrant who happened to become extraordinarily wealthy. But the financial returns enjoyed by Zapruder and his heirs are so extraordinary that they go far beyond any reasonable version of that dream. The film was sold for top dollar, returned to the original owner for nothing, and then sold again by his heirs for top dollar once more. This series of transactions has never happened before and never will again. It doesn't reflect fair dealing or luck—it points to something else entirely. When an asset generates gains of this magnitude through insider arrangements and opaque decisions, it suggests not honest opportunism, but corruption.

Why would Time Inc. pay over $1 million in today's dollars for the Zapruder film, only to sell it back 12 years later for $1? Just a few

years earlier, Time had refused to let CBS air the footage, calling it an "invaluable asset" and claiming a duty to preserve public taste. But once exposed for suppressing the truth, Time abandoned its moral posture and unloaded the film without explanation.

## The Zapruders Insisted They Still Retain the Copyright

Even after receiving such extraordinary compensation, the Zapruders insisted they still retained the copyright — a claim that many found astonishing.  Why was it so important for the Zapruders to retain the copyright, when they didn't actually want to keep it — within months they handed it over to the Museum.

This discrepancy has never been fully explained and seems to run directly contrary to the purposes of the JFK Act, which was meant to increase public access to assassination records. Had the government secured the copyright along with the physical film, the Zapruder footage would today be freely available to the public. Taking the film, but not the copyright serves no public purpose because the Museum has the option to deny FOIA requests.

There are likely two reasons why it was so important for the Zapruders to retain the copyright. By retaining the copyright, the Zapruder heirs were able to get everything they wanted, and the American people would receive nothing.

First, by donating the copyright to the Sixth Floor Museum, the Zapruder family could likely claim a substantial charitable deduction, significantly reducing the taxes owed on their $16 million windfall. Notably, Henry Zapruder was a tax lawyer. Second, keeping the copyright out of government hands defeated the entire purpose of the 1992 JFK Act. Despite the film purportedly being "owned" by the public,

the Museum would continue granting access only to those who do not pose a threat to the official narrative.

## Fees Were Charged for Physical Access, Not Copyright Licensing

Although the Zapruder family purchased the film from Time, Inc. for just one dollar in 1975, they collected hundreds of thousands of dollars in copyright royalties. In reality, however, the revenue they generated was not based on copyright protection, but instead on their ability to control physical access to the film itself. Despite losing its one and only attempt to enforce the copyright in court, and not appealing the decision, it appears the Zapruders and the Museum capitalize on public misunderstanding to monetize access while cloaking it in the language of copyright.

This concept is illustrated by the fact that Josiah Thompson sought and obtained copyright permission from the Museum to use Zapruder frames in his 2021 book, *Last Second In Dallas*. This is highly counterintuitive. Over 55 years prior to publishing his recent book, Thompson published Zapruder frames without permission and defeated Time's lawsuit over the issue.

So why, when Thompson published *Last Second in Dallas*, did he obtain a license from the Sixth Floor Museum to publish Zapruder frames. Why did Thompson request permission when it was not required?

The answer lies in access, not law. Thompson did not need the Museum's copyright approval—he needed access to high-quality digital scans, which are physically controlled by the National Archives and not publicly available without permission from the Museum.

In short, control over the Zapruder film has never truly rested on copyright law—it has rested on physical gatekeeping. That model has allowed private parties to profit from a national record and restrict public access under a legal pretense that does not withstand scrutiny.

Chapter Fourteen

# Each Time a Lie Was Exposed, the Copyright Changed Hands

The history of the Zapruder film's copyright ownership reveals a troubling pattern:\the film was repeatedly transferred between private entities. Every new custodian arrived with a veneer of credibility, often after the previous holder had lost public trust. Yet the underlying purpose of each transfer appears to have been the same: to shield the film from scrutiny and preserve the official narrative.

## Zapruder and *Life*: The "Accidental Witness" and the "Tasteful" Magazine

Abraham Zapruder, the man who captured the Kennedy assassination on film, was viewed as an innocent bystander—an ordinary citizen thrust into an extraordinary situation. Most Americans accepted without question the stories told about Zapruder, including his decision to sell the film to be published by *Life*.

We were told Zapruder didn't want to profit from JFK's death. Zapruder only earned $25,000 from selling the film to *Life*, and he donated the entire amount to the wife of slain Dallas police officer J.D. Tippit. He was a family man with a small business. He hadn't even intended to film the motorcade that day; it was only at his secretary's urging that he returned home to retrieve his camera. He appeared to have no agenda beyond ensuring the footage was treated with dignity. Zapruder was a *Life* subscriber himself and chose to sell to *Life* without even hearing from potentially higher bidders because he trusted their taste and discretion not to exploit the film.

## Zapruder and Life's "Strong" Ethics Shams Were Weaponized for Censorship

In hindsight, considering that *Life* was lying about the Zapruder film, it is clear that the quaint back story of Zapruder's sensibility and Life's tastefulness were false tales weaponized for censorship. He reportedly told *Life*'s Richard Stolley about a nightmare in which a frame of the headshot appeared in a seedy Times Square theater, with someone shouting, *"Do you want to see the President's head explode?"*

This anecdote became a powerful PR tool, framing both Zapruder and *Life* as morally responsible stewards of the footage.

However, "tastefulness" has been frequently asserted to justify suppressing the film. It allowed *Life* to appear ethical while hiding frames that would later cast doubt on the official theory. Zapruder's good intentions and *Life*'s refined image were used as a smokescreen to control access and shield the public from learning anything about the film that could be used to undermine the official narrative.

But Zapruder and Life's purported high degree of ethics turned about to be a sham. Zapruder *was* in it for the money. It was revealed in 1968 that he had not been paid just $25,000, but a total of $150,000 in a staggered deal over four years with *Life*—a substantial sum at the time. The discrepancy between what he claimed versus what he actually received raised serious questions about his credibility.

