**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

FORUM ON OPEN ACCESS TO
GOVERNMENT RECORDS INC.,

          Plaintiff,

    v.

DALLAS COUNTY HISTORICAL
FOUNDATION, d/b/a THE SIXTH FLOOR
MUSEUM AT DEALEY PLAZA, and
NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION,

          Defendants.

Civil Action No. 3:25-cv-02034-B

**APPENDIX IN SUPPORT OF**
**DEFENDANT NATIONAL ARCHIVES AND RECORDS ADMINISTRATION'S**
**PARTIAL MOTION TO DISMISS**

Defendant National Archives and Records Administration ("NARA") hereby submits the following Appendix pursuant to Local Rule 7.1(i).  The evidence attached hereto is submitted in support of NARA's Partial Motion to Dismiss and Brief in Support thereof, which are being filed simultaneously herewith.

The contents of this Appendix are:

| Exhibit | Description | APP. Pages |
|---------|-------------|------------|
| 1 | June 28, 2024 FOIA Request and correspondence with NARA | APP. 3–6 |
| 2 | August 8, 2024 FOIA Request and correspondence with NARA | APP. 7–10 |
| 3 | H.R. Rep. No. 104-795, at 20 (1996), as reprinted in 1996 U.S.C.C.A.N. 3448, 3463 (1996 WL 532690) | APP. 11–51 |

DATE: November 21, 2025

Respectfully Submitted,

BRETT SHUMATE
Assistant Attorney General

SCOTT BOLDEN
Director

*/s/ Matthew D. Tanner*
MATTHEW D. TANNER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C. 20530
Matthew.D.Tanner@usdoj.gov
Telephone:    (202) 305-9847
Facsimile:    (202) 307-0345

**ATTORNEYS FOR DEFENDANT THE
NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION**

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2025, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

*/s/ Matthew D. Tanner*
Matthew D. Tanner

APP. 2

# EXHIBIT 1

 Gmail

**Mark Javitch <mark@javitchlawoffice.com>**

## Re: FOIA NGC24-045A Appeal of 24-51268

1 message

**NARA General Counsel FOIA Office** <foia@nara.gov>                        Tue, Jul 2, 2024 at 9:39 AM
To: mark@javitchlawoffice.com
Cc: NARA General Counsel FOIA Office <foia@nara.gov>

**Sent via Email  <mark@javitchlawoffice.com>**

July 2, 2024

Mark L. Javitch
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo CA 94401

**Re: FOIA NGC24-045A Appeal of 24-51268**

Dear Mr. Javitch:

On **July 1, 2024**, we received on behalf of the Deputy Archivist of the United States, your request for administrative appeal, submitted via the foia@nara.gov inbox.  You are appealing the response you received from the **Still Picture Branch** to your FOIA request **24-51268**.  We assigned your appeal the tracking number **NGC24-045A**.  Please provide this number in any future correspondence about this appeal.

The Deputy Archivist of the United States has the responsibility to adjudicate such appeals.  To afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt.

We will notify you of the decision on your appeal as soon as we can.  If you have any questions about the status of your appeal, you may contact us at *foia@nara.gov*.

Sincerely,

Operational FOIA Division
National Archives and Records Administration
8601 Adelphi Road
College Park, Maryland, 20740-6001
301-837-3642

On Mon, Jul 1, 2024 at 5:26 PM Mark Javitch <mark@javitchlawoffice.com> wrote:
> Dear NARA,
>
> On behalf of my client, Forum on Open Access to Government Records, this is an appeal of the response to my client's FOIA Request 24-51268 which I forwarded to you below. My client was not provided copies in response to its request for copies of the transparencies of the Zapruder Film frames 171-207, 212-334 (Reference: 559449 Local ID: ZF-ZF) . "The general rule under FOIA is that a person is entitled to copies of a federal agency's records upon making a request that 'reasonably describes such records' and that complies with required procedures for such requests." Trentadue v. FBI, 572 F.3d 794, 796 (10th Cir. 2009) (quoting 5 U.S.C. § 552(a)(3)(A)(i)).
>
> The reason given was that my client does not have permission and must seek permission from the copyright holder, the Sixth Floor Museum. However, this response is incorrect as a matter of law, as there is no copyright on these requested

APP. 4

Case 3:25-cv-02034-B    Document 294    Filed 08/01/25    Page 53 of 54    PageID 245

transparencies because these are Warren Commission exhibits that were published in the Warren Commission volume 18 in 1964 without any notice of copyright and with cooperation from any copyright holder. *See Brown v. Latin Am. Music Co.*, 498 F.3d 18 , 23-24 (1st Cir. 2007) ("LAMCO did not present any substantive support for its claim of copyright, as against ... the uncontroverted documentary evidence of prior publication without the required statutory notice."

Further, under the reading room provision, copies of the requested documents were supposed to be provided under Section 552(a)(2)(D) which requires that (2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format . . .(D) copies of all records, regardless of form or format--(II) that have been requested 3 or more times . . . .I am sure there is no doubt that these transparencies have been requested more than 3 times.

Thank you,
Mark Javitch
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo CA 94401
(650) 781-8000

---------- Forwarded message ---------
From: **William Wade** <stillpix@nara.gov>
Date: Mon, Jul 1, 2024 at 12:27 PM
Subject: FOIA Request 24-51268
To: Mark Javitch <mark@javitchlawoffice.com>

Dear Mark Javitch,
I am writing in response to your Freedom of Information request sent on June 28, 2024 for records in the custody of the National Archives and Records Administration. We assigned your request FOIA Case Number 24-51268.

The series ZF-ZF (National Archives Identifier 559449) is open to the public and available to view in our research room in College Park, MD. If you would like to schedule a Still Picture Research Room appointment, please visit https://www.eventbrite.com/o/national-archives-at-college-park-still-pictures-48193105693. Please note that you may only view the slides during your visit, and you may not reproduce them without written permission from the Sixth Floor Museum. Although NARA has legal custody of the Zapruder Film, and it is considered a federal record, the copyright to the film/slides is owned by the Sixth Floor Museum in Dallas, Texas.  Researchers wishing to copy the slides must first obtain written permission from the Sixth Floor Museum.

The Sixth Floor Museum at Dealey Plaza
411 Elm Street
Suite #120
Dallas, TX 75202
Phone: (214) 747-6660 (Permission) Toll-Free 888-485-4854  Fax: (214) 747-6662
http://www.jfk.org/

The Sixth Floor Museum must then send a written copy of any permission granted to the Still Picture Branch of NARA. The permissions can be forwarded via email to: stillpix@nara.gov.  Alternatively if you are unable to visit, you may wish to hire an independent researcher to copy images on your behalf, who would also need to obtain permission.

This completes the processing of your request. If you have any questions, the Still Picture Reference Team will be happy to assist you.  Written inquiries may be directed to the Still Picture Reference Team, RRSS, Room 5360, National Archives and Records Administration, 8601 Adelphi Road, College Park, Maryland 20740-6001.  Our phone number is 301-837-0561 and fax 301-837-3621.  We can also be reached by email at stillpix@nara.gov.

We do not consider this a denial of your FOIA request. However, if you are not satisfied with our action on this request, your options for appeal and dispute resolution are outlined in the attached document.

Billy Wade, Branch Chief
Still Picture Branch

APP. 5

On Fri, Jun 28, 2024 at 1:13 PM Mark Javitch <mark@javitchlawoffice.com> wrote:

Dear Still Pictures Unit (stillpix@nara.gov):

On behalf of my client, Forum on Open Access to Government Records,

And pursuant to the Freedom of Information Act, My client requests

> Reference: 559449 Local ID: ZF-ZF
> Zapruder Transparencies 171-207, 212-334
> (for the frames in Warren Commission Volume 18)

If you need any clarification, please let me know.

Thank you,

Mark L. Javitch
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo CA 94401
(650) 781-8000

--
You received this message because you are subscribed to the Google Groups "STILLPIX" group.
To unsubscribe from this group and stop receiving emails from it, send an email to Stillpix+unsubscribe@nara.gov.
To view this discussion on the web visit https://groups.google.com/a/nara.gov/d/msgid/Stillpix/
CABh7VXB1GWGLtGn3tVP7sw9aWzVKi%2BbY0iRpbYA6tTnBeDiR7Q%40mail.gmail.com.

APP. 6

# EXHIBIT 2

Case 3:25-cv-02034-B       Document 498       Filed 10/20/25       Page 82 of 54       PageID 446

                                                                      **Mark Javitch <mark@javitchlawoffice.com>**

## Re: Appeal of FOIA Request 24-60113: Freedom of Information Act Request for Zapruder Transparencies 208-211

1 message

---

**Wanda Williams** <wanda.williams@nara.gov>                             Mon, Aug 12, 2024 at 8:52 AM
To: mark@javitchlawoffice.com
Cc: FOIA <foia@nara.gov>

**Sent via Email**  <mark@javitchlawoffice.com>

August 12, 2024

Mark L. Javitch
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo CA 94401
(650) 781-8000

### Re: FOIA NGC24-052A Appeal of 24-60113 Still Picture Branch

Dear Mark Javitch:

On **August 9, 2024**, we received your request for administrative appeal on behalf of the Deputy Archivist of the United States, submitted via the foia@nara.gov inbox.  You are appealing the response you received from NARA's *Still Picture Branch* to your FOIA request 24-60113.  We assigned your appeal the tracking number **NGC24-052A**.  Please provide this number in any future correspondence about this appeal.  The Deputy Archivist of the United States has the responsibility to adjudicate such appeals.

In your appeal, you stated:

*On behalf of my clients, this is an appeal of the response to my client's FOIA Request 24-60113, which I forwarded to you below. My client was not provided copies in response to its request for copies of the transparencies of the Zapruder Film frames 208-211 (Reference: 559449 Local ID: ZF-ZF) . "The general rule under FOIA is that a person is entitled to copies of a federal agency's records upon making a request that 'reasonably describes such records' and that complies with required procedures for such requests." Trentadue v. FBI, 572 F.3d 794, 796 (10th Cir. 2009) (quoting 5 U.S.C. § 552(a)(3)(A)(i)).*

*The reason given was that my client does not have permission and must seek permission from the copyright holder, the Sixth Floor Museum. However, this response is incorrect as a matter of law, as there is no valid copyright on these requested transparencies, and providing a copy under FOIA is Fair Use and not infringing.*

*Further, under the reading room provision, copies of the requested documents were supposed to be provided under Section 552(a)(2)(D) which requires that (2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format . . .(D) copies of all records, regardless of form or format--(II) that have been requested 3 or more times . . . .I am sure there is no doubt that these transparencies have been requested more than 3 times.  [sic]*

To afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt.  We will notify you of the decision on your appeal as soon as we can.  If you have any questions about the status of your appeal, you may contact us at *foia@nara.gov*.

Sincerely,

Wanda Williams

APP. 8

Case 3:25-cv-02034-B Document 298 Filed 10/20/25 Page 9 of 54 PageID 2447

Deputy FOIA Officer/Archivist
Office of General Counsel (NGC)/Operational FOIA and Access Division
National Archives and Records Administration
College Park, Maryland, 20740-6001
301-837-0773 direct
301-837-3642 FOIA Information Line
wanda.williams@nara.gov



On Fri, Aug 9, 2024 at 11:13 PM Mark Javitch <mark@javitchlawoffice.com> wrote:
Dear NARA Deputy Archivist,

On behalf of my clients, this is an appeal of the response to my client's FOIA Request 24-60113, which I forwarded to you below. My client was not provided copies in response to its request for copies of the transparencies of the Zapruder Film frames 208-211 (Reference: 559449 Local ID: ZF-ZF) . "The general rule under FOIA is that a person is entitled to copies of a federal agency's records upon making a request that 'reasonably describes such records' and that complies with required procedures for such requests." *Trentadue v. FBI*, 572 F.3d 794, 796 (10th Cir. 2009) (quoting 5 U.S.C. § 552(a)(3)(A)(i)).

