UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FORUM ON OPEN ACCESS TO GOVERNMENT RECORDS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:25-CV-2034-B |
| DALLAS COUNTY HISTORICAL FOUNDATION d/b/a/ THE SIXTH FLOOR MUSEUM AT DEALEY PLAZA and NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | § § § § § § | |
| Defendants. | § § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are two motions to dismiss: the first filed by Defendant Dallas County Historical Foundation d/b/a The Sixth Floor Museum at Dealey Plaza (the "Museum") (Doc. 18), and the second filed by Defendant National Archives and Records Administration ("NARA") (Doc. 28). Having reviewed the briefing and applicable law, the Court **GRANTS** the Museum's Motion in part and **DENIES** NARA's Motion. Accordingly, the Court **DISMISSES** the Forum on Open Access to Government Records, Inc. (the "Forum")'s first, third, fifth, and seventh causes of action **WITHOUT PREJUDICE**. The Court **DISMISSES** the Forum's sixth cause of action **WITH PREJUDICE**. All remaining claims will proceed.

# I.

# BACKGROUND[1]

Perched atop a concrete pedestal in Dealey Plaza, Abraham Zapruder captured, on film, the assassination of President John F. Kennedy. Although that footage is widely available on the internet, some, including the Forum, believe that today's "Zapruder film" is not the original. It is instead an altered version meant to conceal the truth of what happened on that fateful day. The Forum contends that the Museum and NARA are complicit in a conspiracy to conceal those alterations. Through this lawsuit, the Forum seeks to invalidate the Museum's purported copyright interest in the Zapruder film and compel NARA to publish a first-generation copy of the film online.

## A.     The Parties

The Forum is an organization "dedicated to making public records more accessible to the public." Doc. 1, Compl. ¶ 32. In pursuit of that goal, the Forum maintains a public website, on which it makes available "the largest-ever collection of historical documents related to the Zapruder film." *Id.* ¶ 34. It obtains many of those documents from the National Archives. *See id.*

In May 2025, the Forum published a book entitled "SCAM: The Zapruder Copyright—How the Sixth Floor Museum Continues the Coverup." *Id.* ¶ 5. SCAM's main contention is that the National Archives's first-generation copy of the Zapruder film is an altered version. *See id.* ¶ 8. To identify the purported alterations, SCAM contains 73 frames[2] from the Zapruder film. *Id.* ¶ 6.

---

[1] At the motion to dismiss stage, except as otherwise noted, the Court takes as true the Complaint's well-pleaded allegations. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

[2] A "frame" is a single still image on a strip of film. When played in rapid succession, a series of frames creates the illusion of motion (hence the term "motion picture"). A film can be altered or repaired through discrete changes to individual frames. Where the Court refers to the Zapruder film, it is referring to both the film as a whole and its component frames.

The Museum, located in Dallas, Texas, is a non-profit organization that maintains and operates historical exhibits related to President Kennedy's assassination. *See id.* ¶ 29. The Museum purports to own the Zapruder film's copyright. *See id.* ¶¶ 6-7.

NARA is a federal agency subject to the Freedom of Information Act ("FOIA") that is responsible for preserving U.S. government records and other documents in the National Archives, in addition to publishing statutes and regulations. NARA possesses several early copies of the Zapruder film. *See id.* ¶¶ 16, 30.

B.    *The Zapruder Copyright*

Since 1963, Mr. Zapruder's original ownership interest in the film has changed hands several times. First, only days after the assassination, Mr. Zapruder sold all rights in the film to Time, Inc., in exchange for royalty payments. *See id.* ¶¶ 43-46. Time then registered the film for copyright protection in 1967. *See id.* ¶ 64. Faced with rampant, unauthorized public use of the Zapruder film, Time initially protected its copyright interest through litigation. *See id.* ¶¶ 66-67. But after losing an infringement action on fair-use grounds, *see id.* ¶ 67, Time eventually transferred its copyright interest back to Mr. Zapruder's heirs for a nominal sum, *see id.* ¶ 82. In 1999, Mr. Zapruder's heirs, operating through a family partnership called LMH Co., then transferred their interest in the copyright to the Museum. *See id.* ¶¶ 86, 91; *see generally* Doc. 20, Museum App., Exs. 4-6. For reasons discussed in depth below, the Forum disputes the validity of several of those transfers.

C.    *The Forum's FOIA Requests*

Although the Museum currently (and disputedly) owns the Zapruder copyright, NARA possesses several early copies of the film. *See* Doc. 1, Compl. ¶¶ 16, 30. The Forum believes that if it could access first-generation copies of the Zapruder film and compare their frames to publicly

available third-generation copies, it could determine the origin of the alleged alterations to the film. *See id.* ¶¶ 190-91. So, in summer 2024, the Forum's counsel of record sent NARA two separate FOIA requests for copies of certain frames. *See id.* ¶¶ 202, 205. But NARA denied each request. *See id.* ¶¶ 203, 206. Although the Forum was permitted to "view the slides" at NARA's Still Picture Research Room in Maryland, the Forum could not "reproduce them without written permission from" the Museum. *See id.* ¶ 203. This was due, NARA explained, to the Museum's copyright interest in the film. *See id.* ¶¶ 203, 206-07.

D.     *The Forum's License Requests to the Museum*

In April 2025, the Forum requested the Museum's permission to use some of the Zapruder frames in SCAM—which at that time had not yet been published. *See id.* ¶ 216. The Forum also asked the Museum to inform NARA that it did not oppose the Forum's FOIA requests. *Id.* ¶ 217. The Museum denied both requests and informed the Forum that, if it wanted a license, the Forum needed to make a request through the Museum's website. *Id.* ¶ 216, 218-19. So, the Forum submitted another request, this time through the Museum's website, asking for a license to "view, obtain and publish . . . the frames in the National Archives" and those "in the Museum's collection." *Id.* ¶ 224. But the Forum never received a response. *See id.* ¶ 227. Apparently undeterred, the Forum (without a license) published SCAM only weeks later. *See id.* ¶ 229.

E.     *The Present Litigation*

Several months after publishing SCAM, the Forum brought the present action against both the Museum and NARA. Each of the Forum's first seven causes of action against the Museum seek a declaratory judgment that the Zapruder copyright is invalid or unenforceable. *See id.* ¶¶ 236-321 (asserting various theories of invalidity). The Forum's eighth cause of action, also asserted against

the Museum, seeks a declaratory judgment of non-infringement due to fair use. *Id.* ¶¶ 322-32. The

Forum's ninth cause of action, its sole claim against NARA, seeks an injunction requiring NARA to

make certain Zapruder frames publicly available online. *See* Doc. 1, Compl. ¶¶ 333-45.

The Museum now moves to dismiss the Forum's first eight causes of action for lack of subject-

matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6). *See* Doc. 19, Museum Br., 1. NARA likewise moves

to dismiss the Forum's ninth cause of action for lack of subject-matter jurisdiction under Rule

12(b)(1) and failure to state a claim under 12(b)(6). *See* Doc. 28, NARA Mot., 1.

The Court considers both Motions below.

## II.

## LEGAL STANDARDS

A.    *Legal Standard for Challenges to Subject Matter Jurisdiction*

Rule 12(b)(1) allows a defendant to move to dismiss a plaintiff's complaint for "lack of

subject-matter jurisdiction." Once the defendant files a Rule 12(b)(1) motion and challenges

jurisdiction, "the party invoking jurisdiction has the burden to establish subject matter jurisdiction."

*Smith v. Am. Pain & Wellness, PLLC*, 747 F. Supp. 3d 989, 996 (E.D. Tex. 2024) (citing *Menchaca v.*

*Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). "In examining a Rule 12(b)(1) motion, the

district court is empowered to consider matters of fact which may be in dispute." *Ramming v. United*

*States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted). Lack of subject-matter jurisdiction can

be based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced

in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of

disputed facts." *Id.* (citation omitted).

"It is well settled that 'the issue of standing is one of subject matter jurisdiction.'" *Harding v. Cnty. of Dallas*, 336 F. Supp. 3d 677, 684 (N.D. Tex. 2018) (Fitzwater, J.) (quoting *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006)), *aff'd*, 948 F.3d 302 (5th Cir. 2020). Standing addresses who may properly bring suit in federal court. It is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming*, 281 F.3d at 161 (citation omitted).

B.   *Legal Standard for Challenges that a Plaintiff Failed to State a Claim*

Rule 12(b)(6) allows a defendant to move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Nevertheless, in considering whether the plaintiff has stated a claim, courts "must accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand*, 565 F.3d at 232.