More troubling, Zapruder appears to have cooperated—actively and through silence—with both Time Inc. and the Warren Commission. By endorsing a version of events that aligned with the official story—and by remaining silent as *Life* lied about the contents of the film—Zapruder helped legitimize a narrative that concealed more than it revealed.

The carefully crafted narrative surrounding Abraham Zapruder's moral sensibilities and Life magazine's editorial restraint now appears to have been a calculated deception designed to justify withholding crucial evidence from the American public. What was presented as ethical stewardship was, in reality, a sophisticated censorship campaign that exploited public trust to suppress information that might challenge the official account of President Kennedy's assassination. Zapruder's trustworthiness—and the moral authority his image lent to the film's custodians—unraveled.

## Geraldo Burned *Life* by Showing the "Back and to the Left" Head Snap

As one of the most respected media institutions of the era, *Life* was trusted to convey the truth—even if only through still frames reproduced in print. Americans assumed they were seeing the most important moments, curated by responsible editors. The magazine format limited what could be shown, but the public trusted *Life* to handle the footage with integrity.

That trust was shattered when journalist Geraldo Rivera broadcast a bootleg copy of the Zapruder film on national television on March 6, 1975. For the first time, viewers saw the full motion of President Kennedy's head snapping violently *back and to the left*—a sequence that *Life* had never shown in its entirety and that clearly contradicted the Warren Commission's conclusion that all shots were fired from the rear. The broadcast made it unmistakably clear: critical evidence had been withheld from the public.

The implications were profound. Time, Inc. had not merely exercised editorial discretion; it had actively suppressed a sequence that undermined the official narrative. The film had been treated not as a public document, but as a corporate asset, controlled in service of a particular version of events.

After Rivera's broadcast, *Life's* credibility was irreparably damaged. Continued corporate control of the film—by the very entity that had selectively published its content and helped prop up the Warren Report—became politically and morally indefensible. The moment called for a new custodian, someone who could appear untainted by the controversy and more sympathetic to public sentiment.

## The Zapruder Heirs: Rebranding Control Under a Family Name

The next custodian came in the form of Abraham Zapruder's heirs. Transferring copyright ownership back to the Zapruder family had a certain superficial appeal. These were his children, not the man himself—they had not participated in the decisions that had disillusioned the public. Under U.S. copyright law, they were legally entitled to inherit and benefit from the film's intellectual property. Their involvement lent an air of legitimacy, privacy, and even justice: after all, it was their father who had captured the footage.

In 1975, the film was quietly transferred back to the Zapruder family. The deal—transferring a film worth millions for just $1—actually proved that *suppression*, rather than *profit,* had always been the primary motive in purchasing the film. But the transfer was framed as a restoration of moral stewardship. The family could now claim they were protecting Abraham Zapruder's legacy, rather than advancing a corporate agenda.

But the family's conduct suggested otherwise. The Zapruder heirs, represented by Henry Zapruder, gained a reputation for being difficult to work with, often demanding exorbitant licensing fees and tightly limiting access to the film. Articles were written that the Zapruders charged $30,000 for publishers wanting to use the film in their projects. In 1988, Henry Zapruder was even sued for overcharging and for ignoring a licensing request for more than three and a half years. What had once been corporate gatekeeping was now rebranded as private stewardship—but the results were the same: limited access, high costs, and an unwillingness to allow public engagement with the film.

## The 1992 JFK Records Act and the $16 Million Payout

With public pressure for transparency mounting, Congress passed the 1992 JFK Act, causing the government to "take" all assassination-related records under eminent domain for public use.

In determining the terms that would apply to the taking, the Zapruder film received special treatment. In a sweetheart deal in which the Zapruders *were allowed to pick one of the arbitrators*, a panel determined that the family should be paid an astonishing $16 million—yet the copyright remained in private hands.

The payout further eroded the Zapruder family's public image. Critics questioned how a family could claim stewardship of a national artifact, profit from it substantially, and still retain the right to restrict access. Their once-sympathetic status had eroded into suspicion, making them no longer viable as the film's public-facing custodians.

## The Sixth Floor Museum: A "Neutral" Custodian with Hidden Interests

Shortly after receiving the $16 million payout, the Zapruder family transferred the copyright to the Sixth Floor Museum—a nonprofit institution that appears at first glance to be a responsible and neutral steward.

This transfer followed the now-familiar pattern: once a custodian became too controversial to maintain control, the copyright was passed to a new, more respectable-seeming entity. However, far from being a neutral choice, the Museum's selection fit the longstanding strategy of narrative management. Like each previous recipient, the Museum inherited not just the legal rights but the responsibility to

protect an increasingly fragile public trust. But that trust was never earned.

If past transfers were designed to deflect scrutiny, why should the most recent transfer to the Sixth Floor Museum be viewed any differently? As the latest link in a chain forged to suppress, not reveal, the truth, the Museum's role must be judged in light of the pattern it perpetuates.

The museum limits access to the film, enforces copyright aggressively, and threatens to censor those with differing viewpoints. In practice, the museum has served as the fourth private gatekeeper of the Zapruder film, all while enjoying a façade of historical impartiality.

## The Public Was Never Meant to Have the Film

If the true intent had been transparency, the Zapruder family—or the government—could have chosen to place the film and its copyright in the public domain, especially after taxpayers funded a $16 million acquisition. Instead, the copyright was handed off to yet another private actor, continuing the cycle of exclusivity and control. That the private actor portrays itself as an innocent non-profit museum is of no moment.

This continued exclusion of the public is telling: it wasn't about preservation, tastefulness, or privacy. It was about ensuring that the most powerful piece of visual evidence in American history remained inaccessible.

## A Pattern of Narrative Management Disguised as Stewardship

The chain of ownership—Zapruder → Time Inc. → Zapruder heirs → Sixth Floor Museum—was no accident. Each transfer served a clear function: to shift custody from a compromised or distrusted party to one that appeared more credible and sympathetic. But in each case, the underlying motive remained constant: preserve narrative control, evade accountability, and limit public access. This was an intentional strategy to control how history itself was shaped and remembered.