The reason given was that my client does not have permission and must seek permission from the copyright holder, the Sixth Floor Museum. However, this response is incorrect as a matter of law, as there is no valid copyright on these requested transparencies, and providing a copy under FOIA is Fair Use and not infringing.

Further, under the reading room provision, copies of the requested documents were supposed to be provided under Section 552(a)(2)(D) which requires that (2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format . . .(D) copies of all records, regardless of form or format--(II) that have been requested 3 or more times . . . .I am sure there is no doubt that these transparencies have been requested more than 3 times.

Thank you,
Mark Javitch
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo CA 94401
(650) 781-8000
---------- Forwarded message ---------
From: **William Wade** <stillpix@nara.gov>
Date: Fri, Aug 9, 2024 at 7:48 AM
Subject: FOIA Request 24-60113: Freedom of Information Act Request for Zapruder Transparencies 208-211
To: Mark Javitch <mark@javitchlawoffice.com>


Dear Mark Javitch,
I am writing in response to your Freedom of Information request sent yesterday, August 8, 2024 for records in the custody of the National Archives and Records Administration. We assigned your request FOIA Case Number 24-.60113.

The series ZF-ZF (National Archives Identifier 559449) is open to the public and available to view in our research room in College Park, MD. If you would like to schedule a Still Picture Research Room appointment, please visit https://www.eventbrite.com/o/national-archives-at-college-park-still-pictures-48193105693. Please note that you may only view the slides during your visit, and you may not reproduce them without written permission from the Sixth Floor Museum. Although NARA has legal custody of the Zapruder Film, and it is considered a federal record, the copyright to the film/slides is owned by the Sixth Floor Museum in Dallas, Texas.  Researchers wishing to copy the slides must first obtain written permission from the Sixth Floor Museum.

The Sixth Floor Museum at Dealey Plaza
411 Elm Street
Suite #120
Dallas, TX 75202
Phone: (214) 747-6660 (Permission) Toll-Free 888-485-4854  Fax: (214) 747-6662

APP. 9

Case 3:25-cv-02034-B    Document 24-8    Filed 10/21/25    Page 14 of 51    PageID 2486

http://www.jfk.org/

The Sixth Floor Museum must then send a written copy of any permission granted to the Still Picture Branch of NARA. The permissions can be forwarded via email to: stillpix@nara.gov.  Alternatively if you are unable to visit, you may wish to hire an independent researcher to copy images on your behalf, who would also need to obtain permission.

I believe you also sent a request on July 1, 2024 for different slide numbers. We have not yet received confirmation from The Sixth Floor Museum that permission has been granted. I just wanted to let you know in case you had reached out to them.

This completes the processing of your request. If you have any questions, the Still Picture Reference Team will be happy to assist you.  Written inquiries may be directed to the Still Picture Reference Team, RRSS, Room 5360, National Archives and Records Administration, 8601 Adelphi Road, College Park, Maryland 20740-6001.  Our phone number is 301-837-0561 and fax 301-837-3621.  We can also be reached by email at stillpix@nara.gov.

We do not consider this a denial of your FOIA request. However, if you are not satisfied with our action on this request, your options for appeal and dispute resolution are outlined in the attached document.

Billy Wade, Branch Chief
Still Picture Branch


--------- Forwarded message ---------
From: **Mark Javitch** <mark@javitchlawoffice.com>
Date: Thu, Aug 8, 2024 at 4:07 PM
Subject: Freedom of Information Act Request for Zapruder Transparencies 208-211
To: Holly Reed <stillpix@nara.gov>


August 8, 2024

Dear Still Pictures Unit (stillpix@nara.gov):

**RE: Freedom of Information Act Request**

On behalf of my clients, FOIACONSCIOUSNESS.COM LLC and Forum on Open Access to Government Records, Inc.,

And pursuant to the Freedom of Information Act, My clients request

    Reference: 559449 Local ID: ZF-ZF
    Zapruder Transparencies 208-211

If you need any clarification, please let me know.

Thank you,

Mark L. Javitch
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo CA 94401
(650) 781-8000

APP. 10

# EXHIBIT 3

| 104TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT 104–795 |

# ELECTRONIC FREEDOM OF INFORMATION AMENDMENTS OF 1996

---

SEPTEMBER 17, 1996.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. CLINGER, from the Committee on Government Reform and Oversight, submitted the following

# R E P O R T

[To accompany H.R. 3802]

[Including cost estimate of the Congressional Budget Office]

The Committee on Government Reform and Oversight, to whom was referred the bill (H.R. 3802) to amend section 552 of title 5, United States Code, popularly known as the Freedom of Information Act, to provide for public access to information in an electronic format, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

## CONTENTS

| | | Page |
|---|---|---|
| I. | Background and Need for the Legislation | 6 |
| II. | Legislative Hearings and Committee Action | 14 |
| III. | Committee Hearings and Written Testimony | 15 |
| IV. | Explanation of the Bill | 18 |
| V. | Compliance with Rule XI | 30 |
| VI. | Budget Analysis and Projections | 31 |
| VII. | Cost Estimate of the Congressional Budget Office | 31 |
| VIII. | Inflationary Impact Statement | 32 |
| IX. | Changes in Existing Law | 32 |
| X. | Committee Recommendation | 39 |
| XI. | Congressional Accountability Act; Public Law 104–1 | 40 |

The amendment is as follows:
Strike out all after the enacting clause and insert in lieu thereof the following:

29–006

2

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Electronic Freedom of Information Amendments of 1996".

**SEC. 2. FINDINGS AND PURPOSES.**

(a) FINDINGS.—The Congress finds that—

(1) the purpose of section 552 of title 5, United States Code, popularly known as the Freedom of Information Act, is to require agencies of the Federal Government to make certain agency information available for public inspection and copying and to establish and enable enforcement of the right of any person to obtain access to the records of such agencies, subject to statutory exemptions, for any public or private purpose;

(2) since the enactment of the Freedom of Information Act in 1966, and the amendments enacted in 1974 and 1986, the Freedom of Information Act has been a valuable means through which any person can learn how the Federal Government operates;

(3) the Freedom of Information Act has led to the disclosure of waste, fraud, abuse, and wrongdoing in the Federal Government;

(4) the Freedom of Information Act has led to the identification of unsafe consumer products, harmful drugs, and serious health hazards;

(5) Government agencies increasingly use computers to conduct agency business and to store publicly valuable agency records and information; and

(6) Government agencies should use new technology to enhance public access to agency records and information.

(b) PURPOSES.—The purposes of this Act are to—

(1) foster democracy by ensuring public access to agency records and information;

(2) improve public access to agency records and information;

(3) ensure agency compliance with statutory time limits; and

(4) maximize the usefulness of agency records and information collected, maintained, used, retained, and disseminated by the Federal Government.

**SEC. 3. APPLICATION OF REQUIREMENTS TO ELECTRONIC FORMAT INFORMATION.**

Section 552(f) of title 5, United States Code, is amended to read as follows:

"(f) For purposes of this section, the term—

"(1) 'agency' as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

"(2) 'record' and any other term used in this section in reference to information includes any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format.".

**SEC. 4. INFORMATION MADE AVAILABLE IN ELECTRONIC FORMAT AND INDEXATION OF RECORDS.**

Section 552(a)(2) of title 5, United States Code, is amended—

(1) in the second sentence, by striking "or staff manual or instruction" and inserting "staff manual, instruction, or copies of records referred to in subparagraph (D)";

(2) by inserting before the period at the end of the 3rd sentence the following: ", and the extent of such deletion shall be indicated on the portion of the record which is made available or published";

(3) by inserting after the 3rd sentence the following: "If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made.";

(4) in subparagraph (B), by striking "and" after the semicolon;

(5) by inserting after subparagraph (C) the following:

"(D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

"(E) a general index of the records referred to under subparagraph (D);";

(6) by inserting after the 5th sentence the following: "Each agency shall make the index referred to in subparagraph (E) available by computer telecommunication by December 31, 1999."; and

(7) by inserting after the 1st sentence the following: "For records created on or after November 1, 1996, within one year after such date, each agency shall

3

make such records available by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means.".

**SEC. 5. HONORING FORM OR FORMAT REQUESTS.**

Section 552(a)(3) of title 5, United States Code, is amended—
    (1) by inserting "(A)" after "(3)";
    (2) by striking "(A)" and inserting "(i)";
    (3) by striking "(B)" and inserting "(ii)"; and
    (4) by adding at the end the following new subparagraphs:

"(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

"(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format.

"(D) For purposes of this paragraph, the term 'search' means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.".

**SEC. 6. STANDARD FOR JUDICIAL REVIEW.**

Section 552(a)(4)(B) of title 5, United States Code, is amended by adding at the end the following new sentence: "In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).".

**SEC. 7. ENSURING TIMELY RESPONSE TO REQUESTS.**

(a) MULTITRACK PROCESSING.—Section 552(a)(6) of title 5, United States Code, is amended by adding at the end the following new subparagraph:

"(D)(i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

"(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

"(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.".

(b) UNUSUAL CIRCUMSTANCES.—Section 552(a)(6)(B) of title 5, United States Code, is amended to read as follows:

"(B)(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

"(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be exceptional circumstances for purposes of subparagraph (C).

"(iii) As used in this subparagraph, 'unusual circumstances' means, but only to the extent reasonably necessary to the proper processing of the particular requests—

    "(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

    "(II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

    "(III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.".

4

(c) EXCEPTIONAL CIRCUMSTANCES.—Section 552(a)(6)(C) of title 5, United States Code, is amended by inserting "(i)" after "(C)", and by adding at the end the following new clauses:

"(ii) For purposes of this subparagraph, the term 'exceptional circumstances' does not include a delay that results from a predictable agency workload of requests under this section.

"(iii) Refusal by a person to reasonably modify the scope of a request or to arrange an alternative time frame for processing a request (or a modified request) under this section after being requested to do so by the agency to whom the person made the request shall be exceptional circumstances for purposes of this subparagraph.

"(iv) In determining whether exceptional circumstances exist, a court shall consider the efforts by an agency to reduce the number of pending requests under this section.".

**SEC. 8. TIME PERIOD FOR AGENCY CONSIDERATION OF REQUESTS.**

(a) EXPEDITED PROCESSING.—Section 552(a)(6) of title 5, United States Code (as amended by section 7(a) of this Act), is further amended by adding at the end the following new subparagraph:

"(E)(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—

"(I) in cases in which the person requesting the records demonstrates a compelling need; and

"(II) in other cases determined by the agency.

"(ii) Notwithstanding subparagraph (A)(i), regulations under this subparagraph must ensure—

"(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

"(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

"(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond timely to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

"(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

"(v) For purposes of this subparagraph, the term 'compelling need' means—

"(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

"(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.".

(b) EXTENSION OF GENERAL PERIOD FOR DETERMINING WHETHER TO COMPLY WITH A REQUEST.—Section 552(a)(6)(A)(i) of title 5, United States Code, is amended by striking "ten days" and inserting "20 days".

(c) ESTIMATION OF MATTER DENIED.—Section 552(a)(6) of title 5, United States Code (as amended by section 7 of this Act and subsection (a) of this section), is further amended by adding at the end the following new subparagraph:

"(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by an exemption under subsection (b) under which the denial is made.".

**SEC. 9. COMPUTER REDACTION.**

Section 552(b) of title 5, United States Code, is amended in the matter following paragraph (9) by adding at the end the following: "The amount of information deleted shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by an exemption under this subsection under which the deletion is made.".

**SEC. 10. REPORT TO THE CONGRESS.**

Section 552(e) of title 5, United States Code, is amended to read as follows:

5

"(e)(1) On or before February 1 of each year, each agency shall submit to the Attorney General a report which shall cover the preceding fiscal year and which shall include—

"(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

"(B)(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

"(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

"(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median number of days that such requests had been pending before the agency as of that date;

"(D) the number of requests for records received by the agency and the number of requests which the agency processed;

"(E) the median number of days taken by the agency to process different types of requests;

"(F) the total amount of fees collected by the agency for processing requests;

"(G) the average amount of time that the agency estimates as necessary, based on the past experience of the agency, to comply with different types of requests; and

"(H) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests.