### III.

### ANALYSIS

The Court first addresses each Defendant's respective arguments that the Court lacks subject-matter jurisdiction to hear this action. Both arguments fail. Addressing the Museum's challenge, the Court finds that the Forum has standing to bring its claims against the Museum and thus the Court

has subject-matter jurisdiction. Addressing NARA's challenge, the Court finds that FOIA provides a private right of action of the kind the Forum asserts and over which this court has subject-matter jurisdiction.

Second, the Court addresses each Defendant's respective arguments that the Forum fails to state a claim. The Museum's challenge succeeds in part: The Forum's first, third, fifth, sixth, and seventh causes of action fail for the reasons discussed below, while the Forum's other causes of action against the Museum state valid claims for relief that survive dismissal. NARA's challenge fails because the Forum sufficiently alleges that NARA violated its statutory obligations under FOIA.

A.      *The Court Has Jurisdiction Over the Forum's Claims Against the Museum.*

The Museum first contends that the Court lacks jurisdiction over the Forum's declaratory judgment claims against it because there is no actual controversy. *See* Doc. 19, Museum Br., 9-12.

The Declaratory Judgment Act ("DJA") provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The phrase "actual controversy" in the DJA refers to the same type of case or controversy necessary for standing under Article III. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted). Thus, a declaratory judgment plaintiff, like any plaintiff in federal court, must show that its asserted dispute is "definite and concrete, real and substantial, and admit[s] of specific relief through a decree of a conclusive character." *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009) (citing *MedImmune*, 548 U.S. at 127). Although declaratory judgments cannot be used to seek advisory opinions under a "hypothetical set of facts," a declaratory judgment plaintiff "need not actually expose [itself] to liability before bringing suit." *Id.* (citation omitted).

To assess standing in intellectual-property-related declaratory judgment suits, "[a] common framework for analysis applies." *Id.* (citing *Texas v. West Pub. Co.*, 882 F.2d 171, 175 (5th Cir. 1989)). Traditionally, this meant a two-part test. A declaratory judgment plaintiff needed to show (1) that the holder of the intellectual property made "an explicit threat" or took other action that "create[d] a reasonable apprehension on the part of the declaratory plaintiff that it w[ould] face an infringement suit," and (2) that the declaratory judgment plaintiff was engaging in "present activity which could constitute infringement" or had taken "concrete steps . . . with the intent to conduct such activity." *Id.* (citing *Benitec Austl., Ltd., v. Nucleonics, Inc.*, 495 F.3d 1340, 1343-44 (Fed. Cir. 2007)).

But in *MedImmune*, the Supreme Court dispatched with the traditional two-pronged approach in favor of a more-fluid approach that considers "all the circumstances." *Id.* (citations omitted). Now, the "question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (citation omitted).

The Federal Circuit, applying *MedImmune*, has explained that where one party asserts intellectual property rights over another's planned activity, and the other party contends that it has a right to engage in that activity without a license, the party claiming non-infringement has standing to bring a declaratory judgment action. *See SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007) (citation omitted). *SanDisk* involved cross-license negotiations between two companies, SanDisk and STMicroelectronics ("STM"), over several patents. *See id.* at 1374. In a licensing meeting, STM presented SanDisk with a slideshow comparing its patents to SanDisk's. *See*

*id.* at 1375. This presentation, by STM's technical experts, identified and discussed specific elements of each of its patents and noted repeatedly that those patents were being infringed by SanDisk. *See id.* But STM's representative then explicitly told SanDisk that it "ha[d] absolutely no plan whatsoever to sue SanDisk." *Id.* at 1376. Licensing negotiations subsequently broke down, and SanDisk filed suit seeking, among other things, declaratory judgments of non-infringement and invalidity as to STM's patents. *See id.*

The Federal Circuit found that there was an actual controversy because STM had "communicated to SanDisk" its determination that SanDisk was infringing on its patents, and SanDisk, in turn, had "maintained that it could proceed in its conduct" without royalty payments. *Id.* at 1382. That was enough. STM, "[h]aving approached SanDisk, having made a studied and considered determination of infringement by SanDisk, having communicated that determination to SanDisk, and then saying that it does not intend to sue" was engaging in the very "extra-judicial patent enforcement with scare-the-customer-and-run tactics that the Declaratory Judgment Act was intended to obviate." *Id.* at 1383 (citation modified).

Applying *SanDisk*'s logic, courts in this district have similarly concluded that although *MedImmune* requires a concrete dispute with sufficient immediacy, an explicit threat of litigation is not a prerequisite. Thus, "even an explicit disavowal of future legal action will not eliminate the existence of an actual controversy if [a defendant] has engaged in a course of conduct that shows a preparedness and willingness to enforce its . . . rights." *Bell v. Accumetric, LLC*, No. 3:18-CV-03264-M, 2019 WL 3429117, at *3 (N.D. Tex. July 30, 2019) (Lynn, C.J.) (citation modified); *see Poly-Am., L.P. v. Stego Indus., LLC*, 694 F. Supp. 2d 600, 606 (N.D. Tex. 2010) (Fish, S.J.) (holding that "[a] potential declaratory-judgment defendant cannot defeat jurisdiction over a declaratory judgment

action" by avoiding specific threats and making only *general* statements about its ownership rights and willingness to enforce those rights).

Each of the Forum's eight declaratory judgment claims against the Museum hinges on the same alleged controversy: that the Museum's asserted copyright interest in the Zapruder film and the Forum's unlicensed use of the film's frames together present an actual legal conflict capable of resolution. *See* Doc. 1, Compl. ¶¶ 237, 257, 268, 280, 297, 305, 315, 323. In May 2025, the Forum published SCAM. Doc. 1, Compl. ¶ 229. The book is available for sale on various commercial platforms and contains 72 Zapruder frames. *See id.* ¶¶ 229-30. The Museum, for its part, has represented itself as owning a copyright interest in those frames—including in licensing discussions with the Forum. *See id.* ¶¶ 216, 218-19; Doc. 4-10, Compl. Ex. K, 4-5. Just before publishing SCAM, the Forum twice requested a license to use the Zapruder film's frames for commercial purposes. *See* Doc. 4-9, Compl. Ex. J, 2 (requesting a license to "sell a commercial book . . . using all frames 1-486 from any source"); Doc. 1, Compl. ¶ 224 (alleging that the Forum requested "to view, obtain and publish" all Zapruder frames in the Museum's and NARA's possession). But the Museum denied the Forum's initial request and did not respond to the second request. *See id.* ¶¶ 219, 224, 227. After denying the first request, the Museum noted by letter that if the Forum made another request, it had to "acknowledge that the Museum owns the copyrights and agree to refrain from any efforts to challenge the validity of the copyrights." Doc. 4-10, Compl. Ex. K, 4. Nevertheless, the Museum— evidently anticipating the present litigation—disclaimed any "conduct . . . that implies an imminent threat of impending legal action against the Forum." *Id.* at 5.

The Museum, citing the Forum's apparent litigation history, contends that the Forum published SCAM only to manufacture an illegitimate controversy. *See* Doc. 19, Museum Br., 9-10.

The Museum notes that it was not obligated to grant the Forum a license to its copyrights—particularly considering the Forum's ongoing efforts to dispute the copyright's legitimacy. *Id.* at 10. The Museum's mere assertion that it holds a copyright, it contends, does not "amount to a threat of litigation" against the Forum and thus cannot create a controversy where there otherwise is none. *See id.* at 11 (quoting *West Pub. Co.*, 882 F.2d at 176).

Although the Forum's past conduct is questionable, the Court finds that this case presents an actual controversy that is ripe for judicial determination. Considering the totality of the circumstances, there is a substantial controversy between the parties because the Forum is actively using the Zapruder film's frames without a license to do so, and the Museum actively claims a copyright interest in those frames. *See Bell*, 2019 WL 3429117, at *2 (noting that "a controversy becomes sufficiently definite and concrete when the defendant asserts [intellectual property rights] based on the activity of the plaintiff, and the plaintiff contends it has the right to engage in that activity without license"). This is not a "hypothetical" set of facts. *See Vantage Trailers*, 567 F.3d at 748. If the Museum's purported copyright interest is indeed valid, and without considering any possible defenses, the Forum is actively infringing on that copyright interest and markets SCAM with actual, ongoing legal risk.