*Fool me once, shame on you. Fool me twice, shame on me.*

The Museum wants the public to fall for the same trick for a fourth time. But after so many deceptions, it's not just the past stewards who are in question—it's the very idea that this material should be privately controlled at all. The Museum now holds exclusive authority over the Zapruder film. Given the copyright's history of dishonest custodians, why should anyone believe this time will be any different?

## Chapter Fifteen

# The Zapruder Heirs Could Not Have Obtained the Copyright in 1975

**Time's Attempt to Relieve Itself of Contractual Obligations Violated the 1963 Agreement.**

The original contract, executed on November 25, 1963, between Abraham Zapruder and Time, Inc. was a binding, multi-decade license and royalty-sharing agreement. The agreement provided for:

- A $150,000 fixed payment over the first five years;

- An ongoing 50% royalty on gross receipts exceeding

$150,000, beginning after the fifth year;

- A requirement that any sale or transfer of the film or its rights be subject to and bound by all terms of the agreement, including the royalty obligation.

In 1975, Time was embarrassed by the public scrutiny of the Zapruder film—especially its showing of President Kennedy's head moving "back and to the left" after the fatal shot. This fact revealed not only that the magazine had withheld the film from public view, but also that it had materially misrepresented what the footage showed. Time sought to withdraw from the controversy by selling the film back to the Zapruder family for $1. However, this sale was invalid.

## The 1963 Contract Specifically Barred Time from Unilaterally Terminating its Obligations

The contract plainly states:

> In the event you shall sell or transfer all rights to this film, such sale shall be subject to the terms of this agreement and shall be binding upon the purchaser thereof...Any such sale shall likewise bind the purchaser thereof to the aforementioned provisions concerning payment of one-half (1/2) of the gross receipts from exhibition, publication, licensing, renting, or other publication of said film.

This language makes clear that Time could not unburden itself of its obligations by simply selling or assigning the film to another

party—even to Zapruder himself or his family. Any transfer had to preserve and bind the new owner to the ongoing royalty payment and reporting obligations.

## Time's $1 Sale Was an Attempt to Escape its Contractual Obligations

The 1975 transaction with the Zapruder family was not a bona fide commercial transaction. It was a constructive repudiation of the contract, done under duress of public pressure and embarrassment, and intended to:

- Evade the obligations to make further payments from gross receipts;

- Avoid compliance with the audit and reporting requirements; and

- Distance Time from the growing controversy around the film.

However, contract law does not permit a party to evade ongoing obligations by engaging in a sham sale or self-serving transfer that defeats the purpose and economic substance of the agreement. Courts routinely reject such maneuvers as bad faith or as an attempt to frustrate performance.

## The Contract Was a Revenue-Sharing Agreement—Not a Buyout

Time did not merely buy the film outright; it entered into a long-term business arrangement under which it would act as commercial steward of the film and share revenue with Zapruder. The payment structure—with five years of fixed installments followed by indefinite annual revenue-sharing—was intended to ensure Zapruder a continuing stake in the film's use. The requirement that future purchasers or assignees be bound by this arrangement underscores its perpetual nature.

Time's later discomfort with the film's implications—after it aired on national television and contradicted earlier narratives—does not relieve it from the bargain it struck in the wake of the assassination.

## The 1975 Agreement Is Invalid and Cannot Be Enforced

Because the 1975 transfer was invalid under the 1963 agreement, Time, Inc. could not have conveyed full title to the film or any enforceable copyright to the Zapruder family. Any chain of title that depends on that invalid transfer is equally defective. As a result, the Sixth Floor Museum—which claims to have acquired the copyright from the Zapruder family—could not have acquired valid copyright ownership. Because that transfer was invalid, the Museum's claim necessarily fails.

Thus, the 1975 agreement is unenforceable, and the Museum's assertion of copyright ownership today is without legal foundation.

Chapter Sixteen

# The Purpose of Copyright is to Expand Knowledge

At its core, copyright law is intended to promote the progress of knowledge and reward creators for their original contributions—not to restrict access to information. Yet it is often misunderstood as a tool of private censorship, a legal mechanism by which rights holders can indefinitely control or withhold important materials from the public. The handling of the Zapruder film since the 1960s has fueled that misunderstanding, and the Sixth Floor Museum continues to capitalize on it today. But this view distorts both the spirit and the letter of copyright law.

In the United States, the constitutional source of copyright is unambiguous. Article I, Section 8, Clause 8 of the U.S. Constitution grants Congress the power:

"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

This clause makes it clear that the purpose of copyright is not control, but public benefit. It is not a property right in the traditional sense. Rather, it is a public bargain—a temporary and limited monopoly granted to creators in exchange for enriching the public domain once the term expires. The end goal is not control, but dissemination.

## Balancing Incentive and Access

The framers of the Constitution understood that for ideas and expression to flourish, creators needed some degree of protection against free riders—those who might otherwise exploit someone else's work without compensation. But they also understood that the long-term benefit to society comes not from hoarding information, but from sharing it. Copyright was crafted to strike a careful balance between incentivizing creation and expanding public access to knowledge.

Unlike patents, which protect inventions, copyright protects expression, not facts or ideas. The goal is to allow scholars, artists, and researchers *to build upon prior works*, not to silence them. This is why the law contains built-in limitations such as:

- Fair use, which permits reproduction for criticism, comment, teaching, research, and news reporting;

- The idea-expression dichotomy, which denies copyright protection to ideas, facts, systems, or methods of operation;

- The merger doctrine, which denies protection when there are only limited ways to express an idea.

All of these doctrines exist to prevent copyright from becoming a weapon to control access to facts or history.

## Copyright Must Serve the Public Interest

In any democracy, the flow of information—especially regarding the government and historical events of profound significance—must remain as open and unrestricted as possible. Copyright law was designed to encourage knowledge, not to impede the public's right to investigate. Its ultimate beneficiary is not the copyright holder, but the public. And when copyright is used to block public access to the truth, it ceases to be a tool of progress and becomes a mechanism of obstruction.