"(2) Each agency shall make each such report available to the public through a computer network, or if computer network means have not been established by the agency, by other electronic means.

"(3) The Attorney General shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General shall notify the Chairman and ranking minority member of the Committee on Government Reform and Oversight of the House of Representatives and the Chairman and ranking minority member of the Committees on Governmental Affairs and the Judiciary of the Senate, no later than April 1 of the year in which each such report is issued, that such reports are available by electronic means.

"(4) The Attorney General, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

"(5) The Attorney General shall submit an annual report on or before April 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.".

**SEC. 11. REFERENCE MATERIALS AND GUIDES.**

Section 552 of title 5, United States Code, is further amended by adding after subsection (f) the following new subsection:

"(g) The head of each agency shall prepare and make publicly available upon request, reference material or a guide for requesting records or information from the agency, including—

"(1) an index of all major information systems of the agency;

"(2) a description of major information and record locator systems maintained by the agency; and

"(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.".

**SEC. 12. EFFECTIVE DATE.**

(a) IN GENERAL.—Except as provided in subsection (b), this Act shall take effect 180 days after the date of the enactment of this Act.

(b) PROVISIONS EFFECTIVE ON ENACTMENT.—Sections 7 and 8 shall take effect one year after the date of the enactment of this Act.

6

## I. Background and Need for the Legislation

### A. THE FREEDOM OF INFORMATION ACT

With the enactment of the Freedom of Information Act ("FOIA" or the "Act") thirty years ago, the Federal Government established a policy of openness toward information within its control. The FOIA establishes a presumptive right for the public to obtain identifiable, existing records of Federal departments and agencies. Any member of the public may use the FOIA to request access to government information. Requestors do not have to show a need or reason for seeking information. Requestors use the FOIA for a variety of purposes. Private vendors with the government, for example, use the FOIA requests as part of the procurement process for competitive purposes. Journalists use the FOIA to obtain details about government actions to broader dissemination to the public. Individual citizens use it to learn more about government activities that have affected them personally.

The burden of proof for withholding requested material rests with the department or agency that seeks to deny the request. Agencies may deny access to records, or portions of records which fall within an enumerated exemption. Agency employees responsible for responding to requests screen requested records to remove or redact exempted material from release. The nine exemption categories are listed below:

Information that is classified for national defense or foreign policy purposes;

Information that relates solely to an agency's internal personnel rules and practices;

Information that has been clearly exempted under other laws.

Confidential business information, such as trade secrets;

Internal government deliberative communications about a decision before an announcement;

Information about an individual that, if disclosed, would cause a clearly unwarranted invasion of personal privacy;

Law enforcement records, particularly of ongoing investigations;

Information concerning bank supervision;

Geological and geophysical information, such as maps.

The Office of Information and Regulatory Affairs within the Office of Management and Budget exercises under various statutes, including the Paperwork Reduction Act,[1] broad authority for coordinating and administering various aspects of government-wide information policy. The Department of Justice, in turn, provides policy guidance and oversees the agencies' compliance with FOIA.

Individual departments and agencies generally have established specific offices for processing FOIA requests. Nevertheless, lack of sufficient agency resources has constrained the effectiveness of the FOIA. At some agencies failure to allocate sufficient staff to comply with the Act has resulted in lengthy backlogs measured in years. Efforts at improving FOIA response time have centered on better

---

[1] The Paperwork Reduction Act consists of (P.L. 96–511, 94 Stat. 2812) as amended by the Paperwork Reduction Act of 1986 (section 101 (m) [Title VIII, Part A] of P.L. 99–500 and P.L. 99–591, 100 Stat. 1783) and The Paperwork Reduction Act of 1995 (P.L. 104–13, 109 Stat. 163). The Paperwork Reduction Act is codified at Chapter 35 of Title 44 of the United States Code.

7

prioritization of requests and more efficient administrative practices.

FOIA access to unpublished agency records has resulted in many disclosures of waste and fraud in the Federal Government. The Act reflects the view that the full disclosure of information to the public about government wrongdoing and other mistakes will ultimately generate appropriate corrective responses. Such revelations may have a certain degree of preventive effect, prompting a higher degree of probity and conscientiousness in the performance of government operations. Exposures resulting from FOIA disclosures, and the reactions they produce, are critical to maintaining an open and free society.

### B. THE EVOLUTION OF THE FREEDOM OF INFORMATION ACT

Initially enacted in 1966, the Act resulted from years of congressional examination of executive department and agency impediments to public access to information.[2] The prevailing public access law, Section 3 of the Administrative Procedure Act of 1946, was being interpreted to restrict information availability.[3] This so-called "housekeeping" law originated from the earliest days of the Republic. It directed department heads to prescribe regulations for the custody, use, and preservation of department records, papers and property.[4]

The origins of the original Freedom of Information Act can be traced to a predecessor subcommittee to the House Subcommittee on Government Management, Information and Technology. In 1955 the House Committee on Government Operations established the Special Subcommittee on Government Information. In chartering the Subcommittee, full Committee Chairman William L. Dawson directed it:

> To study the operation of agencies and officials in the executive branch of the Government at all levels with a view to determining the efficiency and economy of such operation in the field of operation. * * * With this purpose your subcommittee will ascertain the trend in the availability of Government information and will scrutinize the information practices of executive agencies and officials in the light of their propriety, fitness and legality.[5]

The efforts of this subcommittee expanded the people's right to know. Congress, in 1958, amended this "housekeeping" law to state that it "does not authorize withholding information from the public or limiting the availability of records to the public."[6]

---

[2] House Committee on Government Operations, Availability of Information From Federal Departments and Agencies: Hearings before the House Committee on Government Operations, 84th-86th Congresses.

[3] 60 Stat. 237 at 238. Francis E. Rourke. "Secrecy and Publicity: Dilemmas of Democracy." Baltimore: The Johns Hopkins Press, 1961, pp. 57–58.

[4] See 1 Stat. 28, 49, 65; these and similar provisions were consolidated in the Revised Statutes of the United States (1878) at Section 161, which is presently located in the United States Code at 5 U.S.C. 301 (1994). Rourke, "Secrecy and Publicity: Dilemmas of Democracy," pp. 47–49.

[5] House Committee on Government Operations, Amending Section 552 of Title 5, United States Code, Known as the Freedom of Information Act, 93rd Congress, 2nd Session, House Report 93–876, p. 3.

[6] 72 Stat. 547. Rourke, "Secrecy and Publicity," pp. 59–60.

8

The author of one of the earliest and most thorough studies of this protective bulwark stated the resulting dilemma dramatically and concisely:

> Public business is the public's business. The people have the right to know. Freedom of information is their just heritage. Without that the citizens of a democracy have but changed their kings. [7]

The Freedom of Information Act evolved from the 1958 Administrative Procedure Act disclosure requirement. An early attempt at a freedom of information bill was considered and approved in the Senate during the 88th Congress. [8] However, the House took no action on such a measure before sine die adjournment. Again, in the 89th Congress, the Senate returned to the measure and adopted a revised and refined version of the earlier bill on October 23, 1965. The House subsequently passed this bill on June 20, 1966.

Signing the FOIA into law on July 4, 1966, [9] President Johnson declared:

> This legislation springs from one of our most essential principles: A democracy works best when the people have all the information that the security of the Nation permits. No one should be able to pull curtains of secrecy around decisions which can be revealed without injury to the public interest. [10]

The FOIA became operative on July 4, 1967. It became codified as section 552 of Title 5, United States Code. [11]

During House and Senate committee consideration of legislation leading to the FOIA, no executive department or agency representative had testified in support of the proposals. Subsequent congressional oversight of the Act revealed that this distaste for the legislation transformed into hostility toward the statute during its initial implementation. A 1972 report by the House Committee on Government Operations characterized the situation as follows:

> The efficient operation of the Freedom of Information Act has been hindered by five years of foot-dragging by the Federal bureaucracy. The widespread reluctance of the bureaucracy to honor the public's legal right to know has been obvious in parts of two administrations. This reluctance has been overcome in a few agencies by continued pressure from appointed officials at the policy making level and in some other agencies through public hearings and other oversight activities by the Congress. [12]

Officials sometimes argue that the FOIA was not a primary program of a particular department and agency. This contention, how-

---

[7] Harold L. Cross. "The People's Right to Know." New York City: Columbia University Press, 1953, p. xiii.

[8] For the legislative history of the Freedom of Information Act of 1966, see Senate Committee on the Judiciary, Freedom of Information Act Source Book: Legislative Materials, Cases, Articles, S. Doc. No. 93–82, 93rd Congress, 2d Session (1974).

[9] 80 Stat. 250.

[10] Public Papers of the Presidents of the United States: Lyndon B. Johnson, 1966. Book 2. Washington, U. S. Govt. Print. Off., 1967, p. 699.

[11] 5 U.S.C. 552 (1970).

[12] House Committee on Government Operations, Administration of the Freedom of Information Act, House Report 92–1419, 92nd Congress, 2d Session, 1972, pp. 8–9.

9

ever, ignores the importance of government information accessibility for the citizens of a democracy. Unfortunately, over time administration of the FOIA has suffered from a lack of resources. Consequently many requests languished, awaiting a response, because agencies failed to provide necessary resources. FOIA has also suffered from weak administrative support in its implementation.

Amendments strengthening FOIA were introduced in the House in early 1973 and legislative hearings were held in May of that year. No department or agency witness expressed any support for the proposed amendments. By the end of 1973, the House bill was refined, reported from the House Government Operations Committee in February 1974, and adopted by the House in March. Shortly thereafter, in May, a Senate counterpart bill was reported, strengthened during floor debate, and adopted. [13]

During the twenty months that the FOIA amendments moved through the two Houses of Congress, various congressional committees and a Special Prosecutor were engaged in pursuing inquiries related to the Watergate scandal. Against this backdrop of concern about the accountability of public officials, the availability of Government information became an important issue for Congress and the public.

Though the FOIA amendments of 1974 were not developed in response to the Watergate incident, they gained legislative momentum as congressional investigators probed Watergate and related matters. President Nixon resigned shortly after the conferees on the FOIA amendments began their deliberations in August. The new President, Gerald Ford, sent a letter to the conferees expressing his reservations about some specific amendments. After resolving their differences, the conferees placed their report before their respective chambers. Approval by the Senate came on October 1, 1974 and the House voted acceptance on October 7, 1974.

On October 17, 1974 the President vetoed and characterized the legislation as "unconstitutional and unworkable." [14] On November 20, 1974 the House voted 371–31 to reject the presidential veto. The next day, the Senate completed action on the legislation, voting 65–27 to override the President's objections. The amendments became law, taking effect on February 19, 1975. [15]

Perhaps the most significant change under the FOIA amendments was that requestors needed only to "reasonably describe" the requested records. Additionally, agencies were directed to furnish documents without charge or at a reduced cost if it determined that such an action would be in the public interest. Courts could conduct an in camera review of contested materials to decide if any materials were being properly withheld. Agencies received specific response deadlines for agency action. The Federal courts were given authority to award attorney fees and litigation costs where a private complainant had "substantially prevailed" in seeking records from an agency; they were authorized to take notice of the

---

[13] For the legislative history of the 1974 amendments to the Freedom of Information Act, see House Committee on Government Operations and Senate Committee on the Judiciary. Freedom of Information Act and Amendments of 1974 (P.L. 93–502). Source Book: Legislative History, Texts, and Other Documents. Joint Committee print, 94th Congress, 1st Session, 1975.

[14] "Public Papers of the Presidents of the United States: Gerald R. Ford, 1974." Washington, U. S. Govt. Print. Off., 1975, pp. 374–376.

[15] 88 Stat. 1561.

10

"arbitrary and capricious" withholding of documents. In addition the amendments expanded and clarified the definition of agencies covered by the FOIA. They also specified that records containing segregable portions of withholdable information be released with the necessary deletions.