The Museum's disavowal of impending litigation does not divest the Forum of standing. *See Bell*, 2019 WL 3429117, at *3 (quoting *SanDisk*, 480 F.3d at 1383). The Museum has shown a preparedness to protect its copyright interest by denying licenses (or ignoring license requests), conditioning future license requests on agreements not to challenge the copyright's validity, and refusing to withdraw objections to FOIA requests. Once the Museum denied it a license (whether or not it was entitled to do so), the Forum had a choice to either refrain from publishing SCAM

with the Zapruder frames (which it contends lack valid copyright protection) or *risk* the possibility of litigation. This is all that is required for an "actual controversy" to exist. *See Poly-Am.*, 694 F. Supp. 2d at 606 (citation omitted). Were it not so, the Museum could engage in the kind of perpetual "extra-judicial" copyright enforcement that the DJA was intended to obviate. *See SanDisk*, 480 F.3d at 1383.

The Museum's role as an obstacle to the Forum's FOIA requests also demonstrates an actual controversy. When the Forum requested copies of certain Zapruder frames from NARA, NARA denied each request based on the Museum's purported copyright interest. *See* Doc. 1, Compl. ¶¶ 202-03. As NARA explained, the Forum needed written permission from the Museum before obtaining copies. *See id.* ¶ 203. And when the Forum asked the Museum to inform NARA that the Museum was unopposed to the FOIA request, or to grant the Forum a license to those materials, the Museum refused. *See id.* ¶¶ 217, 219, 220-21. Yet, the Museum contends that unless it threatens or brings litigation against the Forum, the Forum cannot challenge the Museum's copyright interest. The Museum proposes a closed loop: NARA rejects FOIA requests based on the Museum's copyright, the Museum declines licenses to the requester, and the Museum refrains from threatening or filing copyright infringement suits to prevent anyone from challenging the copyright's validity or scope, ad infinitum. In other words, the Forum's rights under FOIA are being actively restricted by the Museum's purported copyright interest, and a declaratory judgment action may be the Forum's only way to overcome the obstacle that is the Museum's assertion of copyright ownership.

The Court finds that there is a substantial and immediate controversy between the Forum and the Museum over the validity of the Museum's copyright interest in the Zapruder film. This

controversy is actual and imminent and, if the Forum's claims have merit, warrants a declaratory judgment.[3]

B.    *The Court Has Jurisdiction Over the Forum's FOIA Claim.*

NARA contends that the Court lacks jurisdiction over the Forum's FOIA claim because FOIA's remedial provision does not empower courts to grant the relief that the Forum requests. Doc. 28, NARA Mot., 5.

Congress designed FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted).

FOIA accomplishes these goals through three disclosure obligations. First, it compels agencies to publish certain documents in the Federal Register. *See* 5 U.S.C. § 552(a)(1) (the "Federal-Register Provision"). Second, it requires agencies to proactively make certain records "available for public inspection in an electronic format." § 552(a)(2) (the "Reading-Room Provision"). And third, it permits the public to request and access certain agency records. *See* § 552(a)(3) (the "General-Request Provision").

At issue here is the Reading-Room Provision, § 552(a)(2). For certain categories of records, the Reading-Room Provision requires agencies to *proactively* make them freely, publicly accessible in an electronic format—no FOIA request needed. *See Animal Legal Def. Fund v. USDA* (*ALDF*), 935 F.3d 858, 862 (9th Cir. 2019). Among other records, the Reading-Room Provision applies to "frequently requested records": records that have been released previously under the General-

---

[3] In a single sentence, the Museum also argues that the Court should, for reasons not given, exercise its discretion to dismiss this action. Doc. 19, Museum Br., 12. Having considered the relevant factors in *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 388 (5th Cir. 2003), and given the lack of particularized argument to the contrary, the Court declines to do so.

Request Provision and are either likely to be subject to frequent access requests or which have been requested three or more times already. *See id.* at 862-63.

To enforce these disclosure obligations, FOIA's remedial provision creates a private right of action and provides district courts with "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." § 552(a)(4)(B).

The Forum contends that the Zapruder frames are frequently requested records that NARA wrongfully omitted from its electronic reading room. *See* Doc. 1, Compl. ¶¶ 338-44. The Forum asks the Court to compel NARA to make the frames available there. *See id.* ¶¶ 344-45.

NARA, for its part, contends that this Court lacks jurisdiction over the Forum's request because FOIA's remedial provision, § 552(a)(4)(B) "is aimed at relieving the injury suffered by the individual complainant, not by the general public." Doc. 28, NARA Mot., 5 (quoting *Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191, 1203 (D.C. Cir. 1996)). NARA contends that while § 552(a)(4)(B) enables the Court to order that an agency produce records to a particular plaintiff, it does not give the Court the authority to mandate publication of those same records to the general public. *See id.*

The question before the Court is thus whether § 552(a)(4)(B)—FOIA's remedial provision— empowers the Court to compel agencies to publish frequently requested records in an electronic reading room or merely to order production to a given plaintiff. If the Court cannot provide the relief sought, the Court lacks jurisdiction over the Forum's sole FOIA claim.

Although the Supreme Court and Fifth Circuit have not addressed this precise question, other circuits, and at least one district court in this Circuit, have. The D.C. Circuit has held and reaffirmed that FOIA's remedial provision does not authorize district courts to order more than

direct production to the plaintiff. *See Citizens for Resp. & Ethics in Wash. v. DOJ* (*CREW*), 846 F.3d 1235, 1243 (D.C. Cir. 2017); *Kennecott*, 88 F.3d at 1203. But shortly after *CREW*, the Second and Ninth Circuits each held the opposite: that the remedial provision *does* give courts the authority to order an agency to publish records subject to the Reading-Room Provision to an online reading room. *See ALDF*, 935 F.3d at 869; *N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals* (*NYLAG*), 987 F.3d 207, 209 (2d Cir. 2021). And most recently, a district court in the Southern District of Texas, presented with this circuit split, adopted the approach taken by the Ninth and Second Circuits. *See La Union Del Pueblo Entero v. FEMA*, No. 5:21-cv-71, 2023 WL 6014397, at *12 (S.D. Tex. June 12, 2023), *report and recommendation adopted*, 2023 WL 4906607 (S.D. Tex. Aug. 1, 2023). But those precedents are not binding on this Court. The Court must conduct its own, independent statutory analysis of the remedial provision.

For the reasons that follow, the Court—like its sister district court—is persuaded that the Second and Ninth Circuits have the better of the argument here: FOIA's remedial provision enables courts to order agencies to publish records that are subject to the Reading-Room Provision to the electronic reading room. The Court reaches this conclusion after analyzing the remedial provision's text and its broader statutory context. The Court also analyzes the provision's amendment history and identifies additional reasons to disregard the D.C. Circuit's past interpretations.

1.    Text

As it must, the Court starts with the text. *See United States v. Palomares*, 52 F.4th 640, 642 (5th Cir. 2022) (citation omitted). The Court's primary directive in statutory interpretation is to "approach[] the words as an ordinary reader would." *Sirius Sols., LLLP v. Comm'r*, 165 F.4th 374, 387 (5th Cir. 2026) (citation omitted); *see Bostock v. Clayton Cnty.*, 590 U.S. 644, 784 (2020) (Kavanaugh,

J., dissenting) ("The prime directive in statutory interpretation is to apply the meaning that a reasonable reader would derive from the text of the law." (citation modified)).

Under FOIA's remedial provision, the Court "has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." § 552(a)(4)(B). But the parties disagree sharply on how this phrase should be understood and which words do the bulk of the work.

NARA would have the Court focus on two modifiers: "production" and "improperly withheld from the complainant." By using the term production, and not publication, NARA contends that the remedial provision does not contemplate a court ordering broad public disclosure. *See* Doc. 31, NARA Reply, 3. NARA then takes "improperly withheld from the complainant" to mean that relief, however granted, must be specific only to the plaintiff. *See id.* at 4. The D.C. Circuit applied this same reasoning. *See CREW*, 846 F.3d at 1243; *Kennecott*, 88 F.3d at 1203.

In the Forum's contrary view, the remedial provision contains two separate powers divided by a conjoining "and." Doc. 30, Forum Resp., 9. First, "the power to 'enjoin the agency from withholding'" agency records and second, "the power to 'order the production'" of records improperly withheld from the plaintiff. *Id.* (first quoting *La Union*, 2023 WL 6014397, at *12; and then citing § 552(a)(4)(B)). By this reading, only the second of these two powers is subject to the modifiers "production" and "improperly withheld from the complainant." Thus, the Forum explains, although the Court's power "to order" production may be limited in remedy to that wrongfully withheld from the plaintiff, the Court has a broader power "to enjoin" an agency from withholding records that FOIA obligates it to publish. *Id.* This is the approach adopted by the Second and Ninth Circuits. *See ALDF*, 935 F.3d at 870; *NYLAG*, 987 F.3d at 217.