# Part IV: The Museum Must Stop Suppressing Certain Viewpoints

### Altering the Slides in Its Possession to Maintain Fictions of the 1960s

From 2000 until late 2009, the Sixth Floor Museum made the authentic MPI transparencies available to the public—apparently unaware of their significance. That changed abruptly in late 2009, when two events forced the Museum to confront what the transparencies revealed. First, David Mantik and Sydney Wilkinson examined the MPI transparencies in person. One week later, Douglas Horne published *Inside the ARRB*, which directly discussed those images. These events appear to have prompted the Museum to take

action—not to clarify the historical record, but to suppress it. Soon afterward, the Museum altered the transparencies once again, in an effort to conceal what they had inadvertently revealed for nearly a decade.

## Weaponizing Copyright to Suppress the Truth

The Museum's use of its copyright claim over the film is strategically employed to silence dissent, limit investigation, and protect a narrow historical narrative. The Zapruder film should exist as a public resource, but the Museum treats it as a private commodity.

The Museum has repeatedly refused to license the Zapruder film to researchers, filmmakers, and scholars whose work challenges the official account of the assassination. For this book, we requested permission to use the frames from the Museum by emailing their attorneys on April 3, 2025. On April 15, 2025, they responded by denying permission to license for this work, but inviting us to use their website to submit another request in the future. When we submitted another request through their website on April 24, 2025, they never responded.

If a proposed use questions the Warren Commission's lone-gunman theory or presents evidence of conspiracy, the Museum often denies permission outright, threatens copyright enforcement, or imposes licensing fees so steep that they become de facto censorship. This behavior turns copyright on its head. Rather than promoting the spread of knowledge and incentivizing public discourse—as the Constitution intends—copyright is being used to block inquiry and control the story.

## *Censorship of the Worst Kind:* The Museum's Big Law Firm Threatened Crushing Copyright Penalties

The Sixth Floor Museum's suppression of the Zapruder film extends into *censorship*. In 2013, documentary filmmaker Shane O'Sullivan received a cease-and-desist letter from the Museum's lawyers complaining about a one-second clip of the Zapruder film in a trailer for his documentary *Killing Oswald*.[1]



*Beginning of "The Zapruder Mystery" by Shane O'Sullivan*

The letter demanded that he remove his use of the Zapruder film within five days or face a lawsuit seeking damages of up to $150,000 per alleged willful infringement. Under legal threat from one of the

---

1. O'Sullivan, Shane. Message to Mark L. Javitch. *Facebook*, 29 Apr. 2025. Private Message.

largest and most influencial law firms in the world,[2] O'Sullivan was unable to include any Zapruder footage in *Killing Oswald* or *The Zapruder Film Mystery*. In response, O'Sullivan added a message at the beginning of The Zapruder Mystery to show explain that the censorship was caused by the Museum.[3] The clip said: "Unfortunately, legal threats from the Sixth Floor Museum in Dallas have prevented me from using the Zapruder Film in *Killing Oswald* or to illustrate [*The Zapruder Film Mystery*] – *censorship of the worst kind, in my opinion*." (emphasis added).

## Violating the JFK Records Act

The 1992 JFK Act was explicit: all records related to the assassination of President Kennedy must be made available to the public, including film, photographs, documents, and recordings. These materials were to be open to inspection, copying, and review without restriction, unless they met extremely narrow exemption criteria. The Assassination Records Review Board specifically determined the Zapruder film was a public record.

---

2. In 2025, Locke Lord LLP merged with Troutman Pepper Hamilton Sanders LLP. The combined firm, Troutman Pepper Locke, has over 1,600 attorneys across 33 offices in the US and Europe.

3. **O'Sullivan, Shane, director.** *The Zapruder Film Mystery*. YouTube, uploaded by Shane O'Sullivan, 15 Aug. 2014, www.youtube.com/watch?v=J_QIuu6hsAc

The Zapruder film and all related materials were placed under the Act's authority, and the federal government paid the Zapruder family $16 million for the physical film, recognizing its public value. The Museum's ongoing use of copyright to block access to the National Archives directly conflicts with the JFK Act. The law did not carve out an exception for licensing or private curation. Nor did it allow institutions to discriminate based on a researcher's viewpoint or the conclusions they might draw.

## Violating the Freedom of Information Act

Those requesting to inspect or copy Zapruder-related materials under the Freedom of Information Act have been blocked, with the National Archives citing the Sixth Floor Museum's copyright claim or licensing requirements as a reason for restricting access.[4] This is not just unethical. It is unlawful. At least one requester has initiated legal action to challenge the withholding of these materials.

## Shaping the Narrative by Controlling Primary Materials

The deeper issue is that the Museum is using its control over the Zapruder film not to preserve history, but to shape it. By deciding who gets access, and under what conditions, the Museum is acting as both gatekeeper and editor—permitting only those uses that reinforce its official narrative. Because the Museum is deeply biased towards

---

4. See *FoiaConsciousness.com LLC v. National Archives & Records Administration*, No. 3:24-cv-00997-JD (N.D. Cal. 2024).

a certain view of history, it is fundamentally wrong for it to be in a position to determine who gains access to the Zapruder film.

Chapter Seventeen

# Copyright Cannot Be Used to Suppress Facts

While copyright law grants creators certain exclusive rights over their original works, it is not a license to suppress truth, facts, or public discourse, especially in matters of national significance. Both the U.S. Constitution and long-standing copyright doctrine make it clear that copyright must operate within the boundaries of free speech and the public interest.

### 1. The First Amendment

The First Amendment protects freedom of speech and the press. Courts have consistently held that copyright law must be applied in ways that respect these fundamental rights. Attempts to use copyright to suppress critical analysis, public debate, or factual reporting—es-

pecially on issues of historical or political importance—risk creating unconstitutional content-based restrictions.

When a party uses copyright not to protect creative expression, but to block critical viewpoints and control public access to factual information (such as the details of the JFK assassination), it infringes upon First Amendment protections.