Additionally the exemptions in the Act concerning classified information and law enforcement materials were narrowed and made more specific. The amendments, and their manner of adoption, also displayed Congress's strong support for and commitment to the FOIA and its proper administration.

In 1976, when adopting another open government law—the Government in the Sunshine Act—in fulfillment of the people's right to know, Congress again amended the FOIA. [16] This change was a limited one, prompted by a 1975 Supreme Court case. The court's decision expanded the interpretation of the types of information covered by the third exemption of the FOIA. [17] Consequently, the FOIA amendment modified the exemption covering information specifically excepted from disclosure by other statutes. The amendment mandated that protection only applied if the statute "left no discretion on the issue," or referred to particular types of information to be withheld. [18]

Further Senate FOIA amendment initiatives ended unsuccessfully during the 97th and 98th Congresses. In the closing days of the 99th Congress, however, during Senate debate of an omnibus anti-drug abuse bill, FOIA amendments were attached to the measure. [19] They strengthened the protection for law enforcement records and created new fee and fee waiver arrangements. They set a structure of three fee categories for FOIA users. The fees covered commercial users; scholars, scientific researchers, journalists; and all other requestors. However, fees could not be charged if the costs of routine collection were likely to be equal or greater than the amount of the fee itself. Also, the first two hours of search time or the first 100 pages of document duplication were free, except for commercial users. In addition, if the disclosure of the information was in the public interest because it was likely to contribute significantly to public understanding of the operations or activities of the Government and otherwise was not primarily in the commercial interest of the requestor, there would be a reduced fee or no charge. These amendments remained in the anti-drug abuse bill signed by the President on October 27, 1986. [20]

The FOIA has become a popular tool used by various quarters of American society—the press, business, scholars, attorneys, consumers, and environmentalists, among others. Recent agency annual reports on the administration of the Act, covering 1992 operations, show an annual volume of almost 600,000 requests. The response

---

[16] For the legislative history of the Government in the Sunshine Act and its amendment to the FOIA, see Senate Committee on Government Operations and House Committee on Government Operations. Government in the Sunshine Act'—S. 5 (Public Law 94–409). Source Book: Legislative History, Texts, and Other Documents. Joint committee print, 94th Congress, 2d Session, 1976.

[17] Administrator, *Federal Aviation Administration* v. *Robertson*, 422 U.S. 255 (1975).

[18] 90 Stat. 1241, at 1247.

[19] See Harold C. Relyea. "U.S. Freedom of Information Act Reforms—1986," 9 Journal of Media Law and Practice—12 (March 1988).

[20] 100 Stat. 3207, at 3207–48.

11

to a request may involve a few sheets of paper, several linear feet of records, or, increasingly, information in an electronic format.

C. THE EFFECT OF ELECTRONIC RECORDS

Today, the FOIA faces a new challenge. The volume of Federal agency records created and retained in electronic formats is growing at a rapid pace. Agency records are now created not just on pieces of paper and placed in filing cabinets. Personal computers and digital storage media, such as CD–ROMs (compact disk read-only memory), are becoming more commonplace at Federal agencies. Information technology makes the management of the information collected, stored, and used by the Government more efficient.

When the FOIA was enacted agency records were primarily produced on paper. FOIA's efficient operation requires that its provisions make clear that the form or format of an agency record constitutes no impediment to public accessibility. Furthermore, the information technology currently being used by executive departments and agencies should be used in promoting greater efficiency in responding to FOIA requests. This objective includes using technology to let requestors obtain information in the form most useful to them. Existing technologies for searching electronic records can often review materials more quickly than is possible via a paper review. Harnessing these tools for FOIA can enhance the operation of the Act.

The public is increasingly using networked computers and broadly accessible data networks such as the Internet. Agencies need to fulfill their responsibilities under the FOIA in a manner that keeps pace with these developments. An underlying goal of H.R. 3802 is to encourage on-line access to Government information available under the FOIA, including requests ordinarily made pursuant to section 552(a)(3). As a result, the public can more directly obtain and use Government information. This can result in fewer FOIA requests, thus enabling FOIA resources to be more efficiently used in responding to complex requests. H.R. 3802, the Electronic Freedom of Information Amendments Act of 1996, amends the FOIA to address these considerations and other information access issues prompted by the electronic information phenomenon.

In 1955, when congressional hearings laying the groundwork for the FOIA were held on the availability of information from Federal departments and agencies, the Federal Government had 45 computers. Ten years later, when the Senate passed its version of the FOIA, the inventory had risen to 1,826 computers. Only five years elapsed before the Government's holdings jumped to 5,277 computers, resulting in hundreds of thousands of automated files and many data banks of agency information.[21]

In succeeding years, the proportion of agency records produced and retained in electronic formats has grown at an expansive rate. The Government's use of personal computers and digital storage

---

[21] Alan F. Westin and Michael A. Baker. "Data Banks in a Free Society". New York: Quadrangle Books, 1972, pp. 29–30.

12

media, such as CD–ROMs, also became more widespread. [22] In fiscal year 1994, the Federal Government used almost 25,250 small computers (costing $10,000 to $100,000 each), 8,500 medium computers (costing $100,000 to $1,000,000 each), and 890 large computers (costing more than $1,000,000 each). Personal computers have proliferated throughout the Federal executive establishment. In a related development, during the past three years, more than 800 Federal sites have been set up on the World Wide Web. [23]

The FOIA must stay abreast of these developments in order to ensure continued public access to Government information. The FOIA must promote uniformity among agencies, reduce uncertainty among FOIA requestors, and avoid potential disagreements between the two. These are the central purposes of H.R. 3802, the Electronic Freedom of Information Amendments of 1996.

Many evolving technological innovations promote the greater availability of Government information through the electronic information "superhighway." [24] For example, the 104th Congress created the "Thomas" on-line service of the Library of Congress, providing access to many legislative resources, including the text of legislation and the Congressional Record. Individual agencies have published data on the World Wide Web through home pages. Agencies, such as the Government Printing Office, have broadly expanded electronic access to government information at other agencies. Computer links let users reach information maintained by other agencies in a matter of key strokes.

The Paperwork Reduction Act of 1995 reflects congressional intent to encourage wider use of electronic distribution as an integral part of the management of Government information. It acknowledges that private, non-governmental information providers perform an essential public service in expanding the availability of information to the public. Government agencies cannot be expected to match the dynamism and creativity of information providers in transforming Government information into valuable consumer information products, especially given the robust nature of information technology developments. Consequently, nongovernment information distributors play a valuable role in advancing information policy objectives.

The FOIA, by contrast, provides access to specifically requested Government information sought at the initiative of a requestor. The Paperwork Reduction Act provides the administrative framework for agencies to more affirmatively disclose information to the public. With more affirmative disclosure, agencies can better use their resources. Making more information available to the public can divert simple requests away from FOIA. This will enable agen-

---

[22] See House Committee on Government Operations. Electronic Collection and Dissemination of Information by Federal Agencies: A Policy Overview, H.R. Rep. No. 99–560, 99th Congress, 2d Session. (1986); U. S. Office of Technology Assessment. "Informing the Nation: Federal Information Dissemination in an Electronic Age". Washington, D. C., October 1988.

[23] Lisa Corbin, "Cyberocracy," Government Executive. p. 28 (January 1996).

[24] See U. S. Information Infrastructure Task Force, "The National Information Infrastructure: Agenda for Action". Washington, D. C., September 15, 1993; U.S. Information Infrastructure Task Force's Committee on Applications and Technology. "Putting the Information Infrastructure to Work". Washington, D.C., May 1994; U.S. Information Infrastructure Task Force's Committee on Applications and Technology, "The Information Infrastructure: Reaching Society's Goals". Washington, D.C., September 1994; U.S. Advisory Council on the National Infrastructure. "A Nation of Opportunity: Realizing the Promise of the Information Superhighway", Washington, D.C., January 1996.

13

cies to more efficiently use their limited resources to complete requests on time.

### D. PROCESSING OF FREEDOM OF INFORMATION REQUESTS

A principal constraint to the full effectiveness of the FOIA has been the lack of adequate agency resources. As a result, many agencies have failed to process FOIA requests within the deadlines required by the law. These delays in responding to FOIA requests continue as one of the most significant FOIA problems.

A 1986 House report cited inadequate resources, unnecessary bureaucratic complexity, political interference with the disclosure process, poor organization of agency records, and a lack of commitment by agencies to disclosure as reasons for the delays.[25] These delays have persisted.

In a memorandum dated October 4, 1993, to all heads of departments and agencies, President Clinton stated:

> The use of the Act by ordinary citizens is not complicated, nor should it be. The existence of unnecessary bureaucratic hurdles has no place in its implementation. I therefore call upon all Federal departments and agencies to renew their commitment to the Freedom of Information Act, and to its underlying principles of government oneness, and to its sound administration. This is the appropriate time for all agencies to take a fresh look at their administration of the Act, to reduce backlogs of Freedom of Information requests.* * *[26]

In an October 1993 memorandum that accompanied the President's memorandum, Attorney General Janet Reno acknowledged the delay problem and the cause for FOIA backlogs, stating:

> Many Federal departments and agencies are often unable to meet the Act's ten-day time limit for processing FOIA requests, and some agencies—especially those experiencing a high-volume of demands for sensitive records—maintain large FOIA backlogs greatly exceeding the mandated deadlines. The reasons for this may vary, but principally it is a matter of limited resources for the heavy workload. This is a serious problem—one of growing concern and frustration to both FOIA requesters and Congress, and to agency FOIA officers as well.[27]

Out of a total of 75 agencies responding to a Department of Justice request for backlog information in February 1994, only 28 agencies reported no backlog.

In *Open America* v. *Watergate Special Prosecution Force,*[28] the District of Columbia Circuit Court of Appeals held that exceptional circumstances exist when the agency can show it has inadequate resources to process FOIA requests within statutory time limits.

---

[25] House Committee on Government Operations. Freedom of Information Act Amendment of 1986. pp. 11–12, House Report 9–832, 99th Cong. 2d. Session, 1986.
[26] Clinton, William J., President of the United States, Memorandum for Heads of Departments and Agencies, October 4, 1993, "The Freedom of Information Act."
[27] Reno, Janet, Attorney General, Memorandum for Heads of Departments and Agencies, October 4, 1993, "The Freedom of Information Act.'
[28] 547 F.2d 605 (D.C. Cir. 1976)

14

Also, an agency may show that it is exercising due diligence by processing requests on a "first-in, first-out" basis. Relying upon overly broad dictum in this case, agencies have employed the exceptional circumstances-due diligence exception to obtain judicial approval for lengthy delays whenever they have a backlog.

Backlogs of requests for records under the FOIA should not give agencies an automatic excuse to ignore the time limits. The development of agency administrative processes to respond to specific types of requests on an expedited basis and for encouraging agencies to cooperate with requestors to frame more targeted requests is critical to using agency FOIA resources in the most efficient manner possible.

## II. Legislative Hearings and Committee Action

### A. HOUSE ACTION

Representative Tate introduced H.R. 3802 on July 12, 1996, with Chairman Horn, of the Subcommittee on Government Management, Information and Technology; Representative Maloney, the ranking member; and Representative Peterson, a member of the Subcommittee, as original co-sponsors. The Subcommittee had previously held a legislative hearing on June 14, 1996 on S. 1090, the bill's Senate counterpart.

H.R. 3802 was marked up on July 12, 1996, by the Subcommittee on Government Management, Information Technology. No amendments were offered and the legislation passed the Subcommittee unanimously by voice vote.

Representative Maloney introduced H.R. 3885, concerning certain reporting requirements, on July 24, 1996. Representative Tate, and Chairman Horn supported the bill as original co-sponsors.

The House Committee on Government Reform and Oversight considered the measure on July 25, 1996. Chairman Horn offered an amendment in the nature of a substitute and Representative Maloney offered an amendment to it reflecting the substance of H.R. 3885. Both were adopted unanimously by voice vote. The bill was favorably reported unanimously to the House of Representatives by voice vote without further amendment.