The Court agrees with the Forum's reading and finds that FOIA's remedial provision provides two separate powers: one to enjoin an agency from withholding agency records and another to order the agency to produce agency records that it improperly withheld from a wronged plaintiff. As the Second and Ninth Circuits explained, the phrase contains a conjunction (and) which links two infinitive verbs. *See NYLAG*, 987 F.3d at 217; *ALDF*, 935 F.3d at 871. This implies two separate clauses with separate powers. *See NYLAG*, 987 F.3d at 217; *ALDF*, 935 F.3d at 871.

With that understanding, the Court must determine whether its power "to enjoin the agency from withholding agency records," § 552(a)(4)(B), includes the power to order publication of those records to the reading room. It does. The Ninth Circuit defined "to enjoin" as to "prohibit or restrain by injunction" or to "prescribe, mandate, or strongly encourage." *ALDF*, 935 F.3d at 869 (citations omitted); *see Enjoin, Black's Law Dictionary* (12th ed. 2024)). And to "withhold," in the context of "withholding agency records," is most plainly understood as "to refrain from granting, giving, or allowing." *See Withhold, Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/withhold. When an agency abnegates its affirmative duty under the Reading-Room Provision to publish frequently requested records, it is "refraining" from its statutory obligation to give up those records. Under this broad language, "FOIA authorizes district courts to stop the agency from holding back records it has a duty to make available" under the Reading-Room Provision. *See ALDF*, 935 F.3d at 869.[4]

NARA warns that the Court's separate-powers reading would render the Court's latter power "to order" production superfluous. *See* Doc. 31, NARA Reply, 5. If the Court has broad authority

---

[4] While the Court, like the Ninth and Second Circuits, uses modern dictionary definitions, neither of the terms at issue here appear to have materially changed since Congress adopted the statute's current form.

to enjoin an agency from withholding records, NARA contends that the Court's power to order production of wrongfully withheld records to a plaintiff is just an unnecessary subset of that broad authority. *See id.* But this Court is not convinced.

To the contrary, the Court's separate-powers reading, unlike NARA's reading, better comports with the Court's obligation to "give effect, if possible, to every word and every provision Congress used." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 488 n.8 (5th Cir. 2013) (citing *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). The Court's power "to enjoin the agency from *withholding*" uses the present participle of withhold. *See* § 552(a)(4)(B) (emphasis added). This targets an agency's present or prospective conduct. *See St. Paul Fire & Marine Ins. Co. v. Pham*, No. CIV.A. 06-2597, 2007 WL 1466747, at *4 (E.D. La. May 18, 2007) ("The use of a present participle expresses a state of action in progress" (citations omitted)). While the Court's power "to order the production of any agency records improperly *withheld* from the complainant" uses withhold's past-tense form. *See* § 552(a)(4)(B) (emphasis added). This targets an agency's past-action—specifically its failure to produce requested records to a complainant. Together, these two powers grant the Court the ability to remedy two separate forms of agency misconduct: (1) when an agency is actively withholding records it is required to publish under the Federal-Register and Reading-Room Provisions; and (2) when an agency improperly withheld records that were specifically requested under the General-Request Provision. If there is still any overlap, the "solution" to avoid superfluidity is to read the Court's broader "to enjoin" power as "excluding the power created by the more specific 'to order' clause . . . ." *ALDF*, 935 F.3d at 870.

2.      Context

The remedial provision's broader statutory context and structure support the Court's reading. "In interpreting a statute, we do not look at a word or a phrase in isolation" because "the meaning of a statutory provision is often clarified by the remainder of the statutory scheme," and any permissible interpretation should "produce[] a substantive effect that is compatible with the rest of the law." *Ramos-Portillo v. Barr*, 919 F.3d 955, 960 (5th Cir. 2019) (citation modified).

FOIA expressly contemplates judicial review of Reading-Room Provision violations. *See ALDF*, 935 F.3d at 871 (citing § 552(a)(4)(B)). And the Reading-Room Provision creates an affirmative duty for agencies to make certain records publicly available without request. *See* § 552(a)(2). Thus, when an agency fails to include frequently requested records in its electronic reading room, it abnegates that duty. But if the remedial provision is read to preclude a court from ordering publication, an agency can violate the Reading-Room Provision without redress for the wronged public. No matter how many individuals bring suit, the Court could only ever order production to the plaintiff, while the agency could continue to violate its statutory obligations. This would render the Reading-Room Provision entirely precatory. *See La Union*, 2023 WL 6014397, at *12 (first quoting *NYLAG*, 987 F.3d at 220; and then citing *ALDF*, 935 F.3d at 872).

3.      Amendment History

FOIA's amendment history also supports the Court's interpretation. Reviewing that history, and the 1974 amendment to FOIA's remedial provision in particular, *NYLAG* concluded that "Congress intended to give district courts the authority to order agencies to make documents available for public inspection when they fail to comply with their affirmative obligations in § 552(a)(2)." 987 F.3d at 223. As the Second Circuit explained, prior to 1974, the remedial

provision appeared within the General-Requests Provision. *See id.* at 221 (citation omitted). But the 1974 amendment moved the remedial provision outside of § 552(a)(3) to § 552(a)(4)(B). *See id.* at 222. This, according to a Senate Judiciary Committee Report, was done because "the Department of Justice has argued in litigation that judicial review of a denial of information requested under subsections (a)(1) and (a)(2) was not available under the FOIA." *Id.* (citation omitted). The restructuring made it clear that "judicial review is available to challenge agency withholding under any provision" of § 552. *Id.* (citation omitted). Of course, these "retrospective reflection[s]" of Congressional intent carry little weight by themselves. *See id.* But insofar as they correspond directly with the changes in the statute's text, they provide an additional piece to the puzzle.

4.    The D.C. Circuit

For several additional reasons, the Court is not persuaded by the D.C. Circuit's statutory analyses in *CREW* and *Kennecott*. First, although the D.C. Circuit narrowly held in *Kennecott* that it lacked the power to order publication based on its powers "to order the production of any agency records improperly withheld from the complainant," the court did not address its power to instead "enjoin" the agency from withholding records. 88 F.3d at 1203 (citation modified). Moreover, *Kennecott* concerns only the Federal-Register Provision, which requires agencies to publish certain records in the Federal Register. This case, like both *ALDF* and *NYLAG*, instead involves the Reading-Room Provision and its requirement that agencies make records "available for public inspection in an electronic format." *See* § 552(a)(2). And although *CREW* does involve the Reading-Room Provision, its brief statutory analysis of the remedial provision relies heavily on *Kennecott, see CREW*, 846 F.3d at 1243, and has been at least implicitly characterized as dicta in a subsequent case, *see Citizens for Resp. & Ethics in Wash. v. DOJ*, 922 F.3d 480, 485 (D.C. Cir. 2019) (construing *CREW*

narrowly as turning on the fact that the plaintiff improperly brought its claim under the APA instead

of the remedial provision).

\*        \*        \*

In sum, FOIA's remedial statute, § 552(a)(4)(B), empowers the Court to stop agencies from

withholding publication of records falling under the Reading-Room Provision, § 552(a)(2). Because

this is precisely the relief that the Forum seeks here, the Court has jurisdiction to hear the Forum's

FOIA claim.

C.      *The Forum's First, Third, Fifth, Sixth, and Seventh Causes of Action Fail to State Claims for Relief, While All Other Causes of Action State Plausible Claims for Relief.*

Under Rule 12(b)(6), the Museum and NARA collectively seek dismissal of the Forum's nine

causes of action for failure to state a claim. Addressing each cause of action in turn, the Court finds

that the Forum's first, third, fifth, sixth, and seventh causes of action fail to state a claim, while all

other causes of action state plausible claims for relief.

1.      The Forum's First Cause of Action Fails to State a Claim for Relief, While Its Second Causes of Action States a Valid Claim for Relief.

The Forum, by its first cause of action, seeks a declaratory judgment that the Museum's

copyright interest in the Zapruder film is invalid or unenforceable because the film is not "an original

work" in whole or in part. *See* Doc. 1, Compl. ¶¶ 236-55. Specifically, the Forum contends that the

existing Zapruder film subject to the Museum's copyright is an "altered version" and not the original

film taken by Mr. Zapruder. *See id.* ¶¶ 241-42. The Forum's second cause of action, seeking the same

relief, contends that the Museum's copyright interest in the Zapruder film, or some of its frames, is

invalid due to waiver. *See id.* ¶¶ 256-66. Specifically, the Forum contends that the Museum's

predecessor in interest released certain damaged frames (frames 207 through 212) into the public domain in the 1960s. *See id.* ¶¶ 259-62.