## 2. The Idea/Expression Dichotomy

Copyright protects original expression, not facts, ideas, or historical events. This principle—known as the idea/expression dichotomy—is central to copyright law. No one can own an idea, nor can they use copyright to control how facts are interpreted or discussed.

The Zapruder film captures a factual, historical event. While Zapruder's camera angles and filming choices involve minimal creative expression, the underlying facts of the assassination cannot be copyrighted. Any effort to monopolize discussion of that moment is a clear overreach.

## 3. The Merger Doctrine

When there are only a limited number of ways to express an idea, expression and idea "merge," and copyright protection does not apply. This is particularly relevant in journalism, history, and documentary filmmaking, where the factual content dictates how it must be expressed.

If the Zapruder film is the only known footage of the precise moment of the assassination, then any attempt to describe or analyze that moment will inevitably rely on or depict that film. In this case, the film and the idea it conveys are functionally merged. Copyright protection

cannot be used to monopolize access to that single, essential factual record.

## 4. The Fair Use Doctrine

Even when copyright applies, the doctrine of fair use ensures that criticism, commentary, education, journalism, and scholarly analysis—are not subject to permission or licensing. The use of the Zapruder film for investigative, historical, or critical purposes falls squarely within the fair use doctrine.

When the Sixth Floor Museum refuses to license the film to those offering alternative interpretations of the assassination, or blocks researchers from using short clips or stills for analysis, it disregards the principle that fair use requires no permission under U.S. copyright law.

Chapter Eighteen

# Copyright Cannot Be Used to Suppress Facts Because of the First Amendment

**Copyright Ends Where Public Discourse Begins**

I n the United States, copyright law must always be interpreted in harmony with the First Amendment. While copyright grants authors limited exclusive rights over their creative expression, those rights cannot be used to suppress public discussion, access to facts, or the ability to analyze government conduct. When copyright interferes

with the right to speak, write, or investigate matters of public concern, the First Amendment steps in as a limit—and sometimes, as a shield against enforcement altogether.

## The First Amendment is a Defense to Copyright

While there are safeguards within copyright law —like fair use and the idea/expression dichotomy—the First Amendment itself operates as an independent defense when those internal limitations prove insufficient.

In particular, the First Amendment protects the right of individuals to:

- View historical records;

- Reproduce or quote from them for the purpose of commentary or scholarship;

- Disseminate them for the purpose of public understanding; and

- Question official government narratives based on the contents of such records.

In this context, if a copyright holder attempts to prevent someone from showing or analyzing the Zapruder film—even if there is a valid copyright and the use technically constitutes infringement —the user may assert a First Amendment defense. The right to understand, discuss, and reinterpret historical events of national importance is constitutionally protected, and cannot be overridden by private ownership claims. This is especially true in the case of the Zapruder film,

where the government has maintained that the Zapruder photographs are the closest representation to how President Kennedy was killed.

## The Zapruder Film Is Tied to Government Action

The Government's actions since the assassination have made the Zapruder film inseparable from history itself. The Zapruder film was relied upon and partially reprinted by the Warren Commission, the official government body charged with investigating the assassination. Officials conducted a reenactment of the assassination that was entirely based on Zapruder frames. For certain frames, the reenactment took photos and measured the distance between the "sniper's nest" and the presidential limo for dozens of Zapruder frames. One hundred sixty Zapruder frames were reproduced in the Commission's published volumes, which were distributed by the Government Printing Office and placed into public libraries across the country.

This means the government itself introduced the film into the public record as part of its official reenactment and explanation of what happened in Dealey Plaza. When the government publishes and relies on a document in the creation of official findings—particularly findings on matters of public interest—the public acquires a right to access and interrogate that evidence.

## The First Amendment Supersedes Copyright

First Amendment protections would be rendered meaningless if the public lacked access to the information the government relies upon to formulate and justify its policies. In order to meaningfully evaluate, criticize, and contribute to discourse on matters of public concern—as our democracy demands—citizens must be able to examine the same

facts and data their government uses. Without such access, the right to speak is reduced to an empty formality, detached from the informed deliberation that self-government requires.

The Supreme Court has long recognized that speech concerning public affairs is not merely a form of self-expression, but rather "the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). Consistent with this foundational principle, the Court has repeatedly affirmed that speech on matters of public concern occupies the "highest rung of the hierarchy of First Amendment values" and is entitled to the most rigorous constitutional protection. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982); *Carey v. Brown*, 447 U.S. 455, 467 (1980).

Courts and commentators recognize the concern that tipping the balance too far in favor of a copyright holder would violate the First Amendment. Professor Nimmer, author of the leading treatise on copyright law, enunciates the concept with a quote: "Here I cannot but conclude that the speech interest outweighs the copyright interest...without access to the photographs, in Meiklejohn's phrase, 'all facts and interests relevant to the problem . . . [would not be] fully and fairly presented . . . .')[1]

As the Supreme Court wrote: "Serious First Amendment questions would be raised if Congress' power over copyrights were construed to include the power to grant monopolies over certain ideas.... We should not construe the copyright laws to conflict so patently with

---

1. Nimmer, *Does Copyright Abridge The First Amendment Guarantees of Free Speech and Press?*, 17 U.C.L.A. L Rev. 1180, 1197-98 (1970) (citing MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT 25 (1948))

the values that the First Amendment was designed to protect." *Lee v. Runge*, 404 U.S. 887, 892 (1971).

## Our Ethical Principles Supersede Copyright

This exception to copyright is consistent with our ethical principles. In the government's valuation report for the for the 1999 arbitration of the Zapruder film, the appraisers argued:

> [O]n an ethical level, for years everyone from editorial writers to judges have expressed the view that no private citizen should have the right to control access to such an important historical document, let alone to be able to exploit it for personal gain. According to one authority some pictures are so newsworthy (e.g., the My Lai massacre and the Kennedy Assassination) that they should not be copyrightable or subject to possible suppression. Such arguments deal with moral rights, not just property rights, but they are part of the larger affecting value.