### B. SENATE ACTION

On November 7, 1991 Senator Patrick Leahy introduced S. 1040, a bill to clarify the application of the FOIA to agency records in electronic forms or formats. Senator Brown co-sponsored the bill. "The Electronic Freedom of Information Improvement Act of 1991" was referred to the Senate Committee on the Judiciary, and a hearing on it was held by the Subcommittee on Technology and the Law on April 30, 1992.

Testifying before the Subcommittee was Steven R. Schlesinger, Director, Office of Policy Development, Department of Justice, accompanied by Daniel Metcalfe, Co-director, Office of Information and Privacy, Department of Justice. The Subcommittee also received testimony from a panel of witnesses. These included Peter Richard, Editor, USA Today, appearing on behalf of the American Newspaper Publishers Association, American Society of Newspaper Editors, Society of Professional Journalists/Sigma Delta Chi, Na-

15

tional Newspaper Association, National Association of Broadcasters, Radio-Television News Directors Association, and Reporters Committee for Freedom of the Press; Scott Marshall, Director, Governmental Relations Department, American Foundation for the Blind; Sybil McShane, Director of Library and Information Services, Vermont State Department of Libraries; and Thomas M. Susan, a practicing attorney with Ropes & Gray, appearing on behalf of the American Bar Association.[29] The Subcommittee took no further action on S. 1940 before the final adjournment of the 102d Congress.

Senator Leahy introduced a related bill, S. 1939, "The Freedom of Information Improvement Act of 1991," on November 7, 1991. This bill contained amendments to the FOIA concerning matters other than agency records in electronic forms or formats. S. 1939 was also referred to the Senate Committee on the Judiciary, but no action was taken on it during the 102d Congress.

Senator Leahy introduced a modified version of S. 1940 on November 22, 1993, as S. 1782, "The Electronic Freedom of Information Improvement Act of 1993," with Senator Brown as a cosponsor. It was referred to the Committee on the Judiciary. Senator John Kerry of Massachusetts co-sponsored the bill on April 11, 1994.

During 1994 and 1995, staff of the Subcommittee on Technology and the Law conferred with representatives of the Office of Management and Budget, the Department of Justice, FOIA officers from various Federal agencies, and interest groups using the FOIA concerning further development of the provisions of S. 1782. Because of these and other consultations, a revised version of S. 1782 was unanimously approved by the Subcommittee on Technology and the Law on June 29, 1994, and by the Committee on the Judiciary on August 11, 1994. The bill then passed the Senate by unanimous consent on August 25, 1994. No further action on the bill was taken in the 103rd Congress.

On July 28, 1995, Senators Leahy, Brown, and Kerry introduced S. 1090, "The Electronic Freedom of Information Improvement Act of 1995." It was modified from the version passed by the Senate in the 103rd Congress. S. 1090 was referred to the Committee on the Judiciary and, on October 6, 1995, to the Subcommittee on Terrorism, Technology and Government Information. The Subcommittee favorably reported the bill on March 14, 1996. Following consultation with the Office of Management and Budget, revisions were made to S. 1090 in the form of a substitute amendment.

On April 25, 1996, by voice vote, the Committee on the Judiciary unanimously ordered the Committee substitute to S. 1090 favorably reported.

### III. COMMITTEE HEARINGS AND WRITTEN TESTIMONY

On June 13 and 14, 1996, the Subcommittee on Government Management, Information and Technology of the Committee on Government Reform and Oversight, held hearings on Federal information policy. The first day of hearings was devoted to oversight of information policy. The second day was a legislative hearing that

---

[29] The Electronic Freedom of Information Improvement Act: Hearing before the Subcommittee on Technology and the Law of the Committee on the Judiciary, 102d Cong., 2d Sess. (1992).

16

considered related amendments to the Freedom of Information Act: H.R. 1281; "The War Crimes Disclosure Act"; and S. 1090, "The Electronic Freedom of Information Improvement Act of 1995."

In his opening statement, Chairman Horn expressed his frustration at learning that the Federal Bureau of Investigation has a four-year backlog for responding to FOIA requests. In noting the significance that the Committee attaches to the Freedom of Information Act, he observed that the first report issued by the House Committee on Government Reform and Oversight had been an updated version of "A Citizen's Guide on Using the Freedom of Information and Privacy Act of 1974 to Request Government Records." [30]

The Subcommittee's ranking member, Representative Maloney noted the interrelation between the Freedom of Information Act and the Paperwork Reduction Act in establishing the presumption that all government documents be available to the public. She noted that: "Information policy is the bedrock of an open and accessible government. The Paperwork Reduction Act codifies one of the fundamental principles of democracy—government information belongs to the public. Information created by government officials and paid for by the public should be available to the public at the lowest possible cost."

Representative Tate commented that: "Opening the work of the Federal Government to the watchful and vigilant eyes of the American public is an effort that both parties and the Administration should embrace wholeheartedly." Representative Peterson observed that: "One of the biggest frustrations with the Freedom of Information Act is that deadlines are rarely met." Representative Flanagan noted with displeasure that citizens who requested their own FBI files could wait years before receiving them in order to correct errors contained therein.

The Subcommittee received testimony from Senator Patrick Leahy on S. 1090 during the June 13th oversight hearing. The Senator noted the role that FOIA requests had in uncovering information about various government actions. He noted that the law needed to be updated to reflect the advancing use of information technology in government to maintain records, adding "access should be the same whether they are on a piece of paper or a computer hard drive." The Senator also criticized the failure of agencies to comply with the statutory time limits for responding to requests:

> Long delays in access can mean no access at all. The current time limits in the FOIA are a joke. Few agencies actually respond to FOIA requests within the 10-day limit required by law. Such routine failure to comply with the statutory time limits is bad for morale in the agencies and breeds contempt by citizens who expect government officials to abide by, not routinely break, the law.

Also testifying at the June 13th hearing were Ms. Roslyn A. Mazer, Deputy Assistant Attorney General, Office of Policy Development, Department of Justice; Mr. Kevin O'Brien, Section Chief, Freedom of Information/Privacy Acts Section, Federal Bureau of In-

---

[30] House Committee on Government Reform and Oversight, A Citizen's Guide on Using the Freedom of Information Act and the Privacy Act of 1974 to Request Government Records, House Report, 104-156, 1st Session, 1995.

17

vestigation, and Mr. Anthony H. Passarella, Director, Directorate for Freedom of Information and Security Review, Office of the Assistant Secretary of Defense (Public Affairs). These three witnesses explained how their agencies processed public requests for information under the Freedom of Information Act and related statutes.

Four representatives of the "requestor" community related their experiences in seeking government information: Ms. Eileen Welsom, on behalf of Society of Professional Journalists, American Society of Newspaper Editors, and the Newspaper Association of America; Mr. Larry Klayman, Chairman, Judicial Watch, Inc., Ms. Jane E. Kirtley, Executive Director, The Reporters Committee for the Freedom of the Press and Mr. Byron York, reporter, The American Spectator. Each drew upon their professional experiences in recounting difficulties experienced in obtaining information on time. They noted that the Federal Bureau of Investigation, in particular, failed to respond to FOIA requests on time.

Ms. Kirtley expressed concern that S. 1090 seemed to require that to be a candidate for expedited access, a news story had to be "already the subject of fervent media attention." She suggested that agencies ought to speed up access to records for the media "whenever records are requested that would enlighten the public on matters where public concern is strong."

Mr. Klayman noted that agencies ought to be penalized when they fail to comply with the law, such as applying criminal penalties for willful failure to abide by the requirements of the FOIA and related laws. He proposed the awarding of attorney fees and costs to successful FOIA plaintiffs be made mandatory, rather than discretionary.

At the June 14th hearing, the Subcommittee heard testimony from Mr. Robert Gellman, an attorney and a privacy and information policy consultant. Mr. Gellman had previously been chief counsel in the 103rd Congress for the congressional predecessor to the Subcommittee on Government Management, Information and Technology and has written extensively on FOIA issues. He was critical of the definitions used in S. 1090. He criticized the standard used in S. 1090 that media receipt of expedited access involve "widespread media coverage" as lacking any clear meaning.

Mr. Gellman praised the principle in S.1090 requiring agencies to respond to requestor format requests for electronic records, but suggested that S. 1090 might go too far in allowing the requestor to unreasonably require disclosure in seldom used formats. He further suggested that a requirement that agencies identify redacted material on electronic records should be subject to a standard of technical feasibility. He criticized the Department of Justice for its handling of FOIA litigation for agencies, stating that: "the Department of Justice defends unreasonable agency denials in court and will make an argument, without regard to the purpose of FOIA or the policies of the President, department litigators bear substantial responsibility for much of the bad FOIA case law in recent years."

Mr. Alan Adler, an attorney familiar with the experience of reporters making FOIA requests, recounted the barriers that journalists face when they request production of records in an electronic format. Based upon his participation in the development of the Leahy bill, he discussed the manner in which the drafters had ad-

18

dressed various administration concerns. In recounting the evolution of Senator Leahy's initiatives toward an electronic Freedom of Information bill, Mr. Adler stressed that the legislation was intended to help agencies to reduce request backlogs and to more effectively use scarce resources. He noted that the legislation had evolved in response to agency concerns.

Mr. James Lucier, Director of Economic Research at Americans for Tax Reform, testified in support of S. 1090. He observed that the public was now more eager to obtain government information than it was when the FOIA was first enacted in 1966. He suggested that increasing public access to Government information through electronic means was essential if the government were to approach the pace of private sector developments. He argued that government needed to keep pace in its use of communication technologies that made information about private institutions more accessible. Lucier testified that Government needs to meet the expectations for responsiveness that consumers insist upon from private institutions.

## IV. EXPLANATION OF THE BILL

### A. OVERVIEW

The highlights of the Electronic Freedom of Information Amendments include:

*Electronic records.*—Records which are subject to the FOIA shall be made available under the FOIA when the records are maintained in electronic format. This clarifies existing practice by making the statute explicit on this point.

*Format Requests.*—Requestors may request records in any form or format in which the agency maintains those records. Agencies must make a "reasonable effort" to comply with requests to furnish records in other formats.

*Redaction.*—Agencies redacting electronic records (deleting part of a record to prevent disclosure of material covered by an exemption) must note the location and the extent of any deletions made on a record. This provision, however, applies only if the agencies have the technology to comply with it.

*Expedited Processing.*—Certain categories of requestors would receive priority treatment of their requests if failure to obtain information in a timely manner would pose a significant harm. The first category of requestors entitled to this special processing includes those who could reasonably expect that delay could pose an imminent threat to the life or physical safety of an individual. The second category includes requests, made by a person primarily engaged in the dissemination of information to the public, and involving compelling urgency to inform the public.

*Multitrack processing.*—Agencies will be able to establish processes for processing requests of various sizes on different tracks. Because of this procedure, larger numbers of requests for smaller amounts of material will be completed more quickly. Requestors will also have an incentive to frame narrower requests.

*Agency Backlogs.*—Agencies can no longer delay responding to FOIA requests because of "exceptional circumstances" simply as a

19

result from a predictable agency request workload. This strengthens the requirement that agencies respond to requests on time.

*Deadlines.*—The deadline for responding to FOIA is extended to 20 workdays from the current 10 workday requirement for initial determinations.

*Reporting requirements.*—The legislation expands certain reporting requirements, and requires agencies to make more information available through electronic means.

### B. SECTION BY SECTION

*Section 1. Short title*

The Act should be cited as the "Electronic Freedom of Information Act Amendments of 1996."

*Section 2. Findings and purposes*

The findings make clear that Congress enacted the FOIA to require Federal agencies to make records available to the public through public inspection and at the request of any person for any public or private use. They further acknowledge the increase in the Government's use of computers and encourages agencies to use new technology to enhance public access to Government information.