The Museum contends that the Forum's first and second causes of action fail to state plausible claims because they do not overcome the presumption of copyright validity. *See* Doc. 19, Museum Br., 12-13.

"[C]opyright certificates of registration . . . [are] prima facie evidence of the validity of the copyright." *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995) (citing 17 U.S.C. § 410(c)). And the Museum attaches to its Motion the original copyright certificate of registration in the Zapruder film, *see* Doc. 20, Museum App., Ex. 3, as well as the recorded assignment of that copyright to the Museum in 2000, *id.*, Ex. 6, at 1-2. But that presumption is rebuttable, such as if the copyright lacks originality, *see, e.g.*, *Doskocil Mfg. Co. v. Make Ideas, LLC*, No. 3:21-CV-1098-B, 2023 WL 1448056, at *12 (N.D. Tex. Jan. 31, 2023) (Boyle, J.) (citation omitted), or if the copyright's owner previously waived its interest in the copyright, *see, e.g.*, *Bobby Goldstein Prods., Inc. v. Habeeb*, No. 3:21-CV-1924-G, 2022 WL 5250284, at *2 (N.D. Tex. Oct. 6, 2022) (Fish, S.J.).

The Forum's first cause of action does not state a plausible claim that the Zapruder copyright (or a portion of it) is unoriginal. Originality, "as the term is used in copyright" has two components: (1) "that the work was independently created by the author (as opposed to copied from other works)" and (2) "that [the work] possesses at least some minimal degree of creativity." *Norma Ribbon*, 51 F.3d at 47 (citation omitted). The Forum alleges that, when Time first registered the Zapruder copyright, the film had already been modified. *See* Doc. 1, Compl. ¶ 65. The modifications, covering frames 154-157 and 207-212, were due to damage caused by a technician after Time received the physical film but before they could register the copyright. *See id.* But "ownership of a copyright . . . is distinct

from ownership of any material object in which the work is embodied." 17 U.S.C. § 202. Minor alterations to a few *physical* frames do not render the Zapruder film, which was indisputably created in 1963 by Mr. Zapruder, an unoriginal work.[5]

The Forum's first cause of action fails to state a plausible claim that the Zapruder film is invalid for lack of originality. The Court **DISMISSES** that claim **WITHOUT PREJUDICE**.

The Forum's second cause of action states a plausible claim for relief. Copyright can be waived by a particular act (even if unintended), or by inaction. *See Bobby Goldstein*, 2022 WL 5250284, at *2 (quoting *Veeck v. S. Bldg. Code Cong. Int'l Inc.* (*Veeck I*), 241 F.3d 398, 409 (5th Cir. 2001), *rev'd on other grounds*, 293 F.3d 791 (5th Cir. 2002) (en banc)). Here, the Forum alleges a particular act: that Time, while possessing the Zapruder copyright, affirmatively waived its interest in frames 207-212 without reservation by releasing those frames into the public domain. *See* Doc. 1, Compl. ¶¶ 261-62. At the pleading stage, that is all that is required. The Forum has stated a plausible claim that the Museum's predecessor waived its copyright interest in frames 207-212.

As a note of caution, the Forum, in its second claim, plausibly alleges only that the Museum's predecessor waived its interest in *some* frames (207-212). The Forum may be entitled to a declaratory judgment that the Zapruder copyright cannot cover *those particular frames*. But the Forum does not sufficiently allege that any other portion of the Zapruder copyright is invalid or unenforceable due

---

[5] At best, the Forum appears to suggest that due to minor modifications to certain frames, the Zapruder film in Time's possession in 1967 (when it sought registration) is derivative of the original out-of-camera film. But a derivative work, unless making an original contribution to the underlying work that is entitled to its own copyright protection, remains protected by the underlying work's copyright. *See* 17 U.S.C. § 106(2); *see also Lennar Homes of Tex. Sales & Mktg., Ltd. v. Perry Homes, LLC*, 117 F. Supp. 3d 913, 928 (S.D. Tex. 2015) ("any elements that the author of the derivative work borrowed from the underlying work . . . remain protected by the copyrights in the underlying work." (citation modified)).

to waiver. If the Forum later seeks to claim broad invalidity or unenforceability based on its second causes of action, thereby exceeding the Complaint's scope, it must first amend its pleadings.

    2.    <u>The Forum's Third Cause of Action Does Not State a Valid Claim for Relief.</u>

The Forum, by its third cause of action, seeks a declaratory judgment that the Museum's copyright interest in the Zapruder film is invalid because the application for copyright registration included willful misrepresentations. *See id.* ¶¶ 267-78. Specifically, the Forum alleges that Time's original registration stated that the film was a 10-second original work, while the version on the Museum's website is over one minute in length. *See id.* ¶ 271. And Time neglected to inform the Copyright Office that certain frames—154-157 and 207-212—had been lost or damaged and were thus unoriginal. *See id.* ¶¶ 272, 276.

The Museum asserts that the Forum's third cause of action fails to state a valid claim on two grounds. First, because "fraud on the Copyright Office" is not a cognizable cause of action and is usually asserted as an affirmative defense. Doc. 19, Museum Br., 14. And second, because the Forum does not sufficiently allege that the Museum or its predecessors acted willfully or that the Copyright Office relied on those misrepresentations in granting the registration. *See id.* at 15. The Court will address each argument in turn.

The Museum's first argument is unavailing here. Like most of the Forum's claims, the third cause of action is a *declaratory judgment claim* based on an assertion of copyright invalidity for fraud on the Copyright Office. Although that argument usually takes the form of an affirmative defense, plaintiffs can assert the argument offensively as the basis for a declaratory judgment action. *See Oldham v. U.S. Small Bus. Admin.*, No. 19-10644, 2025 WL 1393867, at *5 & n.21 (5th Cir. May 14, 2025) ("If a court could not consider defenses brought in an 'affirmative' posture, then the judgment

of that court could differ based on who brought an action over the exact same dispute."). Thus, the fact that fraud on the Copyright Office is normally an affirmative defense, not a cause of action, is inapposite here.

The Museum's second argument is more compelling. "The party alleging fraud on the Copyright Office must establish that '(1) the application for copyright registration is factually inaccurate; (2) those inaccuracies were willful or deliberate; and (3) the Copyright Office relied on those misrepresentations.'" *Friedheim v. Hoeber*, No. 4:20-CV-00335-O, 2020 WL 10893185, at *7 (N.D. Tex. Dec. 16, 2020) (O'Connor, J.) (citation omitted). "A misstatement or clerical error in the registration application if unaccompanied by fraud will not invalidate the copyright." *Id.* (citation modified). Here, the Forum alleges two factual inaccuracies. First, that the registration lists the video as being ten seconds instead of over one minute; and second, that Time failed to inform the Copyright Office that several frames in the video were either damaged or missing. But the Forum fails to allege beyond bare assertions that those inaccuracies were willful or that the Copyright Office relied on them. Although the Forum contends that Time admitted that the frames were damaged, it does not explain *when* Time became aware of that fact. *See* Doc. 1, Compl. ¶ 274. And the fact that the Museum currently displays a one-minute video on its website does not on its own indicate that Time's 1967 copyright application was misrepresenting the film's total length or which portion of the video it sought to copyright. As the Forum notes, "it is unknown what the ten seconds is referring to." *Id.* ¶ 271. And if, as alleged, it was "apparent to anyone who merely viewed the[] frames" that there was damage or that some frames were missing, *see id.* ¶ 275, it can hardly be said that the Copyright Office relied on Time's alleged omission of that fact. The same could be said about the

film's total length. It would be obvious to anyone from the Copyright Office reviewing the video that a one-minute film is not ten seconds.

The Forum's third cause of action does not state a valid claim for relief. The Court **DISMISSES** that claim **WITHOUT PREJUDICE**.

    3.    <u>The Forum's Fourth Cause of Action States a Valid Claim for Relief.</u>

The Forum, by its fourth cause of action, seeks a declaratory judgment that the Museum's copyright interest in the Zapruder film was effectively abandoned because Time lost a related infringement action in 1968, and neither the Museum nor its predecessors have since attempted to enforce the copyright—even in the face of large-scale infringement. *See id.* ¶¶ 279-95. The Forum points to the Museum's predecessors' past failures to prevent infringement, including when the film was sold by third parties on VHS, when it was presented at colleges and universities "across the country," and when it was played on local and national television in 1975. *See id.* ¶ 286.