The public has a constitutional right to access and discuss the Zapruder film, even if doing so involves reproduction of copyrighted material. In the balance between copyright and free speech, the First Amendment prevails.

Chapter Nineteen

# Copyright Cannot be Used to Suppress Facts Because the Idea and Expression Merge

At the heart of copyright law lies a foundational boundary: the idea-expression dichotomy. As established by the U.S. Supreme Court, "facts do not owe their origin to an act of authorship" and therefore are "not copyrightable." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 360 (1991). While copyright may protect the *expression* of facts, it can never protect the facts themselves.

This principle ensures that copyright does not become a tool for monopolizing knowledge.

Closely related to this is the merger doctrine, which holds that when an idea can only be expressed in a limited number of ways, the expression merges with the idea, and is therefore not protectable under copyright. The merger doctrine prevents copyright holders from gaining de facto ownership of facts or ideas simply by being the first to record or depict them.

These principles apply directly to the Zapruder film, which the U.S. government has acknowledged as the most complete visual record of President John F. Kennedy's assassination. Zapruder did not stage or script what occurred in Dealey Plaza; he captured a singular, unrepeatable moment in American history. Each frame of the film contains unique historical information—showing, in real time, the position of the President before, during, and after the fatal shots, the movement of the limousine, and the reactions of witnesses. There is no substitute for viewing the film itself; no written account, summary, or recreation can convey the precise facts embedded in each frame. In this case, the idea—the historical fact of the assassination—and the expression—Zapruder's 486 photographic frames—are inseparable. The expression is not merely a depiction of the event; it is the event. The film is essential to understanding what happened, and each citizen must be free to examine it directly.

Under *Feist* and the merger doctrine, it is inconsistent with both the purpose and limits of copyright law to allow copyright to be used to suppress this visual record. To treat the Zapruder film as a proprietary asset, capable of being licensed, withheld, or redacted, is to grant a private party exclusive control over the most critical primary evidence of a public crime. That would defeat the purpose of copyright. As the Court in *Feist* made clear, "The primary objective of copyright is not

to reward the labor of authors, but to promote the progress of science and useful arts."

Courts and commentators have explicitly cited the Zapruder film as the paradigmatic example of the merger doctrine. See *Los Angeles News Service v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992) (citing 1 Nimmer § 1.10[C][2], at 1 – 81 - 1 – 84) ("where the 'idea' of a work contributes almost nothing to the democratic dialogue, and it is only its expression which is meaningful," copyright protection of the expression should be limited in the interest of public access to information necessary to effective public dialogue."); *Iowa State Univ. Research Found., Inc. v. American Broadcasting Cos., Inc.*, 621 F.2d 57, 61 n.6 (2d Cir. 1980) (that in the "almost unique instance" of the Zapruder Film "it is at least arguable that the informational value of that film cannot be separated from the photographer's expression").

The suppression or restriction of the Zapruder film through copyright thus violates both the letter and spirit of U.S. copyright law. The public has a right—not merely a curiosity—to access the only complete, contemporaneous record of the assassination. Copyright law, properly understood, cannot be the legal mechanism that denies that right.

Chapter Twenty

# Copyright Cannot be Used to Suppress Facts Because of Fair Use

**The Core Safeguard for Public Discourse**

Fair use is a doctrine that protects analysis and commentary—even when the discussion is about copyrighted material. Section 107 of the 1976 Copyright Act states that "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for pur-

poses such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, *is not an infringement* of copyright." (emphasis added)

In other words, fair use confers a "privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner." *Marcus v. Rowley*, 695 F.2d 1171, 1174 (9th Cir. 1983) (internal citation omitted).

Fair use is not merely a feature of federal law. The doctrine traces back to English common law. Supreme Court Justice Joseph Story introduced it into American jurisprudence in an 1841 case. In assessing the state of the law at that time, Story wrote:

> [n]o one can doubt that a reviewer may fairly cite largely from [an] original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism.

*Folsom v. Marsh*, 9 F. Cas. 342, 344 (C.C.D. Mass. 1841).

Justice Story identified three factors from English common law to consider in deciding whether use is fair, including: "the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the object, of the original work." *Id*. at 344, 348. These factors are substantially the same ones used today.

## The Zapruder Film Illustrates the Essential Need for Fair Use

The ongoing debate over what the Zapruder film depicts has made it a defining example of the need for fair use. As the most significant visual record of the Kennedy assassination, public discussion and analysis of the film fall squarely within the category of uses that fair use must protect. Its inclusion in the Warren Commission's investigation underscores the public's right to scrutinize not only the film itself but also the government's interpretation of it. The ability of citizens to evaluate official conclusions must not be hindered by private copyright claims.

Fair use also protects commercial works of criticism, provided they are transformative—adding new meaning, context, or purpose rather than merely reproducing the original. Uses that do not cause economic harm to the market for the original work are more likely to be deemed fair. Documentaries, books, and films that analyze or comment on the Zapruder film are classic examples of transformative use and do not constitute infringement.

## The Landmark Case: *Time, Inc. v. Bernard Geis Associates*

In 1968, fair use of the film was tested directly in court. Time, Inc., which then owned the rights to the Zapruder film, sued to stop the publication of a book titled *Six Seconds in Dallas* by Josiah Thompson.



*Time Sued to Prevent the Publication of Six Seconds in Dallas*

Thompson's book challenged the official Warren Commission conclusion that Lee Harvey Oswald was the lone shooter and relied heavily on analysis of Zapruder frames. Thompson had access to the frames during a period of employment with Time and he took them without permission.



*Would Using Sketches of Photos Violate the Copyright?*

In an attempt to avoid a copyright infringement claim, instead of reprinting the frames, Thompson hired a sketch artist to draw renderings (such as Z-237, shown above).