*Section 3. Application of requirements to electronic format information*

The section explicitly states that a "record" under the FOIA includes electronically stored information. This articulates the existing general policy under the FOIA that all Government records are subject to the Act, regardless of the form in which they are stored by the agency. The Department of Justice agrees that computer database records are agency records subject to the FOIA.[31] The bill defines "record" to "include any information that would be an agency record subject to the requirements of this section if maintained by an agency in any format, including an electronic format."

This section clarifies the meaning of the term "record" and similar terminology used in the FOIA. Several important points are worth making.

*Breadth of Policy.*—First, the FOIA usually uses the term "record," but other terms are also used occasionally, including "information" and "matter." The terms are used interchangeable. The section makes clear a comprehensive policy that records in electronic formats are agency records subject to the Act. The language of the section should leave no doubt about the breadth of the policy. As noted previously, a number of statutes set Federal Government information policy. This bill is not intended to be dispositive of all aspects of those policies. For example, matter not previously subject to FOIA when maintained in a non-electronic format is not made subject to FOIA by this bill.

*Storage Media.*—Second, the section clarifies that a record in electronic format can be requested just like a record on paper or any other format, and within enumerated exceptions, can potentially be fully disclosed under the law. The format in which data

---

[31] See "Department of Justice Report on 'Electronic Record' Issues Under the Freedom of Information Act," Senate Hearing 102–1098, 102d Cong., 2d Sess. P. 33, 1992.

20

is maintained is not relevant under the FOIA. Computer tapes, computer disks, CD–ROMs, and all other digital or electronic media are records. Microfiche and microforms are records. When other, yet-to-be invented technologies are developed to store, maintain, produce, or otherwise record information, these will be records as well. When determining whether information is subject to the FOIA, the form or format in which it is maintained is not relevant to the decision.

The requirements for the disclosure of information exist elsewhere in the Act. No matter how it is preserved, information that passes the threshold test of being an agency record, remains a record. This provision should restrain agencies from evading the clear intent of the FOIA by deeming some forms of data as not being agency records and not subject to the law. The primary focus should always be on whether information is subject to disclosure or is exempt, rather than the form or format it is stored in. This provision, however, does not broaden the concept of agency record. The information maintained on a computer is a record, but the computer is not.

*Rejected Definitions*.—Third, the Committee rejects the definition of record in the substitute to S. 90, as reported by the Senate Committee on the Judiciary on April 25, 1996. The Senate bill had incorporated a definition of record drawn from the Records Disposal Act.[32]

A case in point comes from the decision in *SDC Development Corp.* v. *Mathews.*[33] The decision has previously been sharply criticized by this Committee and its holding is inconsistent with the policies expressed in this legislation.[34] The Court found that an agency-created computer database of research abstracts was not an agency record because it was library material. The court used the library material exclusion in the Records Disposal Act as an excuse to place these records beyond the reach of the FOIA. H.R. 3802 makes clear, contrary to *SDC* v. *Mathews,* that information an agency has created and is directly or indirectly disseminating remains subject to the FOIA in any of its forms or formats.[35]

### Section 4. Information made available in electronic format and indexation of records

This section of the bill requires that materials, such as agency opinions and policy statements, which an agency must "make available for public inspection and copying," pursuant to Section 552(a)(2), and which are created on or after November 1, 1996, be made available by computer telecommunications, and in hard copy, within one year after the date of enactment. If an agency does not have the means established to make these materials available online, then the information should be made available in another electronic form, e.g., CD–ROM or disc. The bill would thus treat

---

[32] 44 U.S.C. *3301 (1994).

[33] 542 F.2d 1116 (9th Cir. 1976).

[34] See House Committee on Government Operations, Electronic Collection and Dissemination of Information by Federal Agencies: A Policy Overview, 99th Cong., 2d Sess. 32–36 (1986).

[35] A recent scholarly article examines the background and policy of the Records Disposal Act and the FOIA. It provides a more extensive discussion of the Court's misreading of the FOIA, the Records Disposal Act and the Copyright Act. See Robert Gellman, Twin Evils: Government Copyright and Copyright-Like Controls Over Government Information, 45 Syracuse Law Review 999, 1036–1046 (1995).

21

(a)(2) materials in the same manner as it treats (a)(1) materials, which under the Government Printing Office Electronic Information Access Enhancement Act of 1993 [36] are required, via the Federal Register, to be made available on-line.

This section would also increase the information made available under Section 552(a)(2). Specifically, agencies would be required to make available for public inspection and copying, in the same manner as other materials made available under Section 552(a)(2), copies of records released in response to FOIA requests that the agency determines have been or will likely be the subject of additional requests. In addition, they would be required to make available a general index of these previously-released records. By December 31, 1999, this index should be made available by computer telecommunications. Since not all individuals have access to computer networks or are near agency public reading rooms, requestors would still be able to access previously-released FOIA records through the normal FOIA process.

As a practical matter, this would mean that copies of previously-released records on a popular topic, such as the assassinations of public figures, would subsequently be treated as (a)(2) materials, made available for public inspection and copying. This would help to reduce the number of multiple FOIA requests for the same records requiring separate agency responses. Likewise, the general index would help requestors in determining which records have been the subject of prior FOIA requests. By diverting some potential FOIA requests for previously-released records with this index, agencies can better use their FOIA resources to fulfill new requests.

This section also makes clear that to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes the index and copies of previously-released records.

Finally, this section would require an agency to indicate the extent of any deletion from the previously-released records. This provision is consistent with the "Computer Redaction" section of the bill. Both provisions similarly temper this requirement by giving agencies the flexibility to show that marking the place on the record where the deletion was made was not technically feasible. Agencies need not reveal information about deletions if such disclosure would harm an interest protected by an exemption.

*Section 5. Honoring form or format requests*

This section requires agencies to help requestors by providing information in the form requested, including requests for the electronic form of records, if the agency can readily reproduce it in that form. The section would overrule *Dismukes* v. *Department of the Interior,* which held that an agency "has no obligation under the FOIA to accommodate plaintiff's preference [but] need only provide responsive, nonexempt information in a reasonably accessible form." [37]

---

[36] 44 U.S.C. 4101 (1993).
[37] 603 F. Supp. 760, 763 (D.D.C. 1984)

22

This section also requires agencies to make reasonable efforts to search for records kept in an electronic format. An unreasonable effort would significantly interfere with the operations of the agency or the agency's use of its computers. Electronic searches should not result in any greater expenditure of agency resources than would have occurred with a conventional paper-based search for documents.

The bill defines "search" as a "review, manually or by automated means," of "agency records for the purpose of locating those records responsive to a request." Under the FOIA, an agency need not create documents that do not exist. Computer records found in a database rather than in a file cabinet may require the application of codes or some form of programming to retrieve the information. Under the definition of "search" in the bill, the review of computerized records would not amount to the creation of records. Otherwise, it would be virtually impossible to get records maintained completely in an electronic format, like computer database information, because some manipulation of the information likely would be necessary to search the records.

Current law provides that most requestors receive the first two hours of search time for free. Ten years ago, computer time was expensive and carefully metered. Today, computer time is generally no longer a scarce resource. Except in unusual cases, the cost of computer time should not be a factor in calculating the two free hours of search time. Often, searching by computer will reduce costs because computer searches are generally faster, more thorough and more accurate, than manual searches. In those unusual cases, where the cost of conducting a computerized search significantly detracts from the agencies" ordinary operations, no more than the dollar equivalent of two hours manual search time shall be allowed for two hours free search time. For any searches conducted beyond the first two hours, an agency shall only charge the direct costs of conducting such searches.

*Section 6. Standard for judicial review*

Section 5 requires a court to accord substantial weight to an agency's determination as to both the technical feasibility of redacting non-releasable material at the place on the record where the deletion was made, under paragraphs (2)(C) and subsection (b), as amended by this Act, and the reproducibility of the requested form or format of records, under paragraph (3)(B), as amended by this Act. This deference is warranted because agencies are the most familiar with the availability of their own technical resources to process, redact, and reproduce records.

This section does not affect the extent of judicial deference that a court may or may not extend to an agency on any other matter. There is no intent with this provision, either expressly or by implication, to affect the deference or weight which a court may extend to an agency determination or an agency affidavit on any other matter. The provision applies narrowly to agency determinations with regard to technical feasibility.

23

*Section 7. Ensuring timely response to requests*

The bill addresses the single most frequent complaint about the operation of the FOIA: agency delays in responding to FOIA requests. This section encourages agencies to employ better records management systems and to set priorities for using their FOIA resources.

In underscoring the requirement that agencies respond to requests in a timely manner, the Committee does not intend to weaken any interests protected by the FOIA exemptions. Agencies processing some requests may need additional time to adequately review requested material to protect those exemption interests. For example, processing some requests may require additional time in order to properly screen material against the inadvertent disclosure of material covered by the national security exemption.

*Multitrack First-In First-Out Processing.*—An agency commitment to process requests on a first-in, first-out basis has been held to satisfy the requirement that an agency exercise due diligence in dealing with backlogs of FOIA requests. Processing requests solely on a FIFO basis, however, may result in lengthy delays for simple requests. The prior receipt and processing of complex requests delays other requests, increasing agency backlogs. The bill would permit agencies to promulgate regulations starting multitrack processing systems, and makes clear that agencies should exercise due diligence within each track. Agencies would also be required to give requestors the opportunity to limit the scope of their requests to qualify for processing under a faster track.

*Unusual Circumstances.*—The FOIA currently permits an agency in "unusual circumstances" to extend for a maximum of ten working days the statutory time limit for responding to a FOIA request, upon written notice to the requestor setting forth the reason for such extension. The FOIA enumerates various reasons for such an extension. These reasons include the need to search for and collect requested records from multiple offices, the volume of records requested, and the need for consultation with other components within the agency.

An extra ten days may still provide an insufficient time for an agency to respond to unusually burdensome FOIA requests. The bill provides a mechanism to deal with such requests, which an agency would not be able to process even with an extra ten days. For such requests, the bill requires an agency to inform the requestor that the request cannot be processed within the statutory time limits and provide an opportunity for the requestor to limit the scope of the request so that it may be processed within statutory time limits, and/or arrange with the agency a negotiated deadline for processing the request. In the event that the requestor refuses to reasonably limit the request's scope or agree upon a time frame and then seeks judicial review, that refusal shall be considered as a factor in determining whether "exceptional circumstances" exist under subparagraph (6)(C).

The Committee believes that the FOIA works best when requestors and agencies work together to define and fulfill reasonable requests. When a requestor can modify a request to make it easier for the agency to process it, this benefits everyone. Still, there will be circumstances in which a requestor and an agency cannot agree

24

upon a modification that will speed processing. As long as a request meets the legal standards of the FOIA, each requestor has the right to frame his or her own request. If an agency determines by an objective standard that a requestor has unreasonably refused to modify a request, and a court concurs, then the court shall consider that refusal when determining whether exceptional circumstances exist.

However, if an agency determines on its own that a requestor has unreasonably refused to modify a request, the agency may not otherwise discriminate against that request or requestor. The request must be processed as it would have been had no modification been sought. An agency may not maintain a separate queue of "unreasonable" requests, nor may an agency constantly move "unreasonable" requests to the back of the queue. The Committee cautions agencies against using this limited test of "reasonableness" in any way other than the narrow way that the statute provides.

This provision does not relieve an agency of the responsibility of making a diligent, good-faith effort to complete its review of an initial request within the statutory time frame. An agency should seek an extension beyond the additional ten days already provided in "unusual circumstances" only in rare instances. This procedure will achieve one of the bill's important goals of encouraging a dialogue between an agency and a requestor. This enhances the opportunity of a requestor to obtain at least some of the records sought in a timely fashion, and could alleviate some of the agency's burden in responding to a request that could not otherwise be processed within the statutory time limits. In addition, it could provide a requestor with some certainty as to a time frame for processing his or her request.