The Museum contends that the Forum's fourth cause of action fails to state a valid claim. Specifically, the Museum argues that its, or its predecessors', decisions not to prosecute every case of copyright infringement are alone insufficient to show abandonment, especially considering the Museum's ongoing licensing program for that very copyright. *See* Doc. 19, Museum Br., 16-18. Absent plausible allegations of the Museum and its predecessors' intent, the Museum asserts, the Forum cannot show abandonment. *See* Doc. 24, Museum Reply, 6.

As an initial matter, it is unclear whether the Forum's abandonment claim is truly separate from its earlier waiver claim—particularly where Fifth Circuit law now recognizes that a copyright holder can "waive" its interest in a copyright by inaction or by a particular act. *See Panini Am., Inc. v. Wild Card, Inc.*, No. 4:22-CV-093, 2023 WL 1073692, at *9 (E.D. Tex. Jan. 27, 2023) (citing *Veeck*

*I*, 241 F.3d at 409). Allegations of open and free infringement "without consent, payment, or recourse is relevant" to a claim that the plaintiff "*abandoned* its copyrights or *waived* its right to enforce its copyrights." *See id.* (emphasis added) (noting that abandonment is "akin to waiver"). So, there does not appear to be a meaningful distinction between the two doctrines. But the Forum appears to argue its waiver claim as arising from an affirmative act, *see* Doc. 1, Compl. ¶ 261, while its abandonment claim arises from alleged inaction, *see id.* ¶ 289. Thus, the Court evaluates the Forum's abandonment claim separately from the already addressed waiver claim—focusing solely on whether the Museum or its predecessors abandoned, or waived by *inaction*, the Zapruder copyright.

The Court finds that the Forum's fourth cause of action states a valid claim. "[C]opyright owners do not have to sue every potential infringer to preserve their rights." *Fed'n of State Massage Therapy Bds. v. Mendez Master Training Ctr., Inc.*, 393 F. Supp. 3d 557, 572 (S.D. Tex. 2019) (citation omitted); *cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 682 (2014) ("It is hardly incumbent on copyright owners . . . to challenge each and every actionable infringement. . . . Even if an infringement is harmful, the harm may be too small to justify the cost of litigation."). Thus, the fact that the Forum can point to several instances in the last 60 years where the Museum's predecessors did not enforce their copyright interests may not by itself support a plausible abandonment claim. But the Forum also alleges that *not a single lawsuit* has been initiated to enforce the Zapruder copyright since 1969—even in the face of specifically cited instances of infringement and dozens of versions of the Zapruder film circulating around the internet and attracting views. *See* Doc. 1, Compl. ¶¶ 285, 291. At the pleading stage, and absent additional information, the Court must credit these allegations. Because the Forum alleges over 60 years of open and free infringement, *see*

*Panini Am.*, 2023 WL 1073692, at *9, it has plausibly pleaded a claim of abandonment—or waiver by inaction.

The fact that the Museum now administers a licensing program, and that it has in the last several years defended suits related to the Zapruder copyright, would not resurrect the copyright if it was already abandoned. Nor did the Forum need to allege additional facts to suggest the Museum's or its predecessors' intent to abandon the copyright. Whether evidence of intent is ultimately required for abandonment *by overt act* is unclear. *Contrast Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 898 (5th Cir. 1972) ("Abandonment can only be shown by proving the copyright proprietor *intended* to surrender the rights in a work he so deliberately perfected." (emphasis added)), *with Veeck I*, 241 F.3d at 409 ("Copyright also may be waived as the result of a particular act, e*ven if waiver was not the intended result.*" (emphasis added)). But abandonment by *inaction* does not require a direct showing of intent. *See Panini Am.*, 2023 WL 1073692, at *9 (noting that while the Fifth Circuit "used to" require "evidence of intent by the copyright holder to surrender rights," "now a right such as copyright may be waived by inaction." (citation modified)).

The Forum's fourth cause of action states a plausible claim that the Museum or its predecessors abandoned the Zapruder copyright.

4.     The Forum's Fifth Cause of Action Fails to State a Valid Claim for Relief.

The Forum, by its fifth cause of action, seeks a declaratory judgment that the Museum's copyright interest in the Zapruder film is invalid because the Museum never properly obtained the copyright. *See* Doc. 1, Compl. ¶¶ 296-303. Specifically, the Forum contends that the Museum's claim to the copyright is only as valid as the preceding transfers from Mr. Zapruder to Time, from Time to Mr. Zapruder's heirs, from Mr. Zapruder's heirs to LMH (the Zapruder family partnership), from

LMH back to Mr. Zapruder's heirs, and from Mr. Zapruder's Heirs to the Museum. *See id.* ¶ 299. Most of those transfers, the Forum alleges, were invalid because the transfer documents for the transfer from Time to Mr. Zapruder's heirs contained "either unsigned or . . . illegible signatures," *id.* ¶ 300; and because the "original licensing agreement" between Mr. Zapruder and Time prohibited Mr. Zapruder's heirs from subsequently transferring their copyright interest to the Museum in 1999, *see id.* ¶ 301.

The Museum contends that the Forum's fifth cause of action fails to state a claim. Specifically, it contends that the Zapruder copyright's ownership and assignment history is clear and well-documented. *See* Doc. 19, Museum Br., 19. Each assignment was properly executed and recorded with the Copyright Office. *See id.*; *see generally* Doc. 20, Museum App., Exs. 3-6.[6] So, the Museum concludes, it is entitled to a presumption of validity. *See* Doc. 19, Museum Br., 19.

Whether a prior transfer was ineffective, and whether the original licensing agreement prohibited any particular transfers, are questions that call for legal conclusions. So, the Court does not take those assertions as true—even at the motion-to-dismiss stage. *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981 (5th Cir. 2019) ("Conclusory allegations, unwarranted deductions, or legal conclusions are not well-pleaded facts for purposes of evaluating a complaint." (citation modified)). Instead, the Court looks to the Complaint's factual allegations that would support those conclusions. *See Ashcroft*, 556 U.S. at 678-79.

The Court finds that, as pleaded, the Forum's fifth cause of action does not allege sufficient facts to support either legal conclusion and thus fails to state a plausible claim for relief. First, the

---

[6] The Court takes judicial notice of recordations with the Copyright Office, as they are a matter of public record. *See Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

Court considers whether the Forum has sufficiently pleaded that Time's transfer to Mr. Zapruder's heirs was ineffective. Federal copyright law provides that a "transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed." 17 U.S.C. § 204(a). The Forum asserts that the transfer documents for the 1975 transfer from Time to Mr. Zapruder's heirs were "either unsigned or contain illegible signatures." Doc. 1, Compl. ¶ 300. But framed as an "either . . . or" assertion, this amounts to little more than pure speculation. The Forum also directs the Court to its website, which contains a "draft" agreement between Time and Mr. Zapruder's heirs, signed only by Mr. Zapruder's heirs; and formal documentation of the assignment, signed by Time. *See id.* at n.15 (providing a link to both documents on an affiliated website). Any purported draft agreement has little or no bearing on the Court's analysis here, but the formal documentation of assignment is properly signed by Time—the owner of the rights conveyed. So, the Forum neither alleges facts nor provides sufficient evidence for the Court to conclude that Time's assignment to Mr. Zapruder's heirs was invalid.

Second, the Court considers whether the Forum pleaded sufficient facts to suggest that the "original licensing agreement" between Mr. Zapruder and Time prohibited the 1999 assignment to the Museum. The Forum provides a link to a document (ostensibly the original licensing agreement) on its website, *see id.* at n.16, and claims that the agreement (1) prohibited any transfers "by Zapruder's heirs" and (2) "preclude[d] any transfers purporting to dispose of [Time's] royalty payment obligation" owed to Mr. Zapruder's heirs, *id.* ¶ 301. The Forum concludes that the transfer to the Museum in 1999 violated both restrictions. *See id.* But the purported agreement, again incorporated into the Complaint by its reference to the website, is not a licensing agreement. It is an agreement

to transfer all interest in the copyright from Mr. Zapruder to Time, in exchange for certain royalties. The agreement's prohibition on further transfers by Mr. Zapruder or his heirs is merely a recognition that Time then owned the copyright. And although the agreement appears to require Time to include the same royalty provision in any subsequent copyright transfer to other parties, the agreement says nothing about any subsequent transfer from Time back to Mr. Zapruder's heirs—who were recipients of those royalties under the agreement. Once Mr. Zapruder's heirs obtained the copyright, thereby becoming simultaneously obligated to pay and entitled to receive royalty payments, the original royalty agreement would necessarily be extinguished.[7] To presume otherwise would be absurd without additional facts. The Forum's legal conclusions thus cannot overcome the transfer's presumptive validity. *See Alaska Elec.*, 915 F.3d at 981.