Time filed suit anyway on December 1, 1967, less than two weeks after Random House started distributing the book. However, the federal district court ruled that the use was fair because it was made for the purpose of critical, historical commentary on an event of great public importance. In its ruling, the court emphasized the public's interest in understanding and analyzing the evidence of the assassination. See *Time Inc. v. Bernard Geis Associates*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968)

This was a groundbreaking decision expanding the principle of fair use. Although Thompson had acted in "bad faith" by essentially stealing and publishing the frames, the court determined that Thompson's bad behavior was outweighed by the public's right to see Thompson's argument. There was a valid copyright, but Thompson's inclusion of the frames in his analysis was protected by fair use.

Time, Inc. did not appeal the decision. Instead, Time stopped attempting to enforce the copyright or collect royalties.

## Time and Its Successors Avoided the Courts Ever Since

After that defeat, neither Time, Inc. nor any of its successors—including the Sixth Floor Museum, which now claims to hold the copyright—ever brought another lawsuit to enforce the Zapruder copyright. They instead exercise behind-the-scenes control—denying access and licensing requests, threatening legal action, or imposing exorbitant fees.

This strategy avoids the risk of a definitive court ruling that would reaffirm the original fair use holding—and potentially weaken their ability to control the narrative. But the truth remains: they were defeated in court—and have never been willing to test their authority again.

## Fair Use Squarely Applies to Zapruder Film Analysis

Pursuant to this unchallenged precedent, anyone using the Zapruder film for the purpose of research, scholarship, commentary, critique, or news reporting is almost certainly within their full legal rights to do so under fair use. That includes even challenges to the authenticity of the film itself. Because the film captures an event of overwhelming public importance, the bar for fair use is at its lowest—and any attempt to restrict such use is not legally defensible.

Chapter Twenty-One

# The Zapruder Film's Copyright Must Be Invalidated

M ore than six decades after the assassination, access to the most comprehensive visual record is controlled by a private institution with its own biased agenda. This is not only contrary to the purpose of copyright law and public records law, it is grounds to render film's copyright legally invalid. The copyright on the Zapruder film should be invalidated or declared unenforceable for several reasons.

## 1. The Zapruder Film Is a Public Record by Law

In 1997, the U.S. government paid the Zapruder family $16 million for the original physical copy of the film under the JFK Records Collection Act. This law was passed to ensure that all records relating to the assassination would be preserved and made publicly accessible. The Act created a legal presumption of openness: *all assassination-related records were to be available to the public for copying, inspection, and use—without restriction.*

The Act did not carve out exceptions for intellectual property claims. The Act specifically said that it takes precedence over copyright law. The intent was unmistakable: the American people should have full access to the materials needed to evaluate the assassination for themselves. A copyright claim that blocks or limits such access undermines the statute's core purpose and is, at best, a circumvention of its mandate.

## 2. The Film Was Taken Under Eminent Domain for *Public Use*

The $16 million payment to the Zapruder family was not a commercial sale—it was a government taking under eminent domain. Under traditional eminent domain principles, the government acquires not only the physical object but also the full bundle of rights necessary to serve the public interest. It is inconceivable that a critical record like the Zapruder film would be taken without acquiring the copyright—unless such a retention was invalidly structured.

The selective retention of the copyright, while transferring the physical film to the public, created a legal loophole that arguably

undermines the public purpose requirement of eminent domain. It allows a private entity to control the very information the government acquired on behalf of the public. That arrangement should be held invalid.

## 3. The Museum's Assertion of Copyright is Contrary to its Purpose

The purpose of copyright is to promote the progress of science and useful arts. Copyright's monopoly is a limited grant to incentivize creation, with the ultimate purpose of enriching the public domain. When copyright is used not for creation, but for suppression, it is being used contrary to its constitutional design.

The Museum's refusal to license the film to researchers with certain viewpoints, and its control over primary materials, turns the copyright into a tool of censorship—something wholly inconsistent with copyright law.

## 4. The Zapruder Film Is Not an "Original Work"

A copyright is only valid if the work is original—that is, independently created and possessing at least minimal creativity. But if, as substantial evidence suggests, the extant version of the Zapruder film has been altered, then the existing version does not reflect Zapruder's original authorship.

Under copyright law, a work that has been modified may not be protectable under the original copyright. If the version currently held by the Sixth Floor Museum is not what Abraham Zapruder filmed, it is at best a derivative or corrupted work—and one that may lack valid legal protection.

## 5. Time, Inc. May Have Committed Fraud on the Copyright Office

The loss and damage to the Zapruder film—whether in the case of Frames 207–212, where Time, Inc. offered a limited explanation; Frames 154–157, where no explanation has ever been provided; or at Frames 132/133 and other points where frames appear to have been removed entirely—was never disclosed to the U.S. Copyright Office. Despite this extensive alteration and degradation, *Life* represented the film as the original work of authorship by Abraham Zapruder. Such omissions raise serious concerns. Under copyright law, knowing misrepresentations to the Copyright Office can be grounds for invalidation due to fraud. The work registered was neither the original nor a bona fide copy in any legally meaningful sense. Without disclosure, the validity of that copyright is in doubt.

## 6. The Tax-Motivated Donation Frustrated the Purpose of the Taking

After receiving $16 million from the government, the Zapruder family donated the copyright to the Sixth Floor Museum, securing a substantial tax deduction. This arrangement—a privately retained right donated to a sympathetic institution—ensured that control over the film stayed in hands ideologically aligned with the official story.

This tactic may have been technically lawful, but it creates a scenario in which public money is paid for a record the public cannot freely use. This should be grounds for a judicial or legislative reeval-

uation of whether such a copyright donation—made in a way that frustrates a transparency statute—can stand.

## 7. Licensing in Violation of the First Amendment

The Museum's pattern of refusing to license the Zapruder film to individuals or groups who question the official assassination narrative may also raise First Amendment concerns. Selective licensing based on viewpoint constitutes content-based discrimination, which courts have found impermissible when government actors or closely affiliated institutions are involved. Since the Museum operates in close collaboration with the National Archives and is in possession of government-acquired records, its conduct should be subject to heightened scrutiny.