*Exceptional Circumstances.*—The Freedom of Information Act provides that, in "exceptional circumstances," a court may extend the statutory time limits for an agency to respond to a FOIA request, but does not specify what those circumstances are. The bill would clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances for purposes of the Act. This is consistent with the holding in *Open America* v. *Watergate Special Prosecution Force*,[38] where the court held that an unforeseen 3,000 percent increase in FOIA requests in one year, which created a massive backlog in an agency with insufficient resources to process those requests in a timely manner, can constitute "exceptional circumstances." Routine backlogs of requests for records under the FOIA should not give agencies an automatic excuse to ignore the time limits, since this provides a disincentive for agencies to clear up those backlogs. Nevertheless, the bill makes clear that a court shall consider an agency's efforts to reduce the number of pending requests in determining whether exceptional circumstances exist. Agencies may also make a showing of exceptional circumstances based on the amount of material classified, based on the size and complexity of other requests processed by the agency, based on the resources being devoted to the declassification of classified material of public interest, or based on the

_____
[38] 547 F.2d 605 (D.C. Cir. 1976)

25

number of requests for records by courts or administrative tribunals.

*Aggregation of Requests.*—The amendments reported out of Committee had reflected an implicit assumption that agency regulations may permit the aggregation of requests by the same requestor, or requestors that an agency reasonably believes are acting in concert. An amendment clarifying this point is anticipated to be considered on the House floor.

Any aggregation must involve such clearly related material that should be considered as a single request. Multiple requests involving unrelated matters should not be aggregated. Existing agency procedures regarding entitlement for fee waivers already permit agencies to aggregate some multiple requests.

The purpose of this aggregation is to ensure the equitable treatment of similarly situated requestors. Aggregation would depend upon the factual circumstances of the requests, and particularly whether multiple requests were being used primarily to obtain a procedural advantage over other requests or requestors. Multiple or related requests could also be aggregated with requests seeking similar information for the purposes of negotiating the scope of the request and schedule. Where multiple requestors have not acted in concert, such aggregation must be with their consent. Applying the same principles, agencies should not aggregate groups of requests simply to delay responding to requests. For example, the filing of a subsequent request should not affect the processing of an initial request by the same requestor.

*Section 8. Time period for agency consideration of requests*

The bill contains provisions designed to address the needs of both agencies and requestors for more workable deadlines for processing FOIA requests.

*Expedited Processing.*—The bill would require agencies to promulgate regulations authorizing expedited access to requesters who show a "compelling need" for a speedy response. The agency would be required to decide whether to grant the request for expedited access within ten days and then notify the requestor of the decision. The requestor would bear the burden of showing that expedition is appropriate. This section limits judicial review to the same record before the agency on the determination of whether to grant expedited access. Moreover, the section provides that the Federal courts will not have jurisdiction to review an agency's denial of an expedited access request if the agency has already provided a complete response to the request for records. The latter provision does not limit a court's ability to consider a requestor's application for the award of attorney's fees.

A "compelling need" warranting faster FOIA processing would exist in two categories of circumstances. In the first category, the failure to obtain the records within an expedited deadline poses an imminent threat to an individual's life or physical safety. The second category requires a request by someone "primarily engaged in disseminating information" and "urgency to inform the public concerning actual or alleged Federal government activity." The section also permits agencies to elect to offer expedited processing in other circumstances.

26

The agencies are directed to establish rules and regulations for processing requests for expedited access. By requiring a "compelling need," the expedited access procedure is intended to be limited to circumstances in which a delay in obtaining information can reasonably be foreseen to cause a significant adverse consequence to a recognized interest.

Agency officials will be required to make factual and subjective judgments about the circumstances cited by requestors to qualify them for "expedited processing." To do so the requestors will need to explain in detail their basis for seeking such treatment. Agency discretion should be exercised with fairness and diligence. The credibility of a requestor who makes repeated claims for expedited processing that are determined to lack factual foundation may be taken into account when the same requestor makes additional requests.

The specified categories for compelling need are intended to be narrowly applied. A threat to an individual's life or physical safety qualifying for expedited access should be imminent. A reasonable person should be able to appreciate that a delay in obtaining the requested information poses such a threat. A person "primarily engaged" in the dissemination of information should not include individuals who are engaged only incidentally in the dissemination of information. The standard of "primarily engaged" requires that information dissemination be the main activity of the requestor, although it need not be their sole occupation. A requestor who only incidentally engages in information dissemination, besides other activities, would not satisfy this requirement.

The standard of "urgency to inform" requires that the information requested should pertain to a matter of a current exigency to the American public and that a reasonable person might conclude that the consequences of delaying a response to a FOIA request would compromise a significant recognized interest. The public's right to know, although a significant and important value, would not by itself be sufficient to satisfy this standard.

Some agencies, such as the Department of Justice, already employ expedited access procedures that, in some respects, have a broader criteria for expedited access than contained in Section 7.[39] Agencies are given latitude to expand the criteria for expedited access, "in other cases determined by the agency." However, the expedited processing procedure should be invoked in the circumstances as enumerated in the bill. Given the finite resources generally available for fulfilling FOIA requests, unduly generous use of the expedited processing procedure would unfairly disadvantage other requestors who do not qualify for its treatment.

*Expansion of Agency Response Time.*—To help Federal agencies in reducing their backlog of FOIA requests, the bill would double the time limit for an agency to respond to FOIA requests from ten days to twenty days. Attorney General Janet Reno has acknowledged the inability of most Federal agencies to comply with the

---

[39] The Department of Justice's procedures for expedited access permits it if a delay would result in the loss of substantial due process rights and the information sought is not otherwise available in a timely manner.

27

ten-day rule "as a serious problem" stemming principally from "too few resources in the face of too heavy a workload." [40]

*Estimation of Matter Denied.*—The bill would require agencies when denying a FOIA request to try to estimate the volume of any denied material and provide that estimate to the requestor, unless doing so would harm an interest protected by an exemption.

### Section 9. Computer redaction

The ease with which information on the computer may be redacted makes the determination of whether a few words or 30 pages have been withheld by an agency at times impossible. The amendments require agencies to identify the location of deletions in the released portion of the record and, where technologically feasible, to show the deletion at the place on the record where they made the deletion, unless including that indication would harm an interest protected by an exemption.

### Section 10. Report to the Congress

This section would add to the information an agency is already required to publish as part of its annual report. Specifically, agencies would be required to publish in their annual reports information regarding denials of requested records, appeals, a complete list of statutes upon which the agency relies to withhold information under Section 552 (b)(3), which exempts information that is specifically exempted from disclosure by other statutes, the number of backlogged FOIA requests, the number of days taken to process requests, the amount of fees collected, and the number of staff devoted to processing FOIA requests. The annual reports would be required to be made available to the public, including by computer telecommunications means. If an agency does not have the means established to make the report available on-line, then the report should be made available in another electronic form. The Attorney General is required to make each report available at a single electronic access point, and advise the Chairmen and ranking members of the Senate Committee on the Judiciary and the House Committee on Government Reform and Oversight that such reports are available.

Congress has undertaken several recent initiatives focused on streamlining government, making government processes more efficient, and improving the availability of government information. The Government Performance and Results Act requires a system of evaluation measures based on performance and results. The Paperwork Reduction Act of 1995 reexamines government information in the light of recent technological developments. Also, the Reports Elimination Act eliminates hundreds of reports to Congress required in a statute. Other pending legislation is likely to eliminate more than 200 statutorily required reports to Congress from the General Accounting Office.

In the spirit of these reforms, the Committee considered the reporting requirements of the Freedom of Information Act. Some new requirements were added to make the reports more useful to the

---

[40] Reno, Janet, Attorney General, Memorandum for Heads of Departments and Agencies, October 4, 1993, "The Freedom of Information Act."

28

public and to Congress. For the public, the FOIA reports should answer certain common questions, such as: How does one request documents? How does the Government respond to those requests, including an explanation of the reasons for not honoring a request? And, how long does it usually take for a request to be processed? For Congress, these reports should furnish a view of the agency workload and any backlog. The reports should identify the progress the agency is making toward eliminating that backlog. They should report on the resources devoted to answering FOIA requests, allowing for meaningful comparisons among agencies about performance. Someone unfamiliar with the FOIA process should be able to understand a report without resorting to reading the statute. Jargon such as "(b)(3) exemptions" should be replaced with more understandable language substituted. Guidance should be given to the agencies so that all reports contain terms with identical meanings.

Besides revising the contents of the reports to make them more useful, the Committee changed the timing and reporting period of the reports. Both changes were done to reduce the burden on the agencies, though it meant a delay in providing information and descriptive language to the public and Congress. FOIA reports have previously reported on a calendar year and have been due on March 1st of the following year. This bill changes the reporting period to a fiscal year to make it easier for agencies to compile the budget and staffing information required. This bill also gives agencies more time to prepare the reports from two to four months. Of course, agencies should strive to make their reports available sooner. In addition, the Committee has provided an additional two months to the Department of Justice to coordinate electronic access to these reports.

This bill also requires the availability of all FOIA reports by electronic means. The Committee anticipates that the Department of Justice will establish a home page for reaching all agency reports through a single site. Until a single site of electronic access is available for all reports, the Committee expects the Attorney General will forward to Congress print copies of all reports not available electronically. Agencies that do not provide electronic access should also make print reports available to the public, including distribution to Depository Libraries.

In drafting this legislation, the Committee rewrote the entire reporting section of the Freedom of Information Act. This was done to make it easier for the public to understand the new reporting requirements, without constant reference to existing law.

Three reporting requirements were added to aid the public and Congress to understand the work flow in each agency. Beginning in 1998, agencies will be required to report:

How many requests have not been resolved to the requestors' satisfaction at the end of the reporting period? What is the median number of days those appeals have been pending?

What is the number of requests received during the year, and the number of requests processed during the year?

What is the median number of days taken to process requests of different types? What is the volume of requests coming into the agency annually, and the number of requests processed by the agency that year? These requirements will give

29

the public and Congress clear measures of any backlog that exists. This will allow Congress to monitor progress in responding to FOIA requests across time. It will help the public understand how long it takes an agency to respond to a request.

The Committee has requested that agencies provide the median number of days requests have been in the backlog queue, and the median number of days necessary to complete the processing of requests. The Committee elected to use medians as a statistical measure because of their appropriateness when the measure being summarized does not have a normal distribution, or when a few cases of extreme value would skew an average. For example, a few requests for excessively large numbers of documents could artificially inflate the average time taken to fill a request. Of course, if agencies determine that the average time is a better measure of their performance, they can include that in the report along with the median. Medians are simple to calculate, simply requiring a distribution of the number of days each request has been pending, and do not increase the reporting burden on agencies. The Committee appreciates that some agencies with decentralized FOIA operations may have trouble in calculating a precise agency-wide median. In such circumstances reasonable estimates may be used. Finally, this bill requires that agencies report the number of staff assigned to processing FOIA requests, and their budget for processing FOIA requests.

Much comment is made of the adequacy of agency resources to comply with the statutory requirements of the FOIA. Effective future congressional oversight of the FOIA requires more detailed information about the level of resources that agencies devote to FOIA, the effectiveness of their utilization and the level of resources that might be required for agencies to fully comply with the FOIA. Agencies should inform Congress of the additional resources needed to fully comply with the FOIA. In the absence of such information on budget requests and management initiatives, the complaint by agencies that Congress has denied the resources necessary to comply with the statutory deadlines is unsupportable.

The Committee has rewritten the FOIA reporting requirements to make them more useful to the public and to Congress, and to make the information in them more accessible. With those goals in mind, we expect that the Department of Justice, in consultation with the Office of Management and Budget, will provide guidelines to the agencies so that all reports use common terminology and follow a similar format. The Attorney General and the Director of the Office of Management and Budget are required to develop reporting guidelines for the annual reports by October 1, 1997.

*Section 11. Reference materials and guides*

This section requires agencies to make publicly available, upon request, reference material or a guide for requesting records or information from an agency. This guide would include an index and description of all major information systems of an agency, and a handbook for obtaining various types and categories of public information from an agency.