The Forum's fifth cause of action does not state a valid claim for relief. The Court **DISMISSES** that claim **WITHOUT PREJUDICE**.

> 5.    The Forum's Sixth Cause of Action Fails to State a Valid Claim for Relief.

The Forum, by its sixth cause of action, seeks a declaratory judgment that the Museum's copyright interest in the Zapruder film is invalid because there is a lack of separation between the uncopyrightable idea of the film and the copyrightable expression of the film. *See* Doc. 1, Compl. ¶¶ 304-13. Stated otherwise, the Forum alleges that the Zapruder film cannot be protected by copyright because the uncopyrightable factual information contained in the film cannot be

---

[7] Mr. Zapruder's heirs could not act as both obligors and obligees under the original royalty agreement because a valid contract requires at least two parties. *See* 1 *Williston on Contracts* § 1:1 (4th ed. 2026); 17A Am. Jur. 2d *Contracts* § 1 (2026); *Galveston Cnty. Comm'rs' Ct. v. Lohec*, 814 S.W.2d 751, 753 (Tex. App.—Houston [14th Dist.] 1991) ("It is hornbook law that a party cannot contract with or be bound to himself." (citation omitted)), *rev'd on other grounds*, 841 S.W.2d 361 (Tex. 1992).

meaningfully distinguished from the film's otherwise-copyrightable expression of that information. *See id.* ¶¶ 307-08.

The Museum contends that the Forum's sixth cause of action fails to state a claim. It argues that the Zapruder film's idea and expression have not merged because the film reflects Mr. Zapruder's specific filming choices, such as location, camera lens type, and compilation of frames. Doc. 19, Museum Br., 20.

The basis for the Forum's sixth cause of action—lack of separation between idea and expression—is known as the "merger doctrine." That doctrine "is based on the statutory prohibition against copyright protection for ideas." *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 549 (5th Cir. 2015) (citing 17 U.S.C. § 102(b)). "If an idea is susceptible to only one form of expression, the merger doctrine applies and § 102(b) excludes the expression from the Copyright Act." *Id.* (quoting *Veeck v. S. Bldg. Code Cong. Int'l Inc.* (*Veeck II*), 293 F.3d 791, 801 (5th Cir. 2002)). This dichotomy between idea and expression is meant to "strike a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) (citation omitted).

An idea seeking copyright protection can be broken down into its underlying "facts": "the unique, *unalterable* expression of the 'idea.'" *Veeck II*, 293 F.3d at 801 (emphasis added). Such facts, including historical information, "may not be copyrighted and are part of the public domain available to every person." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991) (citation omitted). But even facts, if "feature[d] [in] an original selection or arrangement," may meet the "constitutional minimum for copyright protection." *See id.* (citing *Harper & Row*, 471 U.S. at 547).

Thus, when facts can be "expressed in various ways," the merger doctrine is not an issue. *See Nola Spice*, 783 F.3d at 549-50.

In *Time, Inc. v. Bernard Geis Associates*, a court in the Southern District of New York considered an argument nearly identical to the Forum's and held that Time had a valid copyright interest in the Zapruder film. *See* 293 F. Supp. 130, 142-44 (S.D.N.Y. 1968). The court recognized that, although a "news event may not be copyrighted," the Zapruder copyright only sought to protect the "the particular form of record made." *Id.* at 143. The court then noted that the Zapruder film contained various unique "elements of creativity" indicating a valid copyright interest:

> Among other things, Zapruder selected the kind of camera (movies, not snapshots), the kind of film (color), the kind of lens (telephoto), the area in which the pictures were to be taken, the time they were to be taken, and (after testing several sites) the spot on which the camera would be operated.

*Id.* The court therefore held that Time's copyright was valid. *Id.* at 144.

The Court agrees with the analysis in *Time* and holds that the Forum's sixth cause of action fails to state a claim. Although the historical facts presented in the Zapruder film are not copyrightable, the Zapruder copyright is limited to a particular expression of those facts and reflects various artistic determinations made by Mr. Zapruder. Those same facts could be "expressed in various ways" making the merger doctrine inapplicable here. *See Nola Spice*, 783 F.3d at 549-50; *Time*, 293 F. Supp. at 143.

The Forum makes much of a copyright treatise for the observation that, in the unique case of the Zapruder film, the film's informational value to the public may outweigh any interest in protecting the photographer's expression, such that the idea and expression effectively merge into one. *See* Doc. 1, Compl. ¶¶ 307-12 (citations omitted). Professor David Nimmer's treatise notes that with some graphic works, "[n]o amount of words describing the 'idea' . . . of [an event] could

substitute for the public insight gained through the photographs." 5 *Nimmer on Copyright* § 19E.03(A)(2) (2026). Specifically discussing the Zapruder film, the treatise contends that only the film could "g[i]ve the public authoritative answers that it desperately sought; answers that no other source could supply with equal credibility." *Id.* In such circumstances, the treatise concludes, "only the expression, not the idea alone, . . . could adequately serve the needs of an enlightened democratic dialogue." *Id.* The Forum would have the Court follow Professor Nimmer's treatise, conclude that the Zapruder film has unique importance to public discourse (and the First Amendment), and hold that Mr. Zapruder's expression has merged with the idea of President Kennedy's assassination itself. Were that the case, the Zapruder film would be unfit for copyright protection.

But Professor Nimmer's treatise does not purport to represent the legal consensus on this issue. Indeed, neither the treatise nor the Forum identifies controlling law adopting Nimmer's view as outlined above. The Forum does cite a footnote in *Iowa State University Research Foundation, Inc. v. American Broadcasting Companies*, where the Second Circuit noted that although "such situations are rare," it was "at least arguable" that in the Zapruder film's unique case, its informational value could not be separated from the author's expression. 621 F.2d 57, 61 n.6 (2d Cir. 1980). But that proposition is dicta, and neither the Second Circuit's decisions nor its dicta are binding on this Court. Moreover, at least one Fifth Circuit judge has expressed doubts on Professor Nimmer's views. *See Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1182 n.4 (5th Cir. 1980) (Brown, J., concurring in part and dissenting in part) (noting Nimmer's position and "express[ing] skepticism that even here the First Amendment would serve as a defense to a copyright suit"). Although Nimmer's treatise and the Forum's arguments here raise important questions, they are more properly addressed by fair use claims—such as the Forum's eighth cause of action here.

The Forum's sixth cause of action does not state a valid claim for relief. The Court **DISMISSES** that claim **WITH PREJUDICE**.[8]

 6. The Court Lacks Jurisdiction Over the Forum's Seventh Cause of Action.

The Forum, by its seventh cause of action, seeks a declaratory judgment that the Museum's copyright interest in the Zapruder film is invalid because the Museum is using that interest to suppress facts. *See* Doc. 1, Compl. ¶¶ 314-21.

But "the Declaratory Judgment Act does not create a cause of action." *Hopkins v. Cornerstone Am.*, No. 4:05-CV-332-Y, 2009 WL 10721229, at *5 (N.D. Tex. June 15, 2009) (Means, J.). Instead, declaratory judgment suits require a recognized, underlying claim or affirmative defense that can actually be litigated. *See id.* at *3 (other citation omitted) (citing *Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984)). Although the Museum challenges the Forum's seventh cause of action for failure to state a claim under Rule 12(b)(6), when a declaratory judgment claim lacks a viable underlying claim, it is properly dismissed for lack of subject-matter jurisdiction. *See id.*

The Forum's seventh cause of action does not identify a recognized claim for relief or affirmative defense as its basis. Without a recognized claim, the Court lacks jurisdiction over the Forum's seventh cause of action and **DISMISSES** it **WITHOUT PREJUDICE.**

 7. The Forum's Eighth Cause of Action States a Valid Claim for Relief.

The Forum, by its eighth cause of action, seeks a declaratory judgment that its use of the Zapruder frames in its book, SCAM, constitutes non-infringing fair use of the Zapruder copyright.

---

[8] Because the Forum's sixth cause of action is legally, not factually, deficient, the Court finds that an opportunity to replead is not warranted and dismisses this claim with prejudice.

*See* Doc. 1, Compl. ¶¶ 322-32. Specifically, the Forum argues that because SCAM utilizes the Zapruder frames for criticism and commentary, it is not infringing on the Museum's purported copyright. *See id.* ¶¶ 325-329.[9]

The Museum contends that the Forum's eighth cause of action fails to state a claim because the Forum has not shown fair use and because fair use is a defense, not a cause of action. *See* Doc. 19, Museum Br., 21-22.