## The Path to Restoring the Public's Right to Know

The copyright claim over the Zapruder film has been used to suppress inquiry, restrict access, and distort history. It contradicts the constitutional purpose of copyright, violates the letter and spirit of FOIA and the 1992 JFK Act, and may lack legal validity due to the altered nature of the film.

The public has a right to freely access this film. The continued assertion of copyright is a direct attack on the public's right to access the truth.

The copyright must be invalidated.

# Conclusion: How to Finally Free the Zapruder Film

More than sixty years after President John F. Kennedy's assassination, the Zapruder film—the most iconic and disputed visual record of that tragic day—remains trapped behind legal barriers and institutional control. Held by the Sixth Floor Museum and encumbered by a questionable copyright claim, the film is still not freely accessible to the American public. If we truly value truth, transparency, and the preservation of history, it's time to remove these restrictions and finally set the film free.

## Preserve the Original—Before It's Too Late

The first step is to preserve the original. The original 8mm Kodachrome film is now a delicate, shrinking artifact. As any film preservationist will tell you, once 8mm film begins to shrink, it becomes increasingly fragile and eventually impossible to handle or digitize accurately. Kodachrome is known for its stable color retention, but its physical integrity cannot be ignored.

Experts have urged the Archives to perform a cleaning and preservation process to safeguard the film for future generations. Deluxe Media, one of the most prestigious post-production houses in Hollywood, even offered to do a full restoration free of charge. The offer was backed by individuals on advisory boards with ties to both Hollywood and the National Archives. But when the proposal was presented, the response was chilling: "It will take an act of God or Congress to open the canister holding the Zapruder film ever again."

That was a tragic missed opportunity.

We must demand that proper preservation protocols be enacted immediately. The decay of the original film would not merely be a loss to history—it could serve the interests of those who wish to permanently obscure or eliminate evidence of manipulation or forgery.

## We Need a True High-Resolution Scan of the Original

The best-quality version of the Zapruder film available to the public today is not the original—it's a third-generation copy. That means we are analyzing and debating one of the most important pieces of visual evidence in American history through a lens that has already passed

through multiple rounds of duplication, each introducing potential loss of detail, distortion, and even opportunities for manipulation.

This must change.

We have the technology today to create a direct, ultra-high-resolution scan of the original 8mm Kodachrome film. Using modern, pin-registered scanners capable of 8K resolution or higher, preservation experts can produce a digital surrogate that captures not just the visible image, but the full grain structure, dye layers, and minute details embedded in the original emulsion. When done correctly, this process creates a master-quality digital negative that can be studied, verified, and preserved indefinitely. Scanning the original now would allow researchers and forensic experts to finally compare first-generation frames with later versions to determine if alterations occurred and, if so, when and how.

## A Three-Way Inspection of the Original

The first step is to subject the film to a thorough forensic examination. To do this properly, we must compare every known version and frame of the Zapruder film:

> 1. The original 8mm Kodachrome film stored at the National Archives;
>
> 2. Wilkinson's 6K scans of the 35mm dupe negative; and
>
> 3. The MPI transparencies held by the Sixth Floor Museum.

This three-way comparison should be conducted publicly and under scrupulous conditions—with independent film experts, witnesses, and full video documentation of the process. We must let the evidence speak for itself. If there were alterations made, as many researchers

allege, they will be exposed through this side-by-side analysis. The American people deserve the unvarnished truth about their history, not a manufactured version protected by secrecy.

## End FOIA Restrictions on Zapruder Material

One of the most inexplicable barriers to access is the National Archives' inconsistent and often contradictory handling of Zapruder-related material. Despite the clear mandates of the 1992 JFK Act and FOIA, many items are still listed as "copyright restricted," creating unnecessary delays or outright denials of public access.

Oddly, the National Archives often treats the same frames differently based solely on how they are requested. If you request a frame by its Warren Commission Exhibit (WCE) number, you may receive it. But if you refer to it by its Zapruder frame number, you could be redirected to the Sixth Floor Museum. This policy makes a mockery of the JFK Act's requirement for full public disclosure.

One group recently took action. In *FOIAConsciousness.COM LLC v. National Archives*, there is a pending FOIA lawsuit in the Northern District of California. The plaintiff FOIA requestor was denied a copy of the Zapruder film and filed suit arguing that copyright is not a valid exemption to FOIA. The case could set a vital precedent for removing arbitrary copyright assertions that block access to public records.

## Invalidate the Zapruder Copyright

Fundamentally, it is absurd to treat the Zapruder film as if it were a piece of commercial entertainment. It is a historical document of the highest significance—which the U.S. government once described as "the most important 26 seconds in film history." As such, the idea that

its use and reproduction should be policed by a copyright holder is both offensive and legally suspect.

Under well-established law, there can be no copyright in historical facts. Even if copyright did attach to the film initially, the doctrine of fair use covers nearly all educational, journalistic, and civic discussions of the footage. In early 2025, a newly formed public access advocacy group sued the Sixth Floor Museum to invalidate its copyright claim. The case, *Forum on Open Access to Government Records, Inc. v. Sixth Floor Museum* (N.D. Texas), could strike a fatal blow to the Museum's ability to keep the film locked away.

## Audit the Museum's Zapruder Holdings

Lastly, it is time for a full and transparent inventory of all Zapruder-related materials held by the Sixth Floor Museum. In December 1999, the LMH Company transferred its film elements to the Sixth Floor Museum. In January 2000, the physical MPI transparencies were also transferred to the Museum. The Museum must disclose this collection to the public. It should identify exactly what it has, how it was acquired, and whether it has been altered or withheld. The public has a right to review these materials without being filtered through the Museum's ideological lens. Selective access only for researchers who agree with the Museum's narrative is censorship masquerading as scholarship.

## Free the Zapruder Film

Freeing the Zapruder film is an essential act of historical justice. We must preserve it, digitize it, inspect it, and return it to the public domain where it belongs. The time for blindly accepting information

about the Zapruder film without evidence has passed. Anything less is complicity in the ongoing concealment of the full truth about what happened to President John F. Kennedy.