The guide is intended to be a short and simple explanation for the public of what the Freedom of Information Act is designed to

30

do, and how a member of the public can use it to access government records. Each agency should explain in clear and simple language, the types of records that can be obtained from the agency through FOIA requests, why some records cannot, by law, be made available, and how the agency makes the determination of whether or not a record can be released.

Each agency guide should explain how to make a FOIA request, and how long a requestor can expect to wait for a reply from the agency. In addition, the guide should explain the requestor's rights under the law to appeal to the courts to rectify agency action. The guide should give a brief history of recent litigation it has been involved in, and the resolution of those cases. If an agency requires that certain requests, such as applications for expedited access, be completed on agency forms, then the forms should be part of the guide.

The guide is intended to supplement other information locator systems, like the Government Information Locator System (GILS) called for in the Paperwork Reduction Act of 1995.[41] Thus, the guide should reference those systems and explain how a requestor can obtain more information about them. Of course, any agency specific locator systems should be similarly referenced in the guide.

It is expected that OMB will assist the agencies in assuring that all guides follow a common format so that a requestor picking up guides from two or more agencies can easily find the information they are seeking. Similarly, OMB should assure that all agencies use common terminology in describing record systems, how to file a FOIA request, and in describing other locator systems.

All guides should be available through electronic means, and should be linked to the annual reports. A citizen picking up a FOIA guide should learn how to access the annual reports. Similarly, any potential requestor reading an annual report should learn about the guide, and how to access it.

*Section 12. Effective date*

To provide agencies with time to implement new requirements under the Act, sections 7 and 8 shall become effective one year after the date of enactment. These sections concern multitrack and expedited processing, unusual and exceptional circumstances, the doubling of the statutory time period for responding to FOIA requests, and estimating the amount of material to which access is denied. The remainder of the bill will take effect 180 days after enactment.

V. Compliance With Rule XI

Pursuant to rule XI, clause 2l(3)(A) of the rules of the House of Representatives, under the authority of rule X, clause 2(b)(1) and clause 3(f), the results and findings for those oversight activities are incorporated in the recommendations found in the bill and in this report.

---

[41] The Paperwork Reduction Act consists of (P.L. 96–511, 94 Stat. 2812) as amended by the Paperwork Reduction Act of 1986 (section 101(m) [Title VIII, Part A] of P.L. 99–500 and P.L. 99–591, 100 Stat. 1783) and The Paperwork Reduction Act of 1995 (P.L. 104–13, 109 Stat. 163). The Paperwork Reduction Act is codified at Chapter 35 of Title 44 of the United States Code.

31

## VI. BUDGET ANALYSIS AND PROJECTIONS

This Act provides for no new authorizations or budget authority or tax expenditures. Consequently, the provisions of section 308(a)(1) of the Congressional Budget Act are not applicable.

## VII. COST ESTIMATE OF THE CONGRESSIONAL BUDGET OFFICE

The Committee was provided with the following estimate of the cost of H.R. 3802, as prepared by the Congressional Budget Office.

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC August 30, 1996.*

Hon. WILLIAM F. CLINGER, Jr.,
*Chairman, Committee on Government Reform and Oversight, House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 3802, the Electronic Freedom of Information Amendments of 1996, as ordered reported by the House Committee on Government Reform and Oversight on July 25, 1996. CBO estimates that enacting this bill would not significantly affect spending by the federal government. Because the bill would not affect direct spending or receipts, pay-as-you-go procedures would not apply.

*Bill Purpose.*—H.R. 3802 would amend the Freedom of Information Act (FOIA) to:

Require that agencies make available for public inspection and reproduction copies of any records that, because of the nature of their subject matter, are likely to elicit additional requests;

Require that agencies provide information in the form requested (for example, paper or computer disk), if the information is readily reproducible in that form;

Authorize agencies to implement a multitrack system for processing requests under FOIA;

Expand the amount of time an agency has to respond to a FOIA request from 10 days to 20 days; and

Require agencies to file an annual report with the Attorney General that documents statistics related to the processing and the denial of FOIA requests.

*Federal Budgetary Impact.*—Many of the bill's provisions are similar to those already required by the Office of Management and Budget (OMB Circular No. A–130), and therefore are not expected to affect agencies' budgets. Some provisions, however, could change the way certain agencies respond to FOIA requests. For instance, the bill would require that agencies make available for public inspection and reproduction copies of any records that—because of the nature of their subject matter—are likely to elicit additional requests. The bill also would require that agencies provide information in the form requested, if the information is readily reproducible in that form. The first provision could reduce agencies' costs, while the second provision might increase agencies' costs, but CBO cannot estimate the extent of these impacts. The bill's provisions would likely have the greatest impact on the departments of Defense and Health and Human Services, which historically receive

32

about one-half of all FOIA requests. Any change in spending from either provision would be subject to appropriation actions.

The bill could also alleviate current agency backlogs in filling FOIA requests by doubling the amount of time an agency has to respond to a FOIA request and by allowing agencies to classify and process requests according to level of effort rather than on a strict first-in, first-out basis. In a 1994 Department of Justice survey of agency backlogs under FOIA, almost two-thirds of the 75 agencies included in the survey reported average response times to new FOIA requests of more than 15 days. While these provisions should help agencies better comply with statutory response times, it is unclear whether they would significantly affect agency costs for completing such response.

Finally, H.R. 3802 would require that agencies annually report a number of statistics concerning FOIA activities to the Attorney General. Under current law, agencies already submit much of this information to the Congress each year. Thus, we expect the new reporting requirement would not significantly increase agency costs.

*Mandates Statement.*—H.R. 3802 contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act of 1995 (Public Law 104–4) and would not have a significant impact on the budgets of state, local or tribal governments.

If you wish further details on this estimate, we will be pleased to provide them. The staff contact is John R. Righter.

Sincerely,

_____ _____

(For June E. O'Neill, *Director*).

VIII. INFLATIONARY IMPACT STATEMENT

In accordance with rule XI, clause 2(l)(4) of the Rules of the House of Representative , this legislation is assessed to have no inflationary effect on prices and costs in the operation of the national economy.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

**TITLE 5, UNITED STATES CODE**

\*    \*    \*    \*    \*    \*    \*

# PART I—THE AGENCIES GENERALLY

\*    \*    \*    \*    \*    \*    \*

**CHAPTER 5—ADMINISTRATIVE PROCEDURE**

\*    \*    \*    \*    \*    \*    \*

33

SUBCHAPTER II—ADMINISTRATIVE PROCEDURE

\*      \*      \*      \*      \*      \*      \*

### § 552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1)  \* \* \*

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register; 【and】

(C) administrative staff manuals and instructions to staff that affect a member of the public;

*(D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and*

*(E) a general index of the records referred to under subparagraph (D);*

unless the materials are promptly published and copies offered for sale. *For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means.* To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, 【or staff manual or instruction】 *staff manual, instruction, or copies of records referred to in subparagraph (D).* However, in each case the justification for the deletion shall be explained fully in writing*, and the extent of such deletion shall be indicated on the portion of the record which is made available or published. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made.* Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. *Each agency shall make the index referred to in subparagraph (E) available by computer telecommunication by December 31, 1999.* A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a

34

member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)*(A)* Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which 〚(A)〛 *(i)* reasonably describes such records and 〚(B)〛 *(ii)* is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

*(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.*

*(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format.*

*(D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.*

(4)(A) * * *

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. *In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).*

*     *     *     *     *     *     *

(6)(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall—

(i) determine within 〚ten days〛 *20 days* (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

(ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the de-

35

nial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

⟦(B) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the reasons for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular request—

⟦(i) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

⟦(ii) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

⟦(iii) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.⟧

*(B)(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.*

*(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be exceptional circumstances for purposes of subparagraph (C).*

*(iii) As used in this subparagraph, 'unusual circumstances' means, but only to the extent reasonably necessary to the proper processing of the particular requests—*

*(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;*

*(II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or*

36

*(III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.*

(C)*(i)* Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

*(ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section.*

*(iii) Refusal by a person to reasonably modify the scope of a request or to arrange an alternative time frame for processing a request (or a modified request) under this section after being requested to do so by the agency to whom the person made the request shall be exceptional circumstances for purposes of this subparagraph.*

*(iv) In determining whether exceptional circumstances exist, a court shall consider the efforts by an agency to reduce the number of pending requests under this section.*

*(D)(i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.*

*(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.*

*(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.*

*(E)(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—*

*(I) in cases in which the person requesting the records demonstrates a compelling need; and*

*(II) in other cases determined by the agency.*

*(ii) Notwithstanding subparagraph (A)(i), regulations under this subparagraph must ensure—*

*(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and*

37

*(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.*

*(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond timely to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.*

*(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.*

*(v) For purposes of this subparagraph, the term "compelling need" means—*

*(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or*

*(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.*

*(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by an exemption under subsection (b) under which the denial is made.*

(b) This section does not apply to matters that are—

(1) * * *

\*   \*   \*   \*   \*   \*   \*

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. *The amount of information deleted shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by an exemption under this subsection under which the deletion is made.*

\*   \*   \*   \*   \*   \*   \*

⟦(e) On or before March 1 of each calendar year, each agency shall submit a report covering the preceding calendar year to the Speaker of the House of Representatives and President of the Senate for referral to the appropriate committees of the Congress. The report shall include—

⟦(1) the number of determinations made by such agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

⟦(2) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information;

38

⟦(3) the names and titles or positions of each person responsible for the denial of records requested under this section, and the number of instances of participation for each;

⟦(4) the results of each proceeding conducted pursuant to subsection (a)(4)(F), including a report of the disciplinary action taken against the officer or employee who was primarily responsible for improperly withholding records or an explanation of why disciplinary action was not taken;

⟦(5) a copy of every rule made by such agency regarding this section;

⟦(6) a copy of the fee schedule and the total amount of fees collected by the agency for making records available under this section; and

⟦(7) such other information as indicates efforts to administer fully this section.

The Attorney General shall submit an annual report on or before March 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subsections (a)(4)(E), (F), and (G). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.⟧

*(e)(1) On or before February 1 of each year, each agency shall submit to the Attorney General a report which shall cover the preceding fiscal year and which shall include—*

*(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;*

*(B)(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and*

*(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;*

*(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median number of days that such requests had been pending before the agency as of that date;*

*(D) the number of requests for records received by the agency and the number of requests which the agency processed;*

*(E) the median number of days taken by the agency to process different types of requests;*

*(F) the total amount of fees collected by the agency for processing requests;*

*(G) the average amount of time that the agency estimates as necessary, based on the past experience of the agency, to comply with different types of requests; and*

39

*(H) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests.*

*(2) Each agency shall make each such report available to the public through a computer network, or if computer network means have not been established by the agency, by other electronic means.*

*(3) The Attorney General shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General shall notify the Chairman and ranking minority member of the Committee on Government Reform and Oversight of the House of Representatives and the Chairman and ranking minority member of the Committees on Governmental Affairs and the Judiciary of the Senate, no later than April 1 of the year in which each such report is issued, that such reports are available by electronic means.*

*(4) The Attorney General, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.*

*(5) The Attorney General shall submit an annual report on or before April 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.*

*(f) For purposes of this section, the term—*

*(1) "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and*

*(2) "record" and any other term used in this section in reference to information includes any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format.*

*(g) The head of each agency shall prepare and make publicly available upon request, reference material or a guide for requesting records or information from the agency, including—*

*(1) an index of all major information systems of the agency;*

*(2) a description of major information and record locator systems maintained by the agency; and*

*(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.*

### X. COMMITTEE RECOMMENDATIONS

On July 25, 1996, a quorum being present, the Committee ordered the bill, as amended, favorably reported.

40

Date: July 25, 1996; final passage of H.R. 3802; offered by: Mr. Horn; voice vote: Ayes.

XI. CONGRESSIONAL ACCOUNTABILITY ACT; PUBLIC LAW 104–1; SECTION 102(b)(3)

This provision applies to the legislative branch in that the Comptroller General is required to review laws and regulations to determine that they do not conflict with the provisions of this bill. It does not relate to any terms or condition of employment or access to public services or accommodations.

○