The Forum's eighth cause of action states a valid claim for relief. First, the Forum plausibly alleges that SCAM's inclusion of certain Zapruder frames constitutes fair use. Relevant here, Section 107 of the Copyright Act provides that uses of a copyrighted work for "criticism, comment, news reporting, . . . or research, is not an infringement of copyright." 17 U.S.C. § 107. The statute then identifies four factors that are "especially relevant" in determining whether the use was fair, including (1) "the purpose and character of the use", (2) "the nature of the copyrighted work", (3) the significance of the portion used, and (4) "the effect on the potential market." *See Harper & Row*, 471 U.S. at 560-61 (citing § 107(1)-(4)). The Museum does not address those factors or provide its theory of why SCAM would not constitute fair use. But the Complaint clearly alleges the book's purpose as a "serious criticism of the [Zapruder] film for purposes of examining whether it is truly the Zapruder out-of-camera original." Doc. 1, Compl. ¶ 324. As a criticism or comment on the Zapruder film and its frames, SCAM is the paradigmatic example of fair use under § 107. And for the same reason, SCAM's purpose, character, and nature weigh in favor of fair use. Absent any substantive argument to the contrary, the Forum has plausibly alleged fair use.

---

[9] The Forum also appears to request a declaratory judgment that any future use of the Zapruder film's first-generation copies—currently held by NARA—would also constitute fair use. *See id.* ¶¶ 324, 330-31. Because this would require the Court to speculate on NARA's, the Museum's, and the Forum's future conduct, there is not an actual controversy, and the Forum seeks relief that the Court cannot grant.

Second, as stated above in more detail, the Forum can base its declaratory judgment claims on affirmative defenses. *See Oldham*, 2025 WL 1393867, at *5 & n.21. That fair use is normally raised defensively is of no concern here.

The Forum's eighth cause of action states a plausible claim that SCAM constitutes non-infringing fair use of the Zapruder copyright.

8.    The Forum's Ninth Cause of Action States a Valid Claim for Relief.

The Forum, by its ninth and final cause of action, seeks an injunction requiring NARA to publish certain Zapruder frames online to its electronic reading room. *See* Doc. 1, Compl. ¶¶ 333-45. Specifically, the Forum argues that the Zapruder frames are frequently requested records that NARA must, but did not, publish online. *See id.* ¶¶ 338-39, 341-42. The Forum acknowledges that the Zapruder frames are available in NARA's physical reading room in Maryland; but it posits that FOIA's Reading-Room Provision further requires NARA to make those frames publicly available on NARA's website (in the "electronic" reading room). *See id.* ¶¶ 339, 341.

NARA contends that the Forum's ninth cause of action fails to state a claim. It claims that FOIA's Reading-Room Provision only requires electronic publication for agency records (1) created by an agency (2) after November 1, 1996. Doc. 28, NARA Mot., 6-7. The Zapruder frames, created well before that date by a third party, would thus not be subject to FOIA's *online* publication requirement. *See id.*

The parties have not identified controlling case law on whether the Reading-Room Provision requires online publication of records created before 1996, nor was the Court able to find any through independent research. Nevertheless, general principles of statutory interpretation resolve this question.

As always, the Court starts with the text. In its current form, the Reading-Room Provision's opening line states that "[e]ach agency, in accordance with published rules, shall make available for public inspection *in an electronic format*" various categories of records subject to that provision. § 552(a)(2) (emphasis added). After listing those categories, the Reading-Room Provision then contains a large paragraph of flush language, which states, among other things, that "[f]or *records created on or after November 1, 1996*, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means." *Id.* (emphasis added). The Forum would have the Court focus on the opening line, which applies generally to each category in the Reading-Room Provision, to find that the statute requires NARA to publish the Zapruder film electronically to the online reading room. *See* Doc. 1, Compl. ¶ 338. NARA would have the Court disregard that language and focus instead on the flush language, which only requires agencies to make records available on the internet or other electronic means if those records were created on or after November 1, 1996. *See* Doc. 28, NARA Mot., 6-8. NARA also emphasizes the word "created" in the flush language as indicating that it applies only to agency records created by the agency itself—not all agency records, which would include those created by third parties like Mr. Zapruder. *See id.* at 7-8.

The Court concludes that although the flush language sets publication timing requirements for records created after November 1, 1996, that language cannot be reasonably read as a limitation on the provision's general electronic publication requirements. Instead, the Reading-Room Provision's opening line requires that all frequently requested agency records, regardless of the

timing or circumstances of their origin, be made available for public inspection in an electronic format.

The Court first considers FOIA's amendment history. Congress added the flush language at issue here in 1996—well before the opening line mentioned electronic format requirements. *See* Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, § 4, 110 Stat. 3048 (1996). At that time, there was little room to dispute that the Reading-Room Provision only required electronic publication for records created on or after November 1, 1996. Contemporary legal scholarship and a related House Report recognized as much. *See* H.R. Rep. No. 104-795, at 20 (1996); Michael E. Tankersley, *How the Electronic Freedom of Information Act Amendments of 1996 Update Public Access for the Information Age*, 50 Admin. L. Rev. 421, 428 (1998). DOJ guidance, while recognizing the same, also interpreted the term "created," as further narrowing the electronic publication requirement to documents *created* by the agency, as distinct from documents obtained by the agency from third parties. *OIP Guidance: Amendment Implementation Questions*, *FOIA Update Vol. XVIII, No. 1*, DOJ Office of Info. Pol'y (Jan. 1, 1997), https://www.justice.gov/archives/oip/blog/oip-guidance-amendment-implementation-questions.

But the flush language (including its timing and origin specifications) cannot be plausibly read as a limitation on an agency's other publication obligations. Before Congress added the flush language in 1996, FOIA did not have any electronic publication requirement. The flush language, by its own terms, only created a *new affirmative obligation* for agencies to electronically publish certain records created after November 1, 1996—it was not limiting any other provision.

Then in 2016, without removing the flush language, Congress amended FOIA to add another electronic publication requirement—this time in the Reading-Room Provision's opening

line. *See* FOIA Improvement Act of 2016, Pub. L. No. 114-185, § 2, 130 Stat. 538 (2016). But unlike the flush language, the opening line lacks explicit timing or origin limitations. The opening line mandates that agencies "shall make available for public inspection in an electronic format" any record meeting one of the categories specified in the Reading-Room Provision. *See* § 552(a)(2).

Despite the 2016 amendment and its categorical language, NARA erroneously asserts that any electronic publication requirements in the Reading-Room Provision are limited by the parameters set by the 1996 flush language. But that reading would render Congress's 2016 amendment superfluous. It is a "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Liu v. SEC*, 591 U.S. 71, 89 (2020) (citation omitted). The Court cannot simply ignore the 2016 amendment. On its face, the opening line mandates public electronic format requirements for the entire Reading-Room Provision. That language is meaningless if it does not require anything beyond what the flush language already imposes (only requiring electronic publication for documents created after November 1, 1996). But this is what NARA suggests. Conversely, taking the 2016 amendment at face value (which required that all Reading-Room Provision records be made "available for public inspection in an electronic format") would not render the flush language superfluous. The flush language would still give NARA a one-year buffer to publish electronic records created on or after November 1, 1996. Thus, the Forum's reading better comports with general rules of statutory construction.

Congress must be assumed to know and understand its own legislation's effect. Congress unambiguously inserted, into the Reading-Room Provision's opening line, a requirement that all records subject to that provision be made available in an electronic format. Congress must have been aware of the existing flush language and its scope. But unlike in the flush language, Congress did

not add any date or other limitation to the opening line. The Court must give effect to Congress's chosen language.

Because the Reading-Room Provision's electronic publication requirement applies to all records subjected to that provision—not only those created by an agency after November 1, 1996—the Forum has sufficiently alleged that NARA violated FOIA by failing to electronically publish the Zapruder film. The Forum's ninth cause of action states a valid claim for relief.

## IV.

## CONCLUSION

In sum, the Court **GRANTS** in part and **DENIES** in part the Museum's Motion to Dismiss (Doc. 18). The Forum's first, third, fifth, and seventh causes of action are **DISMISSED** without prejudice. The Forum's sixth cause of action is **DISMISSED WITH PREJUDICE**. The Court **DENIES** NARA's Motion to Dismiss (Doc. 28).

If it so chooses, the Forum may amend its Complaint to address deficiencies in its first, third, and fifth causes of action within **14 days** of the date of this Order.[10]

**SO ORDERED.**

**SIGNED: August 5, 2026.**

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE

---

[10] The Forum does not have leave to amend its sixth cause of action, which was dismissed with prejudice, or its seventh cause of action, over which the court lacks jurisdiction.